UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | |
|---|---|
| KALSHIEX LLC, | Case No.: 25-cv-1283 |
| *Plaintiff*, | |
| vs. | |
| JOHN A. MARTIN, in his official capacity as Secretary of the Maryland Lottery and Gaming Control Commission and Director of the Maryland Lottery and Gaming Control Agency; MARYLAND LOTTERY AND GAMING CONTROL AGENCY; MICHAEL EATON, in his official capacity as Managing Director of Gaming for the Maryland Lottery and Gaming Control Agency; EVERETT D. BROWNING, SR., in his official capacity as Chair of the Maryland Lottery and Gaming Control Commission; E. RANDOLPH MARRINER, in his official capacity as Vice Chair of the Maryland Lottery and Gaming Control Commission; ADE ADEBISI, in his official capacity as Commissioner of the Maryland Lottery and Gaming Control Commission; DIANE CROGHAN, in her official capacity as Commissioner of the Maryland Lottery and Gaming Control Commission; GEORGE L. DOETSCH, JR., in his official capacity as Commissioner of the Maryland Lottery and Gaming Control Commission; HAROLD E. HODGES, in his official capacity as Commissioner of the Maryland Lottery and Gaming Control Commission; JAMES J. STAKEM, in his official capacity as Commissioner of the Maryland Lottery and Gaming Control Commission; MARYLAND LOTTERY AND GAMING CONTROL COMMISSION, | **COMPLAINT FOR PERMANENT INJUNCTION AND DECLARATORY RELIEF** |
| c/o John A. Martin 1800 Washington Blvd., Suite 330 Baltimore, MD 21230 | |

and ANTHONY G. BROWN, in his official
capacity as Attorney General for the State of
Maryland,

      200 St. Paul Place,
      Baltimore, MD 21202

*Defendant*s.

## INTRODUCTION

1.      This action challenges the State of Maryland's intrusion into the federal
government's "exclusive" authority to regulate futures derivatives trading on exchanges overseen
by the Commodity Futures Trading Commission ("CFTC"). 7 U.S.C. § 2(a)(1)(A). Maryland
agencies are seeking to prevent Plaintiff KalshiEX LLC ("Kalshi") from offering event contracts
for trading on its federally regulated exchange. Maryland's attempt to regulate Kalshi intrudes
upon the federal regulatory framework that Congress established for regulating futures
derivatives on designated exchanges. Maryland law is both field-preempted and conflict-
preempted. This Court should therefore issue both a preliminary and a permanent injunction, as
well as declaratory relief to that effect.

2.      Commodity futures regulation has long been under the exclusive purview of the
federal government. In 1936, Congress passed the Commodity Exchange Act ("CEA"), which
enacted a federal regulatory framework for derivatives. In 1974, Congress established a federal
agency called the CFTC to oversee it.

3.      The text, purposes, and statutory history of the CEA leave no question that
Congress sought to preempt state regulation of futures derivatives on exchanges overseen by the
CFTC, known as "designated contract markets" or DCMs. The text of the statute gives the
CFTC "exclusive jurisdiction" over contracts traded on federally regulated exchanges. 7 U.S.C.
§ 2(a)(1)(A). During the CEA's drafting process, Congress deleted a provision that would have
granted states concurrent jurisdiction over futures derivatives. *See* 120 Cong. Rec. 30,464 (Sept.
9, 1974) (statements of Sens. Curtis and Talmadge). One of Congress's avowed goals in creating
the CFTC was to avoid the "chaos" that would result from subjecting exchanges to a patchwork

of 51 different—and potentially conflicting—state laws. *Commodity Futures Trading Commission Act: Hearings Before the Senate Committee on Agriculture & Forestry,* 93d Cong., 2d Sess. 685 (1974) (hereinafter "Senate Hearings") (statement of Sen. Clark). And the statute gives the CFTC comprehensive authority over regulated exchanges, including the authority to approve or reject certain categories of event contracts as against the public interest.

4.      For that reason, courts have easily found state laws preempted in similar contexts. *See, e.g.*, *Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992), *abrogated on other grounds by Time Warner Cable v. Doyle*, 66 F.3d 867 (7th Cir. 1995). The CFTC itself agrees. It informed the U.S. Court of Appeals for the D.C. Circuit just a few months ago that, "*due to federal preemption*, event contracts *never violate state law* when they are traded on a DCM" like Kalshi. CFTC Brief at *27, *KalshiEx LLC v. CFTC*, 2024 WL 4512583 (D.C. Cir. Oct. 16, 2024) (emphasis added).

5.      Three Maryland agencies—the Maryland Lottery and Gaming Control Agency, the Maryland Lottery and Gaming Control Commission, and the Maryland Attorney General's Office—are threatening to intrude on the comprehensive federal scheme for regulating designated exchanges. Kalshi is a federally designated and approved derivatives exchange, subject to the CFTC's exclusive jurisdiction. It offers consumers the chance to invest in many types of event contracts, including, as relevant here, sports-event contracts. These contracts are subject to extensive oversight by the CFTC, and—critically—they are *lawful* under federal law. Three months ago, the CFTC allowed Kalshi's sports-event contracts to take effect without restriction.

6.      Even though Kalshi's contracts are lawful under federal law, Defendants are threatening to shut down these contracts in Maryland "immediately." Exhibit 1, at 2. Defendants' actions would subject Kalshi to the patchwork of state regulation that Congress created the CFTC to prevent and would interfere with the CFTC's exclusive authority to regulate futures derivatives contracts in the exchanges it oversees. For that reason, Defendants' actions are preempted under the Supremacy Clause of the U.S. Constitution—both because Congress has

occupied the entire field of regulating futures derivatives on CFTC-approved exchanges and because Defendants' acts would squarely conflict with federal policy.

7.      Kalshi is aware of no other exchange regulated by the CFTC subject to state law in Maryland or any other state.

8.      Kalshi is entitled to declaratory and injunctive relief to prevent Maryland authorities from enforcing their preempted state laws against Kalshi.

9.      The Maryland authorities' actions threaten immediate and irreparable harm, not just to Kalshi but to its customers.  Shutting down its contracts in Maryland would threaten Kalshi's viability and require devising complex technological solutions whose feasibility is entirely untested and unclear.  Defendants' acts would also impair Kalshi's existing contracts with consumers, subject Kalshi's users to uncertainty and loss, and undermine confidence in the integrity of Kalshi's platform.  For those reasons, concurrently with the filing of this complaint, Kalshi seeks an emergency temporary restraining order and preliminary injunction to avoid immediate and irreparable harm that would result from Defendants' unlawful acts.

10.     The U.S. District Court for the District of Nevada recently granted Kalshi a preliminary injunction in a substantially similar case.  Like the Defendants here, state officials and state agencies in Nevada threatened Kalshi with civil and criminal liability for offering event contracts that were claimed to be contrary to Nevada law.  Kalshi brought suit and sought a preliminary injunction, which the court granted.  The court explained that "because Kalshi is a CFTC-designated DCM, it is subject to the CFTC's exclusive jurisdiction and state law is field preempted." *KalshiEX LLC v. Hendrick*, No. 2:25-cv-00575-APG, 2025 WL 1073495, at *6 (D. Nev. Apr. 9, 2025).  And the court noted that Kalshi faced irreparable harm because it "faces a 'Hobson's choice': if it does not comply with the defendants' demand to cease it faces civil and criminal liability, but if it does comply it will incur substantial economic and reputational harm as well as the potential existential threat of the CFTC taking action against it for violating the CFTC's Core Principles if Kalshi disrupts contracts or geographically limits who can enter contracts on what is supposed to be a national exchange." *Id.* at *7.

11.     The court further noted that other states like Maryland "have sent" Kalshi cease-and-desist letters, which "highlights the problem of allowing the States to regulate a national exchange" because it "raises the possibility that another State would have different rules than not only [] the CFTC, but other States." *Id*. As the court explained, "[p]reventing the difficulties that would create is the reason Congress granted the CFTC exclusive jurisdiction over CFTC-designated exchanges." *Id*.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises under the Supremacy Clause of the United States Constitution. The federal question presented is whether Maryland gambling laws are preempted by the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.*, as applied to Kalshi's event contracts.

13.     The Eleventh Amendment imposes no bar to this Court's jurisdiction in this suit for prospective declaratory and injunctive relief against state officials. The Eleventh Amendment, as construed in *Ex parte Young*, 209 U.S. 123, 160 (1908), allows private plaintiffs "to petition a federal court to enjoin State officials in their official capacities from engaging in future conduct that would violate the Constitution or a federal statute." *Indus. Servs. Grp., Inc. v. Dobson*, 68 F.4th 155, 163 (4th Cir. 2023).

14.     Venue is proper under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2). The Individual Defendants perform their duties, and thus reside, in this District. The Maryland Lottery and Gaming Control Agency and Maryland Lottery and Gaming Control Commission are subject to this Court's personal jurisdiction and thus reside in this district. A substantial part of the events giving rise to the claim occurred in this District.

## PARTIES

15.     Plaintiff Kalshi is a financial services company with its principal place of business in New York. Kalshi operates a derivatives exchange and prediction market where users can buy and sell financial products known as event contracts. Its exchange market is federally regulated

by the Commodity Futures Trading Commission pursuant to the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.*

16.    Defendant John A. Martin is sued in his official capacity as Secretary of the Maryland Lottery and Gaming Control Commission and Director of the Maryland Lottery and Gaming Control Agency.

17.    Defendant Michael Eaton is sued in his official capacity as Managing Director of Gaming of the Maryland Lottery and Gaming Control Agency.

18.    Defendant Everett D. Browning, Sr. is sued in his official capacity as Chair of the Maryland Lottery and Gaming Control Commission.

19.    Defendant E. Randolph Marriner is sued in his official capacity as Vice Chair of the Maryland Lottery and Gaming Control Commission.

20.    Defendant Ade Adebisi is sued in his official capacity as Commissioner of the Maryland Lottery and Gaming Control Commission.

21.    Defendant Diane Croghan is sued in her official capacity as Commissioner of the Maryland Lottery and Gaming Control Commission.

22.    Defendant George L. Doetsch, Jr. is sued in his official capacity as Commissioner of the Maryland Lottery and Gaming Control Commission.

23.    Defendant Harold E. Hodges is sued in his official capacity as Commissioner of the Maryland Lottery and Gaming Control Commission.

24.    Defendant James J. Stakem is sued in his official capacity as Commissioner of the Maryland Lottery and Gaming Control Commission.

25.    Defendant Maryland Lottery and Gaming Control Agency ("MLGCA") is sued as the state agency that regulates the state's casinos and sports wagering entities and is responsible for ensuring that all casinos and sports wagering licensees comply with all regulations before issuing an operation license. The MLGCA oversees licensing, internal controls, auditing and accounting, compliance, and responsible gaming at regulated casinos and sportsbooks in

Maryland. As the state's gaming regulator, the MLGCA has jurisdiction over all persons participating in casino gaming.

26.     Defendant Maryland Lottery and Gaming Control Commission ("MLGCC") is sued as the independent advisory board to the Maryland Lottery and Gaming Control Agency. The MLGCC oversees the work of the MLGCA's staff.

27.     Defendant Anthony G. Brown is sued in his official capacity as Attorney General of Maryland.

28.     Together, defendants John A. Martin, Michael Eaton, Everett D. Browning, Sr., E. Randolph Marriner, Ade Adebisi, Diane Croghan, George L. Doetsch, Jr., Harold E. Hodges, James J. Stakem, as commissioners of MLGCA and MLGCC, and Anthony G. Brown, as Attorney General, would be responsible for enforcing any demand for Kalshi to comply with Maryland state law that is preempted by federal law.

## FACTUAL ALLEGATIONS

**A. An Event Contract—Like Other Derivatives—Is A Recognized Financial Tool To Mitigate Risk.**

29.     Derivatives contracts are financial tools used to mitigate risk and disseminate pricing information. Event contracts are a quintessential example of a derivatives contract—they are a type of option. This form of derivatives contract identifies a future event with several possible outcomes, a payment schedule for the outcomes, and an expiration date. Most commonly, event contracts involve a binary question: Every "yes" position has an equal and opposite "no" position. For example, a derivatives contract might center around whether an earthquake will take place in Los Angeles County before December 31, 2025. A purchaser may trade on either the "yes" or the "no" position on the Los Angeles earthquake contract. If an earthquake does take place in Los Angeles County before the end of the calendar year, then the "yes" positions would be paid out.

30.     Event contracts are traded on an exchange.  Traders exchange positions with other traders in the marketplace.  Importantly, event contracts do not reflect a "bet" against the "house."

31.     The value of an event contract is determined by market forces.  An event contract's price will fluctuate between the time of its creation and the expiration date in accordance with changing market perceptions about the likelihood of the event's occurrence. During that period, individuals can buy and sell the contract at its fluctuating prices.  The ultimate value of an event contract is determined at its expiration date.  If the underlying event occurs, the holder of the "yes" position is entitled to its full value.  But if the underlying event does not occur, the holder of the "no" position gets the payment.

32.     Traders price event contracts by reference to available information at any given time.  If new information comes to light portending an increase in the likelihood of the event's occurrence, then the event contract's price will increase.  The market prices of event contracts thus reflect probabilistic beliefs about whether the underlying event will occur.  Returning to the earthquake example, a "yes" contract that trades at 30 cents reflects that the market believes that there is a 30% chance of an earthquake this year.  The 30% figure can be informed by datapoints that the market deems significant, such as the time since the last earthquake in the area and the frequency of fault line tremors in preceding months surrounding Los Angeles County.

33.     Event contracts are a valuable means to hedge risk against event-driven volatility. Event contracts reflect real-time risk assessment and thus provide a nuanced and finely tuned opportunity for traders to mitigate their exposure on real-world events in an uncertain market. There is no other financial instrument with the unique capability to capture the risks of an event with economic consequences.  A property owner in Los Angeles County might purchase an earthquake event contract because the payoff would offset economic losses in the event an earthquake occurs.

34.     Event contracts should not be mistaken for insurance.  While insurance covers property losses, event contracts can cover a wider range of possible economic fallout like

temporary shelter, a decline in rental income, or short-term cost increases for basic needs due to shortages generated by an earthquake.

35.     Event contracts are also a valuable means of communicating information to the general public because contract prices reflect prevailing market opinions and conditions. Prediction markets thus serve as sensitive information-gathering tools that can provide insights for stakeholders—including businesses, individuals, governments, and educational institutions. The data that is generated through prediction markets can also help to set rates and prices for assets whose value depends on the occurrence or non-occurrence of the underlying event. *See* 7 U.S.C. § 5(a) (derivatives contracts, including event contracts, "are affected with a national public interest by providing" both a means for hedging risk and "disseminating pricing information through trading in liquid, fair and financially secure trading facilities").

**B.  Congress Delegated The Power To Regulate Event Contracts That Are Offered By A Regulated Exchange To The Commodity Futures Trading Commission.**

36.     Futures contracts have long been regulated by the federal government.  In 1936, Congress passed the CEA, which provides for federal regulation of all commodities and futures trading activities and requires that all futures and commodity options are traded on organized, regulated exchanges.

37.     In 1974, Congress established the CFTC as the federal agency empowered to oversee and regulate exchanges under the CEA.  Proponents of the 1974 Act were concerned that the "states . . . might step in to regulate the futures markets themselves[,]" which would lead to the undesired outcome that national futures exchanges might be subject to "conflicting regulatory demands." *Am. Agric. Movement*, 977 F.2d at 1156.  One Senator remarked that "different State laws would just lead to total chaos."  Senate Hearings, 93d Cong., 2d Sess. 685 (1974) (statement of Sen. Clark).  As a solution, the House Committee on Agriculture put "all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned." H.R. Rep. No. 93-975, at 79 (1974).  The Senate reaffirmed the CFTC's exclusive power by deleting a provision of the CEA that would have preserved the

states' authority over futures trading. *See* 120 Cong. Rec. 30,464 (Sept. 9, 1974) (statements of Sens. Curtis and Talmadge).

38.     To offer derivatives for public trading, an entity must seek and receive the CFTC's designation as a contract market. 7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.3(a). An entity must first submit an application to the CFTC detailing how the entity complies with the 23 Core Principles of the CEA. 17 C.F.R. § 38.3(a)(2). Among other things, the proposed contract market must show that it can and will (1) comply with all CFTC requirements imposed by rule or regulation; (2) establish, monitor, and enforce compliance with the rules; (3) list only contracts that are not readily susceptible to manipulation; (4) have the capacity and responsibility to prevent manipulation, price distortion, and disruptions through market surveillance, compliance, and enforcement; and (5) adopt position limitations for each contract to reduce the threat of market manipulation. 17 C.F.R. §§ 38.100, 38.150, 38.200, 38.250, 38.300. Proposed exchanges must provide detailed information demonstrating their capacity to abide by the CEA. 17 C.F.R. § 38.3(a)(2). The CFTC then reviews the application and renders a decision on the purported market's designation within 180 days of submission. 17 C.F.R. § 38.3(a)(2).

39.     Once the CFTC designates an entity as a contract market, the CEA gives the CFTC "exclusive jurisdiction" over the derivatives that are traded on the regulated market. Those derivatives include "accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an 'option', 'privilege', 'indemnity', 'bid', 'offer', 'put', 'call', 'advance guaranty', or 'decline guaranty'), and transactions involving swaps or contracts of sale of a commodity for future delivery." 7 U.S.C. § 2(a)(1)(A). This exclusive jurisdiction extends to "event contracts." *See id.* § 1a(47)(A)(ii), (iv), (vi).

40.     Once an exchange is designated as a CEA-compliant contract market—known as a DCM—the market is subject to an extensive framework for CFTC oversight. Part 38 of Title 17, Chapter 1 of the U.S. Code comprehensively regulates DCMs, ensuring that these markets continue to comply with the CEA. Exchanges must meet detailed requirements to maintain good standing as DCMs. 17 C.F.R. pt. 38. Among other things, DCMs must abide by recordkeeping

requirements that specify the form, manner, and duration of retention. 17 C.F.R. §§ 38.950, 1.31. DCMs must meet reporting obligations such as furnishing daily reports of market data on futures and swaps to the CFTC. 17 C.F.R. § 38.450, pt. 16. Specific liquidity standards, disciplinary procedures, dispute resolution mechanisms, board of directors requirements, auditing demands, and more are also detailed in Part 38. A DCM must adhere to all these requirements to comply with the CEA and remain in good standing before the CFTC. 7 U.S.C. § 7(d); 17 C.F.R. pt. 38. As long as the DCM abides by the requirements set forth in the CEA, it may list contracts on its exchange without pre-approval from the CFTC. Instead, the DCM may self-certify that the contract complies with applicable law by filing a "written certification" with the CFTC at the time of listing. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a). The CFTC may initiate review of any contract under its purview. *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.11(c).

41.     Alternatively, DCMs may submit contracts to the CFTC for approval prior to listing. 7 U.S.C. § 7a-2(c)(4)(A); 17 C.F.R. §§ 40.3(a), 40.11(c). The CFTC "shall approve a new contract" unless the CFTC finds that it would violate the CEA. 7 U.S.C. § 7a-2(c)(5)(B).

42.     The CEA's enforcement process rounds out the comprehensive federal framework that regulates futures derivatives sold on DCMs. The CEA gives the CFTC discretion as to how to police and enforce violations of the CEA for DCMs. The CFTC includes an Enforcement Division, which may initiate investigations and, with the approval of a majority of the CFTC, pursue enforcement actions in federal court or administrative proceedings. If the Division concludes that there has been a violation of the CEA, it may recommend to the Commission that it seek a wide range of enforcement measures, including civil monetary penalties; restitution; disgorgement; the suspension, denial, revocation, or restriction of registration and trading privileges; and injunctions or cease-and-desist orders. *See* CFTC Division of Enforcement, Enforcement Manual (2020), at § 3.3. If the Division suspects that an entity has engaged in criminal violations, the Division may also refer the matter to the Department of Justice or the appropriate state authority for prosecution. *Id.*

43.     The CFTC regulates derivatives in products like "wheat, cotton, rice, corn, [and] oats," as well as "excluded commodities" such as interest rates, certain financial instruments, economic indices, risk metrics, and events. 7 U.S.C. § 1a(9), (19)(i)–(iv). The CFTC regulates event contracts as a type of derivative referencing an "excluded commodity." *See id.* § 1a(47)(A)(ii), (iv), (vi); *see KalshiEX LLC v. Commodity Futures Trading Comm'n*, No. 23-3257 (JMC), 2024 WL 4164694, at *2-3 (D.D.C. Sept. 12, 2024). "Event contracts" are "agreements, contracts, transactions, or swaps in excluded commodities." 7 U.S.C. § 7a-2(c)(5)(C)(i). Events themselves constitute "excluded commodities" under the CEA and are defined as any "occurrence, extent of an occurrence, or contingency" that is "beyond the control of the parties to the relevant contract" and "associated with" financial, commercial, or economic consequences. *Id.* § 1a(19)(iv).

44.     In 2010, Congress amended the CEA to address event contracts specifically. Congress provided that the CFTC "may"—but need not—conclude that event contracts are "contrary to the public interest" if they "involve" an "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i).

**C.  After An Extensive Regulatory Process, The CFTC Registered Kalshi As A Contract Market That Operates Under Federal Law.**

45.     Kalshi is a regulated exchange and prediction market where users can buy and sell event contracts. In 2020, the CFTC unanimously certified Kalshi as a designated contract market, affirming that its platform complied with the CEA. Since then, Kalshi has been fully regulated as a financial exchange under federal law alongside entities such as the Chicago Mercantile Exchange and the Intercontinental Exchange.

46.     Kalshi specializes in event contract trading, offering a secure and federally approved exchange where individual, retail, and institutional participants can hedge their risks on event-based outcomes.

47.     Kalshi offers many kinds of event contracts related to an array of substantive areas such as climate, technology, health, crypto, popular culture, and economics.  For example, Kalshi's platform currently allows users to trade on whether India will meet its 2030 climate goals or whether the market share for electric vehicles will be above 50% in 2030.  Kalshi offers contracts on the outcomes of Supreme Court decisions, congressional votes, weather events, technological benchmarks, markers of cultural influence, and Federal Reserve interest rate decisions.

48.     Among its menu of event contracts, Kalshi offers sports-event contracts.

49.     Kalshi self-certified and began listing sports-event contracts on its exchange on January 24, 2025.  Kalshi's sports-event contracts allow users to place positions on which teams will advance in certain rounds of the NCAA College Basketball Championship or who will win the U.S. Open Golf Championship.  The CFTC declined to restrict Kalshi's sports-event contracts.  Unless and until the CFTC takes action on Kalshi's sports-event contracts, they remain authorized under federal law.

50.     Several other federally regulated exchanges began listing sports-related event contracts around the same time.  In response, the CFTC exercised its power to commence review of a sports-related event contract offered by NADEX/crypto.com—a designated contract market that the CFTC certified under the name HedgeStreet in 2004.  The CFTC initiated its 90-day review period of the sports-related contracts on January 14, 2025.  The CFTC requested that NADEX/crypto.com suspend its sports-related contracts during the pendency of the review.  But the CFTC never made a similar request to Kalshi.

**D. The Maryland Lottery and Gaming Control Commission Threatened Kalshi With State Criminal Action With Regard To Its Sports-Event Contracts.**

51.     On April 7, 2025, the MLGCC sent a Notice to Cease and Desist to Kalshi.  The MLGCC informed Kalshi that its sports-event contracts violated Maryland law, and directed Kalshi to "immediately cease and desist offering" them in the state.  Exhibit 1, at 1.

13

52.    The MLGCC warned that under Maryland law, gaming activities are illegal unless
expressly authorized in the Annotated Code of Maryland, Criminal Law ("Crim. Law") Titles 12
and 13. *Id.* The letter further noted that MLGCC has the "final determination of whether
gaming is operating legally." *Id.* (citing Crim. Law § 12-113).

53.    The MLGCC also noted that "[s]ports wagering" is a legal, authorized gaming
activity in Maryland only "if it is offered and conducted as required by the State's Sports
Wagering law." *Id.* (citing State Government Article ("SG") § 9-1E-01, *et seq.*)  According to
the letter, the Commission approves legal sports wagers in Maryland and retains a broader
responsibility to oversee sports wagering and sports gaming revenue in the state. *Id.* (citing SG §
9-1E-01(j); Code of Maryland Regulations ("COMAR") 36.10.01.02B(24); SG § 9-1E-01(b); SG
§ 9-1E-01(e); SG § 9-1E-01(k); SG § 9-1E-01(i); SG § 9-1E-04(b)(6)(ii); COMAR 36.10.14.01;
SG § 9-1E-04; SG § 9-1E-12).

54.    The MLGCC further described a January 22, 2025 letter that Kalshi sent to the
CFTC regarding an event contract "relating to American sport leagues." *Id.* at 2.  The MLGCC
concluded that those contracts are "indistinguishable from the act of placing a sports wager" as
defined under Maryland law. *Id.*

55.    The MLGCC concluded that by offering its contracts in Maryland, Kalshi was
engaged in business in Maryland, but was unable to find Kalshi on a list of business entities
registered with Maryland's State Department of Assessment and Taxation ("SDAT").  The
MLGCC further noted that failure to register with SDAT would violate Business Regulation §
14-113, Annotated Code of Maryland, which prohibits any "person" from "sell[ing] or offer[ing]
to sell any business opportunity in the State or to any prospective buyer in the State unless the
business opportunity is registered under this subtitle." *Id.*

56.    Concluding that Kalshi "is operating in Maryland and is offering and conducting
what is, in fact, wagering on sporting events" without a sports wagering license issued by the
MLGCC, approval of its "wagers" by the MLGCC, or any other authorization under Maryland
law, the MLGCC directed Kalshi to "immediately cease and desist these illegal offerings in

Maryland." *Id.* The MLGCC's letter further instructed Kalshi to let the MLGCC know "within 15 days of [April 7, 2025] that Kalshi has complied with this notice." *Id.*

57.     Kalshi's counsel acknowledged receipt of the MLGCC's letter by email on the evening of April 7, 2025 and asked for an opportunity to discuss the issues raised therein.  In a written response sent the next day, defendant MLGCC Managing Director of Gaming Michael Eaton stated that the MLGCC required a written response to its letter by April 22, 2025 before it would engage with Kalshi and its counsel.

58.     On April 8, 2025, the U.S. District Court for the District of Nevada preliminarily enjoined Nevada officials from pursuing legal action against Kalshi for offering event contracts in Nevada in a substantially similar case.  *Hendrick*, 2025 WL 1073495, at *8.  The court found that federal law preempts the "field of regulating CFTC-designated exchanges and the transactions conducted on those exchanges." *Hendrick*, 2025 WL 1073495, at *12.  The court explained that Kalshi's contracts are "legal under federal law," and that Nevada's threats of civil and criminal enforcement of state gaming laws against Kalshi establish that Kalshi was likely to incur irreparable harm absent a preliminary injunction.  Under the CEA, the court noted, states that object to Kalshi's sports event contracts "must take that up with the CFTC and Congress" rather than seeking to subject Kalshi to state law that federal law has preempted.  *Id.* at *6-8.

59.     On April 18, 2025, Kalshi's counsel reached out to the MLGCC, offering to discuss the issues raised in the MLGCC's April 7 cease-and-desist letter and the implications of the Nevada court's ruling in the *Hendrick* matter.  Neither the MLGCC, the MLGCA, nor any of their executives, commissioners, or staff responded to Kalshi's outreach.

60.     On April 21, 2025, Kalshi's counsel responded to the cease-and-desist letter in an email to Secretary Martin and Michael Eaton, the state official identified in the cease-and-desist letter as the official to whom follow-up correspondence should be addressed.  Kalshi's email response explained that the "demand in your cease-and-desist letter implicates the very same issues being litigated in federal court in Nevada in a case where Kalshi recently successfully obtained a preliminary injunction enjoining enforcement of state law as preempted by laws duly

15

enacted by the Congress of the United States." Exhibit 2, at 1. The email further explained that state efforts to regulate or prohibit Kalshi's contracts "are preempted under the Supremacy Clause of the U.S. Constitution," and that Maryland "lacks authority to regulate or prohibit Kalshi's event contracts." *Id.* And Kalshi explained that it hoped "you will agree to preserve the status quo and forbear any enforcement against Kalshi pending the outcome of the proceedings in Nevada." *Id.* Noting the imminent cease-and-desist letter deadline, Kalshi noted that "[y]our agreement to preserve the status quo would avoid any need to burden a Maryland court with emergency litigation involving the same issues now under review in Nevada." *Id.* at 2.

61.    Mr. Eaton acknowledged receipt of the email but did not agree to preserve the status quo. Counsel for Kalshi then followed up by telephone and by email with Mr. Eaton to obtain those assurances given the looming cease-and-desist letter deadline. Mr. Eaton responded by email, again declined to provide those assurances, noted that Kalshi had "until April 22, 2025" to comply with the cease-and-desist letter, and added that "we will take appropriate actions based on your response." Exhibit 2. Faced with the specter of imminent enforcement of Maryland civil and criminal law as early as the next day, Kalshi filed this complaint.

### REQUISITES FOR RELIEF

62.    As a result of Defendants' threatened conduct described above, there is an imminent likelihood that Defendants' forthcoming actions will violate the Supremacy Clause of the U.S. Constitution and subject Kalshi and its customers to irreparable harm.

63.    An actual and substantial controversy exists between Plaintiff and Defendants as to their respective legal rights and duties. Defendants' conduct alleged herein will result in irreparable injury to Plaintiffs, including but not limited to criminal liability, economic hardship, and impairment of existing contractual relationships.

64.    Plaintiff has no plain, speedy, or adequate remedy at law to address the wrongs described herein. Plaintiffs therefore seek declaratory and injunctive relief restraining Defendants from enforcing Maryland law that interferes with the operation and function of Plaintiff's futures market described herein.

## COUNT I

### (Supremacy Clause—Preemption By Commodity Exchange Act)

65.     Plaintiff incorporates all prior paragraphs by reference.

66.     The Supremacy Clause, Article VI, Section 2, of the U.S. Constitution provides:

> This Constitution, and the Laws of the United States which
> shall be made in Pursuance thereof; and all Treaties made, or
> which shall be made, under the Authority of the United States,
> shall be the supreme Law of the Land; and the Judges in every
> State shall be bound thereby, any Thing in the Constitution of
> Laws of any State to the Contrary notwithstanding.

67.     The Supremacy Clause mandates that federal law preempt state law in any field over which Congress has expressly or impliedly reserved exclusive authority to the federal government, or where state law conflicts or interferes with federal law.

68.     Congress explicitly gave the CFTC "exclusive jurisdiction" to regulate futures trading on approved exchanges.  7 U.S.C. § 2(a)(1)(A).  Without a unified approach to futures regulation, Congress feared that fragmented and uncoordinated state regulation would lead to "total chaos."  Senate Hearings, 93d Cong., 2d Sess. 685 (1974) (statement of Sen. Clark). Having analyzed the text, purpose, and history of the CEA, courts nationwide have agreed that Congress intended to preempt state law in futures trading on CFTC-regulated exchanges.  *See, e.g., Am. Agric*. *Movement*, 977 F.2d at 1156; *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (Friendly, J.); *FTC v. Ken Roberts Co.*, 276 F.3d 583, 588 (D.C. Cir. 2001); *Jones v. B.C. Christopher & Co.,* 466 F. Supp. 213, 220 (D. Kan. 1979); *Hofmayer v. Dean Witter & Co.,* 459 F. Supp. 733, 737 (N.D. Cal. 1978).

69.     In threatening to enforce R.C. Chapters 2915, 3775, and any rules adopted thereunder against Kalshi, Defendants are impermissibly intruding on the CFTC's exclusive authority to regulate futures trading on CFTC-regulated exchanges.  Indeed, federal law authorizes the CFTC to "determine" whether event contracts involving "gaming" should be

restricted as "against the public interest"—authority that is completely incompatible with parallel state regulation of the same putative subject matter. 7 U.S.C. § 7a-2(c)(5)(C)(i). Because federal law occupies the entire field of regulating futures trading on regulated markets, the threatened actions are field preempted under the Supremacy Clause.

70.    Maryland authorities likewise threatened to deploy Maryland law in a manner that conflicts with federal law and policy. Defendants seek to ban event contracts that federal law and the CFTC have authorized, which would plainly frustrate the CFTC's exclusive authority to regulate its designated exchanges. In addition, complying with Defendants' demand to immediately cease offering event contracts in Ohio would conflict with the federal law governing DCMs and would thus imperil Kalshi's CFTC approval. For that reason, the threatened actions are conflict-preempted under the Supremacy Clause.

71.    Defendants therefore may not enforce Maryland's gambling laws against Kalshi because Kalshi is a federally regulated exchange that operates under the exclusive oversight of the CFTC and its enabling statute, the CEA, 7 U.S.C. §§ 1 et seq.

## PRAYER FOR RELIEF

WHERFORE, Plaintiff Kalshi requests that judgment be entered in its favor and against Defendants as follows:

1.  Enter a judgment declaring that Crim. Law Titles 12 and 13, SG §§ 9-1E-01, 9-1E-03, 9-1E-04, 9-1E-12, COMAR 36.10.01.02B and 36.10.14.01, Business Regulation § 14-113, any rules adopted thereunder, and any other Maryland law that is used in a manner to effectively regulate Plaintiff's designated futures market violates the Supremacy Clause of the United States Constitution as applied to Plaintiff, and a declaratory judgment under 28 U.S.C. §§ 2201-2202 saying the same;

2.  Enter both a preliminary and permanent injunction prohibiting Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from Crim. Law Titles 12 and 13, SG §§ 9-1E-01, 9-1E-03, 9-1E-04, 9-1E-12, COMAR 36.10.01.02B and

36.10.14.01, Business Regulation § 14-113, any rules adopted thereunder, or any other Maryland law that attempts to effectively regulate Plaintiff's futures market, against Plaintiff;

3. Any other relief within this Court's discretion that it deems just and proper.

Dated this 21st day of April, 2025.          /s/ *Neal Kumar Katyal*

Neal Kumar Katyal (D. Md. Bar No. 21694)
Joshua B. Sterling (pro hac vice pending)
William E. Havemann (D. Md. Bar No. 19164)
Milbank LLP
1850 K Street, Suite 1100
Washington D.C. 20006
Telephone: 202-835-7505
Facsimile: 213-629-5063

Mackenzie Austin (pro hac vice pending)
Milbank LLP
2029 Century Park East, 33rd Floor
Los Angeles, California 90067
Telephone: 424-386-4000
Facsimile: 213-629-5063

ATTORNEYS FOR PLAINTIFF