**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

| | |
|---|---|
| KALSHIEX LLC, | Case No.:  25-cv-01283 |
| *Plaintiff,* | |
| | **PLAINTIFF'S MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF AN IMMEDIATE TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| vs. | **(ORAL ARGUMENT REQUESTED)** |
| JOHN A. MARTIN, et al., | |
| *Defendants.* | |

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

BACKGROUND ....................................................................................................3

    A.    The Exclusive Federal Scheme For Regulating Futures Markets On
Regulated Exchanges ...............................................................................3

    B.    Kalshi's Registration As A CFTC-Designated Contract Market Under
Federal Law ..............................................................................................6

    C.    The Maryland Regulatory Scheme For Gaming...........................................7

ARGUMENT ..........................................................................................................8

    A.    Kalshi Is Likely To Succeed Because Maryland's Gaming Laws Are
Preempted By The CEA And Its Implementing Regulations.............................9

        1.    Maryland Laws Are Field-Preempted As Applied To Kalshi's
Event Contracts. ..............................................................................9

        2.    Maryland Laws Are Conflict-Preempted As Applied To Kalshi.............13

    B.    Kalshi Will Suffer Irreparable Harm Without A TRO And Preliminary
Injunction.................................................................................................17

    C.    The Balance Of The Equities And Public Interest Favor A TRO And
Preliminary Injunction. ...........................................................................19

    D.    No Security—Or Only A *De Minimis* Security—Is Appropriate.......................20

CONCLUSION.......................................................................................................20

Plaintiff Kalshi moves this Court for an immediate temporary restraining order and preliminary injunction against Defendants John A. Martin, Michael Eaton, Everett D. Browning, Sr., E. Randolph Marriner, Ade Adebisi, Diane Croghan, George L. Doetsch, Jr., Harold E. Hodges, James J. Stakem, the Maryland Lottery and Gaming Control Agency, the Maryland Lottery and Gaming Control Commission, and Anthony G. Brown. This Motion is based upon the pleadings on file herein, including Plaintiff's Complaint, the memorandum of points and authorities contained in this document, all documents on file in this action including exhibits and affidavits, and any further arguments presented.

## INTRODUCTION

The Maryland Lottery and Gaming Control Commission ("MLGCC") is unconstitutionally threatening to prohibit trading of Plaintiff KalshiEX LLC's ("Kalshi") sports-event contracts in Maryland, even though those contracts are authorized by the Commodity Futures Trading Commission ("CFTC")—the federal agency that Congress endowed with "exclusive jurisdiction" to regulate trading on federally designated exchanges like Kalshi. The MLGCC's actions threaten irreparable harm to Kalshi and its users, and unless these actions are enjoined, will result in the sort of state-by-state patchwork of regulation that Congress sought to prevent when it subjected CFTC-regulated exchanges to exclusive federal regulation. A temporary restraining order and preliminary injunction are warranted—and desperately needed now.

The U.S. District Court for the District of Nevada recently agreed. On April 9, 2025, the court granted Kalshi's motion for a preliminary injunction against Nevada gaming authorities to prevent them from enforcing state law against the same event contracts that Maryland targeted in its cease-and-desist letter. Chief Judge Gordon found that the Commodity Exchange Act ("CEA") establishes a comprehensive federal framework for regulating commodity futures trading. As a CFTC-designated contract market that offers event contracts on its exchange, Kalshi "is subject to the CFTC's exclusive jurisdiction and state law is field preempted." *KalshiEX LLC v. Hendrick*, No. 2:25-cv-00575-APG, 2025 WL 1073495 at *6 (D. Nev. Apr. 9, 2025). Chief Judge Gordon further noted that other states—like Maryland—have sent Kalshi

cease-and-desist letters, which "highlights the problem of allowing the States to regulate a national exchange." *Id.* at *7. Preventing the "difficulties" that would arise from many different states subjecting Kalshi to conflicting rules "is the reason Congress granted the CFTC exclusive jurisdiction over CFTC-designated exchanges." *Id.*

Much like the Nevada authorities, Maryland authorities recently issued a letter demanding that Kalshi halt access to event contracts for users in Maryland and citing possible criminal enforcement if Kalshi refuses. Just as in Nevada, Maryland's attempt to regulate trading on a federally regulated exchange is preempted by federal law. Kalshi filed this action accordingly, seeking prospective relief to prevent Defendants—the MLGCC, its Commissioners, the Maryland Lottery and Gaming Control Agency ("MLGCA"), its Directors, and the Maryland Attorney General—from enforcing preempted state laws against Kalshi.

But immediate action is required to avoid irreparable harm to Kalshi and its users. The MLGCC ordered Kalshi to cease offing its event contracts in Maryland no later than April 22— one day after this motion is filed. As the Nevada district court recognized, state cease-and-desist letters confront Kalshi with a "Hobson's choice"—either face "civil and criminal liability," or "incur substantial economic and reputational harm as well as the potential existential threat of the CFTC taking action against it for violating the CFTC's Core Principles[.]" *Hendrick*, 2025 WL 1073495, at *7. Thus, without immediate relief, Kalshi will incur irreparable harm no matter how it responds to Defendants' unconstitutional demand. Kalshi respectfully requests that this Court issue a temporary restraining order and preliminary injunction enjoining Defendants from enforcing preempted state laws against Kalshi.

Kalshi endeavored in good faith to reach an accommodation with Defendants upon receipt of the cease-and-desist letter. Counsel for Defendants, however, declined to meet with counsel for Kalshi, and instead requested a written response. After counsel for Kalshi responded in writing, counsel for Defendants declined to provide the assurances Kalshi requested that Defendants would not carry out the threat of liability as early as the following day. Exhibit 2. Instead, counsel for Defendants reiterated the April 22 deadline and stated: "we will take

appropriate actions based on your response." *Id.*  Counsel for Kalshi therefore informed counsel for Defendants of our intent to file this suit and to seek a TRO and preliminary injunction. Counsel for Defendants did not agree to preserve the status quo for the short period necessary for this Court to convene a hearing on a preliminary injunction.  Kalshi therefore respectfully requests that this Court issue a TRO immediately for the maximum 14 days allowed by Rule 65(b)(2) and schedule a hearing on the preliminary injunction as soon as is practicable thereafter. In Kalshi's view, given the absence of harm to Defendants from injunctive relief, either no security or only a *de minimis* security is needed under Fed. R. Civ. P. 65(c).  Kalshi will serve Defendant's counsel by email with the complaint and this motion immediately, followed by formal service in the normal course.

## BACKGROUND

### A.    The Exclusive Federal Scheme For Regulating Futures Markets On Regulated Exchanges

Derivative contracts are financial tools that traders use to mitigate risk.  *See KalshiEX LLC v. Commodity Futures Trading Comm'n*, No. CV 23-3257 (JMC), 2024 WL 4164694, at *1-2 (D.D.C. Sept. 12, 2024).  Event contracts are a type of derivative contract—they are financial instruments that identify a future event with several possible outcomes, a payment schedule for the outcomes, and an expiration date.  *Id.* at *2.  Event contracts are typically traded on an exchange, and their value is determined by market forces.  *Id.*  This means the price of an event contract fluctuates from the time of its creation to its expiration according to the changing likelihood of the event's occurrence, creating a uniquely sensitive financial instrument that tracks real-world market perceptions.  *Id.*  During the period of a contract, individuals can buy and sell the contract at its changing prices; no user is locked into a contract and may trade her contract in accordance with her desire to hedge her risk.  Compl. ¶ 31.  The ultimate value of an event contract is determined at its expiration date—most commonly, the event's occurrence or a set date upon which the contract terminates.  *See KalshiEx*, 2024 WL 4164694, at *2.  For example, a property owner on the Gulf Coast may place a position on whether a hurricane will strike the

area in 2025. *Id.* If a hurricane strikes, the property owner will receive the ultimate value of the contract and can thereby hedge risk by offsetting losses incurred due to the hurricane. *Id.*

Congress passed the CEA in 1936 to regulate the derivatives market and a series of amendments in 1974. Compl. ¶¶ 36, 37. The amendments established the CFTC, which Congress created as the federal agency empowered to oversee and regulate exchanges under the CEA. One of Congress's principal goals "was to put all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned." *Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992), *abrogated on other grounds by Time Warner Cable v. Doyle*, 66 F.3d 867 (7th Cir. 1995); *see also Hendrick*, 2025 WL 1073495, at *6.

The CFTC's regulatory framework is extensive, comprehensive, and exclusive. To obtain approval from the CFTC, an exchange must first apply for and receive the CFTC's designation as a contract market. 7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. §§ 38.3(a). The exchange's application must detail its capacity to comply with all CFTC rules and regulations through a series of written submissions and exhibits. 17 C.F.R. § 38.3(a)(2). The CFTC then reviews the application and renders a decision on the exchange's designation. *Id.*

Once the CFTC designates an entity as a contract market—known as a "DCM"—the CFTC has "exclusive jurisdiction" over derivatives traded on the market, including "accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an 'option', 'privilege', 'indemnity', 'bid', 'offer', 'put', 'call', 'advance guaranty', or 'decline guaranty'), and transactions involving swaps or contracts of sale of a commodity for future delivery." 7 U.S.C. § 2(a)(1)(A). This exclusive jurisdiction extends to "event" contracts. *See id.* § 1a(47)(A)(ii), (iv), (vi).

DCMs are subject to the CFTC's extensive regulatory framework as set out in Part 38 of Title 17 of the U.S. Code and in CFTC regulations. Together, these provisions establish a comprehensive scheme for regulating DCMs. *See Hendrick*, 2025 WL 1073495, at *3-*4 (summarizing CFTC's regulatory scheme).

The CEA prescribes a specific method by which the CFTC may approve new contracts on DCMs.  A DCM that abides by the requirements set forth in the CEA may list contracts on its exchange without pre-approval from the CFTC by self-certifying that the contracts comply with CFTC requirements.  7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a).  The contracts are immediately effective unless and until the CFTC initiates review of any contract.  *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.11(c).  The CFTC "shall approve a new contract" unless the CFTC finds that it would violate the CEA or CFTC regulations.  7 U.S.C. § 7a-2(c)(5)(B).  If a DCM offers a contract in violation of the CEA or CFTC regulations, the CFTC has an array of enforcement mechanisms, including but not limited to revocation of licensing, civil penalties, and referral for criminal enforcement.

The CEA contains a "Special Rule" addressing event contracts.  The Special Rule authorizes the CFTC to review and prohibit specific types of event contracts that it determines to be "contrary to the public interest."  7 U.S.C. § 7a-2(c)(5)(C)(i).  The CEA provides that the CFTC "may"—but need not—deem event contracts contrary to the public interest if they "involve":

    (I)      activity that is unlawful under any Federal or State law;
    (II)    terrorism;
    (III)   assassination;
    (IV)   war;
    (V)    gaming; or
    (VI)   other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest.

*Id.*; *see also* 17 C.F.R. § 40.11(a)(1)–(2) (implementing Special Rule).  The decision to prohibit an event contract that falls within any of these categories is subject to the CFTC's evaluation of the "public interest."  *See KalshiEX*, 2024 WL 4164694, at *3 ("[T]he CFTC may determine that an agreement, contract, or transaction is contrary to the public interest only if it involves" one of the enumerated categories.).  The Special Rule further provides that no contract "determined by the Commission to be contrary to the public interest . . . may be listed or made available for clearing or trading on or through a registered entity."  7 U.S.C. § 7a-2(c)(5)(C)(ii).

B.    **Kalshi's Registration As A CFTC-Designated Contract Market Under Federal Law**

In 2020, the CFTC unanimously certified Kalshi as a DCM that offers event contracts, affirming that its platform complied with the CEA's regulatory requirements.  *See KalshiEX LLC*, 2024 WL 4164694, at *4.  Since then, Kalshi has been fully regulated as a DCM under federal law alongside entities like the Chicago Mercantile Exchange and the Intercontinental Exchange.  Compl. ¶ 45.

Because Kalshi is a DCM, its event contracts are subject to the "exclusive jurisdiction" of the CFTC.  7 U.S.C. § 2(a)(1)(A).  As a result of being a DCM, Kalshi is required by federal law to comply with a host of federal requirements designed to ensure market integrity.  An exchange's status as a DCM "imposes upon it a duty of self-regulation, subject to the Commission's oversight," requiring the exchange to "enact and enforce rules to ensure fair and orderly trading, including rules designed to prevent price manipulation, cornering and other market disturbances."  *Am. Agric. Movement*, 977 F.2d at 1150–51.

Kalshi offers many kinds of event contracts related to climate, technology, health, crypto, popular culture, sports, politics, and economics.  Compl. ¶ 47.  For example, Kalshi's platform currently allows users to trade on whether India will meet its 2030 climate goals or whether the market share for electric vehicles will be above 50% in 2030.

Of particular importance here are Kalshi's sports-event contracts.  Kalshi self-certified and listed sports-related contracts on its exchange on January 24, 2025, allowing users to place positions on, for example, which teams will advance in certain rounds of the NCAA College Basketball Championship or who will win the U.S. Open Golf Tournament.  Compl. ¶ 49.  Kalshi's sports-event contracts were effective upon self-certification, and the CFTC has declined to review them.  *Id.*  Thus, Kalshi's sports-event contracts are legal under federal law.  *Id.*  While federal law requires the CFTC to prohibit contracts it considers "gaming" if it concludes those contracts are contrary to the public interest, the CFTC has declined to prohibit Kalshi's contracts.

Kalshi's sports-event contracts involve the outcomes of sporting events, but there are crucial differences between Kalshi's exchange and a sportsbook that justify the very different

regulatory models under which they function.  A financial exchange is an investment marketplace where traders enter into contracts with other traders—not with a casino or "house" that stacks the odds in its own favor.  Affidavit of Xavier Sottile ¶¶ 25-26.  Kalshi operates a nationwide marketplace that facilitates complex interstate transactions between traders.  For that reason, federal law as enforced by the CFTC focuses on preventing market manipulation and disruption and ensuring market efficiency nationwide.  *See* 17 C.F.R. §§ 38.250, 38.15; *see Am. Agric. Movement*, 977 F.2d at 1156.

### C.    The Maryland Regulatory Scheme For Gaming

Maryland Lottery and Gaming Control Agency ("MLGCA") is the state agency that regulates Maryland's casinos and sports wagering entities and is responsible for ensuring that all casinos and sports wagering licensees comply with all regulations before issuing an operation license.  Compl. ¶ 25.  The MLGCA oversees licensing, internal controls, auditing and accounting, compliance, and responsible gaming at regulated casinos and sportsbooks in Maryland.  *Id.*  As the state's gaming regulator, the MLGCA has jurisdiction over all persons that participate in casino gaming.  *Id.*  The Maryland Lottery and Gaming Control Commission ("MLGCC"), by contrast, serves as the independent advisory board to the MLGCA.  The MLGCC oversees the work of the MLGCA's staff.  *Id.* ¶ 26.

 Particularly relevant to the present dispute are Maryland's laws on sports wagering. Maryland requires that any entity that offers or conducts sports wagering seek a license from the MLGCC.  *See* SG § 9-1E-01(e), (k); *id.* § 9-1E-03(b).  Maryland law defines "sports wagering" to include "exchange wagering."  *Id.* § 9-1E-01(j).  It defines an "exchange wager" as "a wager in which a bettor wagers with or against another bettor through a sports wagering licensee." Code of Maryland Regulations ("COMAR") 36.10.01.02B(24).  Offering sports gaming in Maryland in a manner that violates the state's gaming laws exposes any violators to civil and criminal penalties.  *See* Crim. Law § 12-102(b); COMAR 36.10.01.02B(53); Maryland Business Regulation § 14-110(c)(1)(vi).

As far as Kalshi's counsel is aware, the MLGCC had never attempted to require a state license from a DCM until this case. On April 7, 2025, however, the MLGCC sent a cease-and-desist letter to Kalshi's counsel, claiming that Kalshi's sports-event contracts are "indistinguishable" from sports wagers, rendering Kalshi's operations in Maryland illegal. Exhibit 1, at 2. The MLGCC demanded that Kalshi cease and desist its "illegal offerings" in Maryland within 15 days of its receipt of the letter—April 22. *Id.*

The MLGCC's demand that Kalshi cease its sports-event contracts, and the specter of imminent enforcement of Maryland civil and criminal law, subjects Kalshi and its users to immediate harm. It requires Kalshi either to subject itself to the possibility of criminal liability, or else cut off Maryland from its contracts immediately. Cutting off contracts to Maryland users would create massive technical challenges and would also risk serious harm to Kalshi's users, who would be forced to liquidate their positions immediately or otherwise lose access to their capital. Affidavit of Xavier Sottile ¶¶ 12, 29-31, 37. Because the MLGCC lacks authority to intrude on the CFTC's exclusive jurisdiction to regulate Kalshi's event contracts, Kalshi brought suit seeking prospective relief. Kalshi now respectfully seeks a TRO and preliminary injunction to prevent the irreparable and immediate harm created by Defendants' actions.

## ARGUMENT

Kalshi is entitled to a TRO and a preliminary injunction. Fed. R. Civ. P. 65 governs the issuance of both forms of relief, and the legal standards for a temporary restraining order and preliminary injunction are "essentially the same." *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 32 (2008) (quotation omitted). In both instances, the moving party must demonstrate that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of relief; (3) the balance of equities tips in its favor; and (4) the injunction is in the public interest. *Id.* at 20. For the same reasons the District of Nevada recently granted Kalshi a preliminary injunction in a similar case, Kalshi meets each element of the inquiry.

**A.    Kalshi Is Likely To Succeed Because Maryland's Gaming Laws Are Preempted By The CEA And Its Implementing Regulations.**

A "fundamental principle of the Constitution" is that "Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000).  Federal law can preempt state law either expressly or impliedly.  One manner of implied preemption is known as field preemption, which occurs where Congress manifests an intent to exclusively occupy an entire field of regulation.  *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982).  Alternatively, federal law can preempt state law where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," known as conflict preemption.  *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).

It is well-settled that the CEA and its implementing regulations have "resulted in the preemption of all other would-be regulators at every level of government."  Philip F. Johnson, *The Commodity Futures Trading Commission Act: Preemption as Public Policy*, 29 VAND. L. REV. 1, 2 (1976).  Maryland state gaming law is no exception.

1.    Maryland Laws Are Field-Preempted As Applied To Kalshi's Contracts.

Field preemption exists where a federal regulatory scheme is "so pervasive as to make reasonable the inference that [it] left no room for the States to supplement it."  *de la Cuesta*, 458 U.S. at 153 (quotation omitted).  "[T]he ultimate touchstone of pre-emption analysis" is the "purpose of Congress."  *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992).  Congress's intent to occupy a field can be apparent in the statutory text and history.  *See, e.g.*, *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203-13 (1983).  Courts can also infer field preemption from a statutory scheme that "provide[s] a full set of standards . . . designed [to function] as a 'harmonious whole.'"  *Arizona v. United States*, 567 U.S. 387, 401 (2012) (quoting *Hines*, 312 U.S. at 72).  "Where Congress occupies an entire field . . . even *complementary* state regulation is impermissible."  *Id.* (emphasis added).

As the Nevada District Court held, the statutory text, purpose, history, and comprehensive regulatory framework of the CEA clearly evince Congress's intent to occupy the

field of futures trading on CFTC-regulated exchanges.  *Hendrick*, 2025 WL 1073495, at *6.  For that reason, the MLGCC's effort to subject Kalshi to criminal and civil liability based on its sports-event contracts is preempted.

_Statutory Text_:  The text of the 1974 Act to amend the CEA could hardly be clearer. Congress established the CFTC and granted it "*exclusive jurisdiction*" over all "accounts," "agreements," and "transactions involving swaps or contracts of sale of a commodity for future delivery" that are "traded or executed on a contract market designated" by the CFTC.  7 U.S.C. § 2(a)(1)(A) (emphasis added).  Kalshi's event contracts are traded on a contract market designated by the CFTC, and the CFTC therefore has "exclusive jurisdiction" to regulate them.

Congress in the 1974 Act did not preempt regulation of *all* derivatives contracts.  Instead, Congress cabined federal preemption to contracts traded *on DCMs*.  The statute preserves concurrent state regulation for commodities and futures contracts traded *outside of DCMs*.  7 U.S.C. § 16(e); H.R. Rep. No. 97-565, pt. 1, at 43 (1982) (acknowledging that federal and state agencies may police "those who offer fraudulent *off-exchange* investments" and other "transactions *outside* those preserved exclusively for the jurisdiction of the CFTC").  Thus, federal preemption of Maryland law as to Kalshi does not call into question the state's regulation of casinos or other gaming establishments, none of which are DCMs.

For CFTC-designated exchanges like Kalshi, however, the CFTC has "exclusive jurisdiction."  7 U.S.C. 2(a)(1)(A).  Courts have easily found that statutes containing similar language preempt parallel state law regulation.  *See Slaney v. The Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 594-95 (7th Cir. 2001).  The Nevada District Court recently granted Kalshi a preliminary injunction on the ground that the statute's "plain and unambiguous language grants the CFTC exclusive jurisdiction" over contracts and swaps "that are traded or executed on exchanges that the CFTC has designated."  *Hendrick*, 2025 WL 1073495, at *5.  And the CFTC itself informed the D.C. Circuit a few months ago, "*due to federal preemption*, event contracts *never violate state law* when they are traded on a DCM" like Kalshi.  CFTC Brief at *27, *KalshiEx LLC v. CFTC*, 2024 WL 4512583 (D.C. Cir. Oct. 16, 2024) (emphasis added).

10

*Statutory Purpose*:  Congress in the 1974 Act sought to regulate the rapidly growing commodity futures market, and also sought to prevent exchanges from being subjected to fragmented regulatory demands that could differ from one jurisdiction to the next.  One "aim" of the 1974 Act was to "avoid unnecessary, overlapping and duplicative regulation."  *FTC v. Ken Roberts Co.*, 276 F.3d 583, 588 (D.C. Cir. 2001).  As one sponsor of the 1974 Act explained, "different State laws would just lead to total chaos."  *Commodity Futures Trading Commission Act: Hearings Before the Senate Committee on Agriculture & Forestry,* 93d Cong., 2d Sess. 685 (1974) (hereinafter "Senate Hearings") (statement of Sen. Clark).

Congress thus placed "all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned."  H.R. Rep. No. 93-975, at 79 (1974). The Conference Report confirmed Congress's intent to preempt the field:  "Under the exclusive grant of jurisdiction to the Commission, the authority in the Commodity Exchange Act (and the regulations issued by the Commission) *would preempt the field insofar as futures regulation is concerned*."  Senate Comm. on Agriculture, Nutrition and Forestry, 93d Cong., 2d Sess., *Commodity Futures Trading Comm'n Act of 1974*, at 11 (Comm. Print 1974) (emphasis added).

Courts agree that Congress intended to preclude states from exercising parallel authority over commodity futures trading in exchanges designated by the CFTC.  *See, e.g.*, *Hendrick*, 2025 WL 1073495, at *6.  The MLGCC's effort to regulate Kalshi's event contracts cannot be reconciled with that clear congressional purpose.

*Drafting history*:  The drafting history of the 1974 Act eliminates all doubt as to Congress's intent to preempt state laws like those Defendants have threatened to enforce against Kalshi.  While considering the 1974 amendments, the Senate deleted a provision which would have preserved states' authority over futures trading, stating instead that "where the jurisdiction of the Commodity Futures Trading Commission is applicable, it supersedes State as well as Federal agencies."  S. Rep. No. 93-1131, at 23 (1974); 120 Cong. Rec. 30,464 (Sept. 9, 1974) (statements of Sens. Curtis and Talmadge).  "Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory

11

language that it has earlier discarded in favor of other language." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987). The Senate's decision to delete the provision allowing concurrent state jurisdiction is yet further proof of Congress's intent to preempt parallel state regulation.

*Comprehensive regulatory scheme*: The "comprehensive" nature of the regulatory scheme Congress created for DCMs is further evidence that Congress intended to foreclose concurrent state jurisdiction. *See Arizona*, 567 U.S. at 401.

As the Supreme Court has found and the District of Nevada recently reaffirmed, the CEA establishes "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 356 (1982) (quoting H.R. Rep. No. 93-975, at 1 (1974)); *Hendrick*, 2025 WL 1073495, at *6-8. An exchange may only offer futures contracts after undergoing an extensive review process and receiving the CFTC's designation as a DCM. 7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.100. Once an exchange is designated as a DCM, the CFTC enjoys "exclusive jurisdiction" over the derivatives traded on the market. 7 U.S.C. § 2(a)(1)(A). DCMs are subject to an extensive framework of CFTC oversight, involving recordkeeping requirements, 17 C.F.R. §§ 38.950, 1.31, reporting obligations, *id.* § 38.450, pt. 16, liquidity standards, *id.* § 38.1101(a)(2), and penalties for noncompliance, *id.*, pt. 38. And Congress elected to allow DCMs to list contracts— including event contracts—by self-certifying that they comply with the CEA's requirements. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a). Congress then gave the CFTC the back-end authority to conduct a review of contracts that it believes may run afoul of any statute or regulation. *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.11(c). Failure to abide by the CFTC's determinations can result in civil and criminal penalties, which the CFTC may pursue at its discretion.

Of particular relevance here, the CEA specifically authorizes the CFTC to reject event contracts if the Commission deems them to be "contrary to the public interest" and if they "involve" an "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). The statute

12

is not mandatory—the CFTC "may" conclude that the contract is against the public interest if it falls within one of the enumerated categories. *Id.* But if the CFTC concludes that the contract would be contrary to the public interest, the contract may not be listed. Congress thus left the decision about the public interest to one federal authority—not 50 separate states.

Congress further dictated an enforcement role for states—but that role expressly *excludes* the right to enforce state laws against DCMs. The CEA authorizes appropriate officials "of any State" to bring suit regarding "any act or practice constituting a violation of any provision of this chapter or any rule … of the [CFTC] thereunder"—but a proviso to this section allows states to enforce the CEA against parties "*other than a [designated] contract market.*" 7 U.S.C. § 13a-2(1) (emphasis added). Congress thus did not want states to bring enforcement actions against DCMs under federal law—let alone under the *state's own law*. Congress further made clear that the CEA does not "supersede or preempt" the application of state law to entities that are "required to be registered or designated" with the CFTC but "fail or refuse" to do so. 7 U.S.C. § 16(e). In other words, Congress granted the CFTC exclusive power to regulate contracts traded on the exchanges it oversees but permitted other federal and state authorities to police "those who offer fraudulent *off-exchange* investments" and other "transactions *outside* those preserved exclusively for the jurisdiction of the CFTC." H.R. Rep. No. 97-565, pt. 1, at 43 (1982) (emphasis added). Congress's decision to authorize states to enforce certain federal and state laws in the derivatives context *but not against DCMs* is plainly inconsistent with the view that Congress nonetheless intended to allow states to enforce their gambling laws against DCMs. The comprehensive regulatory scheme for regulating futures contracts traded on licensed exchanges evinces a strong congressional intent to preempt the field.

2.  Maryland Laws Are Conflict-Preempted As Applied To Kalshi.

Maryland's gaming laws are also conflict-preempted as applied to Kalshi because they "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" as evidenced in the CEA. *Hines*, 312 U.S. at 67. Conflicts may exist with respect

13

to "the practical result of the state law," as well as "the means that a state utilizes to accomplish the goal." *United States v. Alabama*, 691 F.3d 1269, 1296 (11th Cir. 2012). "If the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress within the sphere of its delegated power." *Crosby*, 530 U.S. at 373-74 (citation omitted). In at least four respects, subjecting Kalshi's contracts to Maryland law would "undermine[] the intended purpose and 'natural effect'" of the federal scheme for regulating CFTC-designated exchanges. *Id.* at 373.

First, Congress passed the 1974 Amendments to the CEA to bring futures markets regulation "under a uniform set of regulations." *Am. Agric. Movement*, 977 F.2d at 1156. "As Congress recognized in enacting the 1974 Act, a contract market could not operate efficiently, and perhaps not at all, if varying and potentially contradictory legal standards governed its duties to investors." *Id.* The Seventh Circuit has thus held that "[w]hen application of state law would directly affect trading on or the operation of a futures market, it would stand 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' and hence is preempted." *Id.* at 1156-57 (citation omitted).

The MLGCC's actions clearly conflict with Congress's goal to avoid subjecting regulated exchanges to multiple conflicting legal regimes. The MLGCC intends to deploy state laws to regulate Kalshi's contract market—exactly what Congress did not want states to regulate. The conflict is even clearer when considering the possibility that 49 other states and the District of Columbia might equally attempt to subject Kalshi to their own state laws. This outcome would plainly erect "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines,* 312 U.S. at 67; *see Hendrick,* 2025 WL 1073495 at *7 ("Preventing the difficulties" created by multiple state enforcement efforts "is the reason Congress granted the CFTC exclusive jurisdiction over CFTC-designated exchanges.").

Second, a state law stands as an "obstacle" to a federal regulatory scheme if Congress chooses a specific enforcement method to achieve federal goals and a state law adopts a different

14

method of enforcement that hampers "the careful balance struck by Congress." *Arizona*, 567 U.S. at 406.  In particular, where Congress "entrust[s]" the federal government with "discretion" over violations of federal law, a state regime that allows for state enforcement regarding the same actions "creates an obstacle to the full purposes and objectives of Congress" and is "preempted by federal law." *Id.* at 407-10.  Otherwise, a state could bring charges against an individual "even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies." *Id.* at 402.

That is exactly the risk posed by the MLGCC's actions here.  Under federal law, once Kalshi was approved as a CFTC-designated contract market, Kalshi was authorized to list its event contracts for trading by self-certifying them.  The CFTC had the authority to review that self-certification if it concluded that these contracts involved "gaming" and were "contrary to the public interest," 7 U.S.C. § 7a-2(c)(5)(C)(i), but did not.  Compl. ¶ 49.  The CFTC's Enforcement Division has authority to investigate and initiate enforcement actions seeking an array of penalties in federal court or administrative proceedings, but, again, chose not to do so. *See* CFTC Division of Enforcement, Enforcement Manual (2020) at § 3.3.  Congress thus gave the CFTC a variety of tools for enforcing federal law against DCMs and entrusted the CFTC with discretion to pursue the penalties it deems most appropriate.

Subjecting federally regulated exchanges to state laws like Maryland's would disrupt "the congressional calibration of force." *Crosby*, 530 U.S. at 380.  Maryland criminal law imposes penalties that would substantially interfere with the CFTC's discretion.  For example, Maryland authorities threatened Kalshi with violations of Maryland law carrying penalties of fines and *imprisonment*. *See e.g.,* Maryland Crim. Law § 12-102(b); *see* Exhibit 1, at 1-2.  Absent a finding of preemption, the carefully calibrated federal enforcement scheme would be displaced by a blunt application of mandatory state criminal penalties. *See Crosby*, 530 U.S. at 373-74 (finding conflict preemption where state regulatory scheme "undermin[ed]" congressional "delegation of effective discretion" to the executive).

15

_Third_, the CFTC has already authorized Kalshi's event contracts by declining to restrict them after Kalshi self-certified them. Compl. ¶ 49. Federal law authorizes DCMs like Kalshi to offer event contracts. _See_ 7 U.S.C. § 1a(47)(A)(ii), (iv), (vi). Kalshi self-certified and began listing sports-event contracts on its exchange earlier this year. Pursuant to 7 U.S.C. § 7a-2(c)(2), the CFTC was authorized to "stay[] the certification" of these event contracts to allow for CFTC review if it concluded that the contracts involved gaming and were contrary to the public interest. The CFTC chose not to exercise that discretion, however, and thereby authorized these contracts in February 2025. Compl. ¶ 49. To this day, sports-related contracts on Kalshi's exchange are legal under federal law, and unless and until the CFTC attempts to restrict those contracts, they will remain so. But the MLGCC now claims the authority to regulate Kalshi based on its assessment of state public policy, which is in direct conflict with the CFTC's evaluation of the public interest. Allowing Maryland—not to mention the other 49 states—to substitute the CFTC's judgment about the public interest with state law would create a direct conflict.

_Fourth_, the MLGCC's demands conflict with the CFTC Core Principles on which Kalshi's designation as a CFTC-approved market depends. The CFTC's Core Principle 2 requires Kalshi to "provide its members, persons with trading privileges, and independent software vendors with _impartial access_ to its markets and services." 17 C.F.R. §§ 38.150, 38.151(b) (emphasis added). Cutting off Maryland residents from Kalshi's platform—including residents with ongoing investments—would be in tension with that principle. Core Principle 4 also requires Kalshi to "establish and maintain risk control mechanisms to prevent and reduce the potential risk of _price distortions and market disruptions_." _Id._ § 38.255 (emphasis added). Again, abruptly closing Kalshi's event contracts to anyone located in Maryland could constitute exactly that sort of market disruption. Depending on the CFTC's interpretation of its Core Principles, it could well be "impossible for [Kalshi] to comply with both state and federal law"— the paradigmatic case for preemption. _Crosby_, 530 U.S. at 372.

16

**B.    Kalshi Will Suffer Irreparable Harm Without A TRO And Preliminary Injunction.**

As the District of Nevada concluded, "Kalshi has met its burden of showing a likelihood of irreparable harm." *Hendrick*, 2025 WL 1073495, at *7. The MLGCC's cease-and-desist letter threatens Kalshi with a classic "Hobson's choice"—either "continually violate state law and expose [itself] to potentially huge liability," or "suffer the injury of obeying the law during the pendency of the proceedings and any further review." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). Kalshi suffers irreparable harm along several dimensions.

*First*, if Kalshi chooses not to comply with the MLGCC's unconstitutional threats, Kalshi and its officers face the extraordinary harms associated with the threat of civil liability and criminal prosecution. The Supreme Court has recognized that a party facing the threat of imminent enforcement under a preempted state statute suffers "irreparable injury" warranting an injunction. *Id.* "A credible threat of imminent prosecution for a state violation that conflicts with federal law can establish a likelihood of irreparable harm." *Hendrick*, 2025 WL 1073495, at *7; *see also Valle del Sol v. Whiting, Inc.*, 732 F.3d 1006, 1029 (9th Cir. 2013) (a "credible threat of prosecution" under a preempted statute imposes irreparable harm). Indeed, the threat of criminal liability is already harming Kalshi. One of Kalshi's partners has already declined to roll out a partnership with Kalshi as a direct response to a similar cease-and-desist letter. Affidavit of Xavier Sottile ¶ 47. Thus, the cease-and-desist letter alone suffices to prove irreparable harm.

*Second*, attempting to comply with the MLGCC's unconstitutional threat would subject Kalshi to extensive harms that could not be remedied even if it ultimately prevailed in this litigation. Kalshi has over 17,000 users in Maryland, many of whom have open investments on the platform. *Id.* ¶ 46. If Kalshi complied with the MLGCC's unconstitutional threat during the pendency of this litigation, it would forego business in this market, without any prospect of recouping its losses even if it ultimately prevails. Moreover, it is not at all clear that Kalshi has the capacity to comply with the threat to cease "immediately" as the MLGCC demands and any attempt at complying would subject Kalshi to extraordinary technological challenges and costs. *Id.* ¶¶ 11-12. Kalshi has no need currently to comprehensively geolocate its users on a state-by-

17

state basis because it is regulated federally rather than state-by-state.  *Id.* ¶ 17.  Attempting to

implement geolocation capabilities would take months and cost tens of millions of dollars

annually.  *Id.* ¶¶ 20-21; *see Hendrick*, 2025 WL 1073495, at *7 ("Kalshi presents credible

evidence that even if it could implement geofencing at great expense, it could not do so

immediately as the defendants demanded.").  And because the Eleventh Amendment permits

only *injunctive relief* against state officials enforcing unconstitutional state law, Kalshi would

have no clear way of seeking damages against Defendants if it ultimately prevailed.  *See Ex*

*parte Young*, 209 U.S. at 155; *McBurney v. Cuccinelli*, 616 F.3d 393, 399 (4th Cir. 2010).

    *Third*, a TRO and preliminary injunction are needed not just to protect Kalshi, but also

Kalshi's users.  Users who trade on Kalshi's platform often enter into sports-event contracts with

other users.  Immediately shuttering access to these contracts for Maryland users could require

Kalshi unilaterally to terminate users' contracts and liquidate their positions, or to pause trading

on these contracts pending the outcome of litigation months or more in the future.  Affidavit of

Xavier Sottile ¶ 28.  Under either scenario, this would be an extraordinary and disruptive act,

harming users nationwide—cutting off access to users in one state would substantially distort the

markets even for users in other states.  Such an impairment of existing contractual obligations for

Kalshi's users easily constitutes irreparable harm.  *See Steves & Sons, Inc. v. JELD-WEN, Inc.*,

612 F. Supp. 3d 563, 596 (E.D. Va. 2020) (inability to fulfill existing contractual obligations to

customers constitutes irreparable harm).

    *Fourth*, no matter how Kalshi responds to the MLGCC's unconstitutional threat, it will

face irreparable reputational harm if no injunction is granted.  If Kalshi chooses not to comply on

the ground that Maryland law is plainly preempted, the threat of prosecution—not to mention

being labelled a willful violator of Maryland law—would undermine the sterling reputation that

Kalshi has cultivated over many years and that resulted in Kalshi being the first event market

designated by the CFTC.  But bowing to the MLGCC's threat by abruptly ending its business in

Maryland would undermine users' confidence in Kalshi's exchange and make them fear that

their own investments are at risk.  This loss of "goodwill" could not easily be regained even if

Kalshi ultimately prevails and constitutes a distinct form of irreparable harm. *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.,* 22 F.3d 546, 552 (4th Cir. 1994), *abrogated in part on other grounds by Winter*, 555 U.S. at 20 ("[W]hen the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied.").

*Fifth*, the MLGCC's demands jeopardize Kalshi's status as a CFTC-designated contract market—and thus pose an existential threat to Kalshi. Abruptly terminating its event-based contracts in Maryland would be in tension with the CFTC Core Principles to which Kalshi is subject, including the obligation to provide "impartial access" to its markets, 17 C.F.R. § 38.151(b), and the obligation to reduce the risk of "market disruptions," *id.* § 38.255. Should the CFTC conclude that closing Kalshi's markets in Maryland violates federal law, it could seek to revoke Kalshi's designation. 7 U.S.C. § 8(b). A TRO and preliminary injunction are needed to prevent Kalshi from suffering that irreparable harm during the pendency of this litigation.

### C. The Balance Of The Equities And Public Interest Favor A TRO And Preliminary Injunction.

As the District of Nevada held, "[t]he balance of hardships tips in Kalshi's favor given that it is facing substantial monetary expenditures, reputational damage, or civil and criminal prosecution based on the defendants' demands that the defendants likely cannot make because they are preempted." *Hendrick*, 2025 WL 1073495, at *7. And the public interest likewise favors Kalshi because "the public undoubtedly has an interest in seeing its governmental institutions follow the law." *Roe v. Dep't of Defense*, 947 F.3d 207, 230-31 (4th Cir. 2020) (quotation marks omitted). The public has a first-order interest in ensuring that preempted Maryland laws are not enforced against DCMs. Maryland retains no reciprocal interest because it lacks any interest in enforcing a state law that is preempted. *See Arizona*, 567 U.S. at 401.

Beyond that, the failure to issue an injunction here would "reach beyond the parties involved directly in the suit and impact on the public's right[s]." *Thompson v. U.S. Dep't Of Hous. & Urb. Dev.*, 404 F.3d 821, 826 (4th Cir. 2005) (quotation omitted). Immediate

compliance with Maryland law to avoid criminal penalties will harm Kalshi's users in Maryland because their "contracts and investment expectations would be disrupted if Kalshi were forced to terminate its existing contracts." *Hendrick*, 2025 WL 1073495, at *8. And, as the District of Nevada recognized, abruptly terminating contracts in one state "may impact counterparties to those contracts who are" located out of the state. *Id.*; *see also* Affidavit of Xavier Sottile ¶¶ 11-27. An abrupt cessation would make it difficult to inform users in Maryland of their rights and obligations regarding ongoing event contracts and would risk cutting off users' access to their investments on Kalshi's exchange. *Id.* ¶¶ 28-36. Given that the Maryland laws are clearly preempted by federal law as applied to Kalshi, the balance of the equities and consideration of the public interest firmly favor a TRO and preliminary injunction.

### D. No Security—Or Only A *De Minimis* Security—Is Appropriate.

Federal Rule of Civil Procedure 65(c) requires a party seeking a TRO or preliminary injunction to "give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." "[T]he district court has discretion to set the bond amount in such sum as the court deems proper . . . ." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999) (quotation marks omitted). Defendants will suffer no nonspeculative damage by halting enforcement against Kalshi during the pendency of this litigation. Accordingly, no security is needed. *See Doctor's Associates, Inc. v. Stuart,* 85 F.3d 975, 985 (2d Cir.1996) (affirming decision not to require bond). Alternatively, should the Court require a security, only a *de minimis* security is warranted. The District of Nevada, for example, ordered Kalshi to provide "a de minimis $10,000 bond." *Hendrick*, 2025 WL 1073495, at *8.

### CONCLUSION

For the foregoing reasons, the Court should grant a temporary restraining order and a preliminary injunction.

Dated this 21st day of April, 2025.

/s/ *Neal Kumar Katyal*

Neal Kumar Katyal (D. Md. Bar No. 21694)
Joshua B. Sterling (pro hac vice pending)
William E. Havemann (D. Md. Bar No. 19164)
Milbank LLP
1850 K Street, Suite 1100
Washington D.C. 20006
Telephone: 202-835-7505
Facsimile: 213-629-5063

Mackenzie Austin (pro hac vice pending)
Milbank LLP
2029 Century Park East, 33rd Floor
Los Angeles, California 90067
Telephone: 424-386-4000
Facsimile: 213-629-5063

ATTORNEYS FOR PLAINTIFF

21