# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| KalshiEX, LLC | * | |
| *Plaintiff* | * | Case No.: 25-cv-1283-ABA |
| | * | |
| v. | * | |
| John A. Martin, et al., | * | |
| *Defendants*. | * | |
| | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION
## FOR PRELIMINARY INJUNCTION

ANTHONY G. BROWN
Attorney General of Maryland

ERIK J. DELFOSSE
Federal Bar No. 18881
Assistant Attorney General
Maryland Lottery and Gaming Control Agency
1800 Washington Boulevard
Suite 330
Baltimore, Maryland 21230

MAX F. BRAUER
Federal Bar No. 30162
Assistant Attorney General
Securities Division
200 Saint Paul Place
25th Floor
Baltimore, Maryland 21202

Attorneys for Defendants, John A. Martin, Maryland Lottery and Gaming Control Commission, Maryland Lottery and Gaming Control Agency, Everett D. Browning, Sr., E. Randolph Marriner, Ade Adebisi, Diane Croghan, George L. Doetsch, Jr., Harold E. Hodges, and James J. Stakem, and Anthony G. Brown

May 9, 2025

# TABLE OF CONTENTS

Page

Introduction ................................................................................................................1

Background ................................................................................................................2

   I.  Kalshi's Gaming Devices Are Sports Wagering. ...............................................2

  II.  Maryland Regulates Sports Wagering to Protect the Public Interest ..........................3

 III. The Commodity Futures Trading Commission Regulates Commodity Futures and Swaps, Not Sports Wagering. ....................................................................5

 IV. Maryland Directs Kalshi to Cease and Desist Unlicensed Sports Wagering ......................8

Standard of Review ................................................................................................................9

Argument ................................................................................................................9

   I.  Kalshi Is Unlikely to Prevail on the Merits Because Its Gaming Devices Are Not Within the Exclusive Jurisdiction of the CFTC. .................................................10

      A. Kalshi's Illegal Gaming Devices Are Outside of the CFTC's Exclusive Jurisdiction Because They Are Not Commodity Futures or Swaps. ..........................10

          1.  Kalshi's Gaming Devices Are Not Commodity Futures. .....................................11

          2.  Kalshi's Gaming Devices Are Not Swaps Within the Ordinary Meaning of 11the CEA, Canons of Statutory Interpretation, or the CEA's Legislative History .........................................................................12

               a.  Kalshi's Gaming Devices Are Unrelated to Any Potential Financial, Economic, Or Commercial Consequence ......................................................12

               b.  Gaming Devices Cannot Be "Swaps" Under Numerous Canons of Statutory Interpretation. ................................................................15

               c.  Legislative History Confirms that Sports Gaming Contracts Are Not Swaps ......................................................18

      B. The CTFC Has Expressly Prohibited Gaming Devices from Being Offered on a DCM. ................................................................20

          1.  § 40.11 Prohibits Listing any Contract Involving Gaming. .....................................21

i

      2.   The Court May Enforce the Provisions of Regulation 40.11(a)(1). ......................22

      3.   Self-Certifying Otherwise Prohibited Contract on a DCM Does Not Foreclose Judicial Review of the Listing. ..............................................................23

   C.  The CTFC Has Expressly Prohibited Gaming Devices from Being Offered on a DCM   …………………………………………………………………24

II.  Any Harm Kalshi May Suffer As A Result Of The Cease And Desist Letter Was Of Its Own Making. .....................................................................................................26

III. The Balance of the Hardships in This Matter Favors the Protection of Maryland's Citizens and Businesses. ...........................................................................................28

Conclusion ......................................................................................................................

# TABLE OF AUTHORITIES

**CASES**                                                                                               Page

*Age of Majority Educ. Corp. v. Preller*, 512 F.2d 1241 (4th Cir. 1975).........................................26

*Ah Sin v. Wittman*, 198 U.S. 500 (1905) ...............................................................................24

*Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chicago*, 977 F.2d 1147 (7th Cir. 1992).. 19

*Amador Cnty. v. Salazar*, 640 F.3d 373 (D.C.Cir.2011).......................................................23

*Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712 (9th Cir. 2003)..............................24

*Bates v. Dow Agrosciences LLC*, 544 U.S. 431 (2005)............................................................24

*Beecham v. United States*, 511 U.S. 368 (1994) .....................................................................16

*Bruesewitz v. Wyeth, Inc.*, 561 F.3d 233 (3rd Cir. 2009) .......................................................24

*Casa De Maryland v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684 (4th Cir. 2019) ...................22

*CFTC v. McDonnell*, 287 F.Supp.3d 213 (E.D. N.Y. 2018)......................................................5

*Coreas v. Bounds*, 451 F. Supp. 3d 407 (D. Md. 2020)..........................................................28

*Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*, 583 U.S. 416 (2018)............................................18

*DTCC Data Repository (U.S.) LLC v. United States Commodity*
    *Futures Trading Comm'n*, 25 F. Supp. 3d 9 (D.D.C. 2014)...........................................7, 18, 23

*Epic Sys. Corp. v. Lewis*, 584 U.S. 497 (2018)......................................................................15

*FTC v. Ken Roberts Co.*, 276 F.3d 583 (D.C. Cir. 2001) .......................................................25

*Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173 (1999).........................24

*Harrell v. University of Md. Sch. of Pharmacy*, WL 2155023 (D. Md. May 13, 2024)................9

*Heckler v. Chaney*, 470 U.S. 821, 828 (1985) .......................................................................22

*Ind. Mich. Power Co. v. Dep't of Energy*, 88 F.3d 1272 (D.C. Cir. 1996)..................................14

*Inv. Co. Inst. v. U.S. CFTC*, 891 F. Supp. 2d 162 (D.D.C. 2012)...........................................6, 7

*Johnson v. Collins Entm't Co., Inc.*, 199 F.3d 710 (4th Cir. 1999)............................................27

*KalshiEX LLC v. CFTC*, 2024 WL 397419 (D.D.C.) ...............................................................27

*KalshiEX LLC v. CFTC*, 2024 WL 4802698 (D.C. Cir.)............................................12-13, 20, 27

*KalshiEX, LLC v. Flaherty, et al.,* 2025 WL 1218313 (D. N. J. April 28, 2025)......................13, 21

*KalshiEX, LLC v. Hendrick*, 2025 WL 1073495 (D. Nev. Apr. 9, 2025).................10, 11, 21, 22

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) ...............................................22, 23

*Low Tide Brewing, LLC v. Tideland Mgmt. LLC*, 2021 WL 1381123 (D.S.C. Apr. 12, 2021) ..... 9

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) ......................................................................24

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982)...............................5

*Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453 (2018) ........................................3, 18, 24

*Nken v. Holder*, 556 U.S. 418 (2009) ...................................................................................28

*Pennsylvania v. Navient Corp.*, 967 F.3d 273 (3d Cir. 2020) ...................................................24

*Perrin v. United States*, 444 U.S. 37 (1979) .........................................................................13

*Precision Instrument Manufacturing Co. v. Automotive*
    *Maintenance Machinery Co.,* 324 U.S. 806, (1945) ...................................................................28

*R. J. Hereley & Son Co. v. Stotler & Co.*, 466 F. Supp. 345 (N.D. Ill. 1979) ...............................5

*RadLAX Gateway Hotel, LLC v. Amalgamated*
    *Bank*, 566 U.S. 639 (2012).............................................................................................16

*Roe v. Department of Def.*, 947 F.3d 207 (4th Cir. 2020) ....................................................28-29

*Wisconsin Cent. Ltd v. United States*, 585 U.S. 274 (2018) ...................................................... 13
*Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680 (3d Cir. 2016) ........................................ 24
*Smith v. Cessna Aircraft Co.*, 124 F.R.D. 103 (D. Md. 1989) .............................................. 26, 28
*Sprint Nextel Corp. v. FCC*, 508 F.3d 1129 (D.C.Cir.2007) .................................................... 26
*United States v. Weiss*, 52 F.4th 546 (3d Cir. 2022) ................................................................ 17
*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ..................................................... 9
*WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292 (4th Cir. 2009) .. 24
*Wyeth v. Levine*, 555 U.S. 555 (2009) ...................................................................................... 24
*Yates v. United States*, 574 U.S. 528 (2015) ........................................................................... 16

## **STATUTES**

18 U.S.C. § 1084(a)-(b) ...................................................................................................... 15, 21
25 U.S.C. § 2702(1) .................................................................................................................. 16
25 U.S.C. § 2703(8) ............................................................................................................ 15, 21
25 U.S.C. § 2710(d)(1) ....................................................................................................... 12, 21
28 U.S.C. § 3702 .................................................................................................................... 3, 21
7 U.S.C. § 1a(9) ..................................................................................................................... 5, 12
7 U.S.C. § 1a(13) ....................................................................................................................... 12
7 U.S.C. § 1a(15) ......................................................................................................................... 6
7 U.S.C. § 1a(19) ....................................................................................................................... 12
7 U.S.C. § 1a(47) ................................................................................................................. *passim*
7 U.S.C. § 2(a)(1) ........................................................................................................... 12, 13, 26
7 U.S.C. § 7a-2(c) ............................................................................................................... *passim*
Md. Code Ann., Crim. Law § 12-113 ....................................................................................... 15
Md. Code Ann., Crim. Law § 12-104 .................................................................................... 4, 21
Md. Code Ann., St. Gov., § 9-1E-01(j) ...................................................................................... 4
Md. Code Ann., St. Gov., § 9-1E-03 .................................................................................... 4, 21

## **LEGISLATIVE HISTORY**

73 Fed. Reg. 25,671 (May 7, 2008) .......................................................................................... 19
156 Cong. Rec. S5902, ......................................................................................................... 19-20
156 Cong. Rec. S5906 ................................................................................................................ 8
40 Fed. Reg. 25849, 25850 (June 19, 1975) .............................................................................. 7
Pub. L. No. 111-203 § 722, 124 Stat. 1376, 1672 ................................................................ 7, 18
Pub. L. No. 93-463, § 207, 88 Stat. 1389, 1400 (1974) ....................................................... 6, 18
S. Rep. No. 93-1131, 1974 U.S.C.C.A.N. 5843, 5856 (1974) .............................................. 6, 11

## **REGULATIONS**

17 C.F.R. § 38.3 ................................................................................................ 2

17 C.F.R. § 40.2 ................................................................................................ 7

17 C.F.R. § 40.11 ...................................................................................... *passim*

25 C.F.R. § 502.4 ...................................................................................... 16, 22

COMAR 36.10.01.02.B ..................................................................................... 4

## **OTHER AUTHORITIES**

1 J. Pomeroy, *A Treatise on Equity Jurisprudence* § 397 (4th ed. 1918) .................................... 28

Black's Law Dictionary (12th ed. 2024) ........................................................... 6

44 Harv. J. on Legis. 39 (2007) ...................................................................... 16

## INTRODUCTION

As it has done in other states, Kalshi is attempting to circumvent Maryland's robust regulation of sports wagering by labelling the placement, purchase, and sale of sports wagers on Kalshi's market as "event contracts" and claiming that federal preemption prohibits Maryland from regulating Kalshi's sports wagering business. Preemption, however, simply doesn't apply. First, Kalshi's sports wagering contracts ("gaming devices") are not within the "exclusive jurisdiction" of the Commodity Futures Trading Commission ("CFTC") because they are neither "swaps" nor "contracts of sale of a commodity for future delivery" under the Commodity Exchange Act ("CEA").[1] Kalshi's gaming devices are not swaps or commodity futures within the ordinary meaning of the text, the application of several canons of statutory interpretation, and an examination of its legislative history. Second, even if they were "swaps" or commodity futures, Kalshi's gaming devices are specifically prohibited by CFTC regulation from being listed on a designated contract market. Since Kalshi's gaming devices are prohibited from such listing, they are outside the CFTC's exclusive jurisdiction, and Maryland may regulate them. Kalshi, and two previous district courts, did not address, and cannot satisfy these predicate issues.

Kalshi's preemption arguments are a red-herring to distract this Court from the fact that its gaming devices are prohibited under federal law and illegal under Maryland law. In previous court filings, Kalshi admitted that the term "gaming," as it is used in the CEA and the CFTC's regulations, was intended to include sports wagering. Based on its disregard for the applicable law, any Hobson's choice facing Kalshi as a result of the Cease and Desist letter was of its own making, and it should not be rewarded for its misconduct with injunctive relief. The balance of

---

[1] 7 U.S.C. §§ 1 – 27f.

the hardships in this matter favors the protections of Maryland's citizens and businesses against unlicensed sports wagering. As such, Kalshi's Motion should be denied.

## BACKGROUND

### I.    KALSHI'S GAMING DEVICES ARE SPORTS WAGERING.

Kalshi is a financial services company that operates a derivatives exchange and prediction market. ECF 1 at ¶15. Its exchange market has been approved as a designated contract market ("DCM")[2] by the CTFC. *Id.* On its DCM, Kalshi offers "event contracts" for public trading *Id.* A subset of Kalshi's event contracts are gaming devices that provide for the placement, purchase, and sale of sports wagers on Kalshi's exchange. *Id.* at ¶ 48. For all event contracts, Kalshi collects a transaction fee based on the value of the contract when it is traded. Exhibit 1, Kalshi Fee Schedule.

As a subset of its event contracts, Kalshi offers gaming devices that permit wagers on the outcome of sporting events to be offered and traded on its market. ECF 1 at ¶¶ 48, 49. Kalshi has marketed its gaming devices as "Betting on Kalshi, the first app for legal sports betting in all 50 states," "Sports Betting Legal in all 50 States," "Kalshi: The First Nationwide Legal Sports Betting Platform." Exhibit 2, Dustin Gouker, *Ten Times Kalshi Said People Could Bet On Things* (April 3, 2025) at 3, 6, 8;[3] Daniel Wallach, *Kalshi's Nevada Court Win May Be Short-Lived Due To Federal Wire Act Ban On Sports Betting*, Forbes (Apr. 15, 2025), https://perma.cc/W2J7-4JVF (captured Apr. 22, 2025). As with its other event contracts, these gaming devices present a binary

---

[2] To offer derivative contracts for public trading, an entity must seek and receive the CTFC's designation as a contract market. ECF 1 at ¶ 38 (citing 7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.3(a)).

[3] Kalshi highlights that its gaming devices permit sports wagering in Texas and California. Exhibit 2 at 3. Both states, however, currently prohibit sports wagering. Tex. Penal Code Ann. § 47.01-14; Cal. Penal Code §§ 330-337z.

choice for traders on its market. ECF 1 at ¶¶ 47-49.  Similar to traditional sportsbooks, individuals purchase one of two outcomes for a sporting event based on a speculative prediction as to who will win the event. Exhibit 3, Affidavit of Michael Eaton at ¶¶ 8, 9.   In a manner similar to cashing out a sports wager before the outcome of a game occurs, Kalshi permits traders to sell their interest in gaming devices prior to the underlying contest being completed.  *Id.* at ¶ 10.

Kalshi states that it differs from traditional sports wagering because "[t]raders do not bet against the house but rather enter into contracts with other traders on an exchange." ECF 2-1 at ¶ 26.  Serving a similar function as the "the house" in a traditional sportsbook, however, Kalshi relies on its selected "market makers" to provide liquidity for its event contracts and to act "as the counterparty to trades, thereby guaranteeing that there is almost always someone on the other side of a transaction."   Kalshi Help Center, *Market Maker Program*, https://help.kalshi.com /markets/market-maker-program (last visited May 8, 2025).  According to Kalshi, "[t]here are perks to being a market maker including but not limited to financial benefits, reduced fees, differing position limits, and enhanced access." *Id.*   As they have admitted in its advertising, Kalshi's gaming devices are sports wagering, and calling them "sports event contracts" does not change that fact.

## II.    MARYLAND REGULATES SPORTS WAGERING TO PROTECT THE PUBLIC INTEREST.

In 2018, the Supreme Court issued its ruling in *Murphy* overruling PASPA[4] and permitting states to legalize sports wagering within their boundaries.  *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 486 (2018).  Maryland voters approved sports wagering by a constitutional referendum in 2020 and in December 2021 sportsbooks first offered sports wagering in the State. Exhibit 4. Affidavit of John Martin at ¶ 5.  Maryland currently has over 20 authorized sportsbooks

---

[4] The Professional and Amateur Sports Protection Act, 28 U.S.C. § 3702

operating within the State. In its first full year of operation, sports wagering delivered over $60 million in revenue to the State. *Id.* at ¶¶ 3-4. This revenue was directed to the Blueprint for Maryland's Future Fund, which supports public education programs. *Id.* at ¶ 3.

Maryland has an extensive statutory and regulatory framework governing the conduct of sports wagering within its borders. Ann. Code of Md., St. Gov. ("SG"), §§ 9-1E-01 *et seq.* and Code of Maryland Regulations ("COMAR"), Chapter 36, Title 10. Maryland defines "sports wagering" as:

> the business of accepting wagers on any sporting event by any system or method of wagering, including single-game bets, teaser bets, parlays, over-under, moneyline, pools, exchange wagering, in-game wagering, in-play bets, proposition bets, and straight bets.

SG, § 9-1E-01(j). "Exchange wagering" is when a "bettor wagers with or against another bettor through a sports wagering licensee." COMAR 36.10.01.02.B(24). Under Maryland law, it is illegal to conduct sports wagering business without the appropriate sports wagering license. Md. Code Ann., St. Gov., § 9-1E-03(b), § 9-1E-04(b)(6)(ii); Md. Code Ann., Crim. Law § 12-104.

Maryland's regulation of lawful sports wagering is comprehensive. Applicants for a sports wagering license undergo an extensive investigatory process to determine their integrity and financial stability. Exhibit 6, Affidavit of J. Philip Metz, Jr. at ¶¶ 4, 8-12. Once licensed, the Agency ensures that licensees have the required safeguards and internal controls in place. Exhibit 3 at ¶¶ 4-6. Licensees must comply with the technical standards set by the Agency, including geofencing to ensure that sports wagering in Maryland is limited to those individuals actually present in Maryland at the time their wager is made. *Id.* at ¶ 19. Maryland also has significant regulatory requirements regarding responsible gaming to ensure that those conducting sports wagering in Maryland do not prey on individuals suffering from gaming addiction. *Id.* at ¶¶ 13-14; Exhibit 4 at ¶¶ 17, 18.

4

### III.    THE COMMODITY FUTURES TRADING COMMISSION REGULATES COMMODITY FUTURES AND SWAPS, NOT SPORTS WAGERING.

The Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1, *et seq.*, provides federal regulation focused primarily on commodity futures. "Commodity" under the CEA includes agricultural products such as wheat, cotton, rice, corn, butter, eggs, livestock, and "all other goods and articles . . . and all services, rights, and interests . . . in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. § 1a(9). The CEA is a Depression Era statute enacted in 1936 as a successor to the Grain Futures Act, designed to control trading in agricultural commodities – other goods, services, rights, and interests were added later.

Congress amended the CEA in 1974 to create the Commodity Futures Trading Commission ("CFTC") and grant the CFTC "exclusive jurisdiction" over commodity futures traded on registered exchanges. History of the CFTC: US Futures Trading and Regulation Before the Creation of the CFTC, https://www.cftc.gov/About/HistoryoftheCFTC/history_precftc.html (last visited May 6, 2025); History of the CFTC: CFTC History in the 1970s, https://www.cftc.gov/About/HistoryoftheCFTC/history_1970s.html (last visited May 7, 2025); *CFTC v. McDonnell*, 287 F.Supp.3d 213, 225 (E.D. N.Y. 2018). The Supreme Court has explained that this exclusive-jurisdiction provision was "intended only to consolidate federal regulation of commodity futures trading in the Commission" and to "separate the functions of the [CFTC] from those of the [SEC] and other regulatory agencies." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 386–87 (1982). Its purpose was "to remedy the confusion about whether certain types of commodities transactions came within the definition of a security and thus subject to regulation under the securities laws." *R. J. Hereley & Son Co. v. Stotler & Co.*, 466 F. Supp. 345, 347 (N.D. Ill. 1979).

Notably, the 1974 amendments did not give the CFTC exclusive jurisdiction over "swaps" or "event contracts."  Rather, by adopting the 1974 amendments, Congress affirmed the CEA's core concern to regulate "[f]utures trading" – "purchases and sales of contracts for delivery at some future date of certain quantities of specified commodities at fixed prices." S. Rep. No. 93-1131, 1974 U.S.C.C.A.N. 5843, 5856 (1974); *see, e.g.,* Futures Contract, Black's Law Dictionary (12th ed. 2024) ("An agreement to buy or sell a standardized asset (such as a commodity, stock, or foreign currency) at a fixed price at a future time, usu. during a particular time of a month.")

Commodity futures are a type of derivative. A derivative is a financial instrument or contract whose price is "directly dependent upon (i.e.[,] derived from)" the value of one or more underlying assets—for example, commodities (like corn and wheat), securities, or debt instruments. *See Futures Glossary: A Guide to the Language of the Futures Industry*, CFTC, https://perma.cc/63HY-DD7E (last visited May 9, 2025). Derivatives "provide a way to transfer market risk or credit risk between two counterparties." *Inv. Co. Inst. v. U.S. Commodity Futures Trading Comm'n*, 891 F. Supp. 2d 162, 168 n.3 (D.D.C. 2012) (citations omitted).

Commodity futures are traded on a DCM, the statutory name for a registered futures exchange.  All contracts on a DCM are required to be "cleared," which generally means that, following a transaction in the contract, a central counterparty assumes the obligations of both parties to the contract, thereby assuming associated credit risk. *Cf.* 7 U.S.C. § 1a(15).  The requirements to list contracts on DCMs have changed over time. From 1974 to 2000, the CEA required DCMs to demonstrate to the CFTC that their contracts satisfied an "economic purpose test," and were not contrary to the public interest before they could trade their contracts.  *See* Pub. L. No. 93-463, § 207, 88 Stat. 1389, 1400 (1974) (codified at 7 U.S.C. § 7(7) (1994)); Contract

Market Designations, 40 Fed. Reg. 25849, 25850 (June 19, 1975).  In other words, the statute

required the CFTC to preapprove new event contracts before DCMs could offer them.

In 2000, Congress amended the CEA to remove the default rule that all event contracts be

subject to a "public interest" review and instead to allow DCMs to self-certify, with no prior review

required for many types of contracts.  *See* 7 U.S.C. § 7a-2(c)(1) (2006); 17 C.F.R. § 40.2.  This

process requires DCMs to certify that they have complied with the CEA and all applicable CFTC

regulations.  On the tenth day following this certification, the new contract may be listed by the

registered entity unless notified by the CFTC that certification is stayed.  7 U.S.C. § 7a-2(c)(2).

However, the CFTC's failure to act during the initial 10-day period does not imply CFTC

approval of the contract or foreclose future CFTC review. *DTCC Data Repository (U.S.) LLC v.

CFTC,*  25 F. Supp. 3d 9, 18 (D.D.C. 2014).  If DCMs want "approval" by the CTFC, they can

also request that the CFTC preapprove their contracts to confirm that they do not violate the CEA

or CFTC regulation.  7 U.S.C. § 7a-2(c)(4)(5); 17 C.F.R. § 40.3.

Not until the 2010 Dodd-Frank Act, on the heels of the 2008 Financial Crisis, did Congress

give the CFTC authority to regulate "swaps."  *See* Dodd-Frank Wall Street Reform and Consumer

Protection Act, Pub. L. No. 111-203, Title VII, Part II, § 722, 124 Stat. 1376, 1672; *DTCC Data

Repository*, 25 F. Supp. 3d at 11.  The purpose of these swap amendments was to illuminate

"previously dark markets in the complex derivative instruments at the heart of the [2008 financial]

crisis." *Inv. Co. Inst. v. CFTC*, 891 F. Supp. 2d 162, 174 (D.D.C. 2012), as amended (Jan. 2,

2013), *aff'd*, 720 F.3d 370 (D.C. Cir. 2013) (quotation omitted).

Congress was careful to make sure that these swap amendments did not legalize sports

gambling.  *See* 156 Cong. Rec. S5906- 07, 2010 WL 2788026, at S5906-07 (daily ed. July 15,

2010) (statements of Sen. Blanche Lincoln and Sen. Dianne Feinstein).  Dodd-Frank limited swaps

in the CFTC's exclusive jurisdiction to being "associated with a potential financial, economic, or commercial consequence." *See* 7 U.S.C. § 1a(47)(A). Congress also enacted a "Special Rule" allowing the CFTC to determine if certain event contracts are contrary to the public interest and prohibit these contracts listing, trading, and clearing on registered entities such as DCMs. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i)-(ii).

In 2011, shortly after the passage of Dodd-Frank, the CFTC exercised its authority under the Special Rule and promulgated Regulation 40.11(a)(1), banning the trade of contracts involving gaming on DCM's. The CFTC prohibited any "agreement contract, transaction, or swap based upon an excluded commodity … that involves, relates to, or references terrorism, assassination, war, gaming, or an activity that is unlawful under any State or Federal law." 17 C.F.R. § 40.11(a)(1). In addition to this ex ante prohibition, the CFTC also provided an ex post review process to determine whether an event contract may involve any of these prohibited activities. 17 C.F.R. § 40.11(c).

## IV.    MARYLAND DIRECTS KALSHI TO CEASE AND DESIST UNLICENSED SPORTS WAGERING.

In January 2025, Kalshi first began listing its gaming devices on its DCM through the self-certification process. ECF 1 at ¶ 49. By letter dated January 22, 2025, Kalshi filed a "CTFC Regulation 40.2(a) Notification of Regarding the initial listing of the 'Will <team> Win <title>?'" to the CTFC. Exhibit 6, January 22, 2025 Notification of Initial Listing Contract. As part of the filing, Kalshi certified that the gaming device to be listed "complie[d] with the [CEA] and [CFTC] regulations thereunder." *Id.* at 4.

On April 7, 2025, the Commission sent a Notice to Cease and Desist to Kalshi. ECF 1-1. The Commission informed Kalshi that its gaming devices violated Maryland law, and directed Kalshi to "immediately cease and desist offering" them in the state. *Id.* The Cease and Desist

letter stated that Kalshi's gaming devices were "indistinguishable from the act of placing a sports

wager" as defined under Maryland law. *Id.* The Commission concluded that Kalshi was operating

in Maryland and was "offering and conducting … wagering on sporting events" without a sports

wagering license issued by the Commission. *Id.*

## STANDARD OF REVIEW

A preliminary injunction is "'an extraordinary remedy that may only be awarded upon a

clear showing that the plaintiff is entitled to such relief.'" *Harrell v. University of Md. Sch. of*

*Pharmacy*, No. MJM-24-104, 2024 WL 2155023, at *5 (D. Md. May 13, 2024) (quoting *Winter*

*v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). The purpose of a preliminary injunction

is to "protect the status quo and to prevent irreparable harm during the pendency of a lawsuit [and]

ultimately to preserve the court's ability to render a meaningful judgment on the merits." *Moore*

*v. Bishop*, No. JKB-17-1919, 2018 WL 2165299, at *5 (D. Md. May 10, 2018), *aff'd*, No. 18-6663,

2019 WL 93269 (4th Cir. Jan. 3, 2019) (citation omitted). To obtain such relief, Plaintiffs must

(1) establish that they are likely to succeed on the merits, (2) that they are likely to suffer irreparable

harm in the absence of preliminary relief, (3) that the balance of equities tips in their favor, and (4)

that an injunction is in the public interest. *Winter*, 555 U.S. at 20, 22. Thus, Kalshi "must make a

'clear showing'" of the requirements" to obtain preliminary injunctive relief. *Harrell*, 2024 WL

2155023, at *5 (quoting *Low Tide Brewing, LLC v. Tideland Mgmt. LLC*, No. 2:21-CV-0775-

DCN, 2021 WL 1381123, at *2 (D.S.C. Apr. 12, 2021))

## ARGUMENT

### I. KALSHI'S IS UNLIKELY TO PREVAIL ON THE MERITS BECAUSE ITS GAMING DEVICES ARE NOT WITHIN THE EXCLUSIVE JURISDICTION OF THE CFTC.

Kalshi's gaming devices do not satisfy the legal prerequisites necessary to be within the

exclusive jurisdiction of the CFTC, and as such, Maryland is not preempted from exercising its

regulatory authority to prohibit Kalshi from conducting sports wagering business within its borders. The CFTC's exclusive jurisdiction includes (1) commodity futures and (2) swaps that are (3) traded or executed on DCMs. *See* 7 U.S.C. § 2(a)(1)(A). First, Kalshi's gaming devices do not qualify as commodity futures or swaps under the CEA and therefore are not within the CFTC's exclusive jurisdiction. The ordinary meaning of the CEA, several canons of statutory interpretation, and legislative history all indicate that gaming devices are not commodity futures or swaps. *Infra* at §I.A. Second, even if they do qualify as swaps, Kalshi's gaming devices are specifically prohibited from being offered on a DCM by 17 C.F.R §40.11(a)(1) because they are illegal under federal and Maryland law and involve gaming. *Infra* at §I.B.

### A.     Kalshi's Illegal Gaming Devices Are Outside of the CFTC's Exclusive Jurisdiction Because They Are Not Commodity Futures or Swaps.

Kalshi self-defines its gaming devices as "event contracts," but this term is not included in the statutory text of the CFTC's "exclusive jurisdiction."[5] 7 U.S.C. § 2(a)(1)(A). Despite "event contracts" not being in the CFTC's "exclusive jurisdiction," Kalshi erroneously argues that anything traded or executed on a DCM is still subject to the exclusive jurisdiction of the CFTC. *See* ECF 2 at 6. Though the District of Nevada accepted this argument, it is incorrect. *See KalshiEX, LLC v. Hendrick*, No. 2:25-CV-00575-APG-BNW, 2025 WL 1073495, at *6 (D. Nev. Apr. 9, 2025). The act of offering a contract on a DCM does not bring necessarily that contract into the CFTC's exclusive jurisdiction.[6]

---

[5] The CEA uses the term "[e]vent contracts" only to specify contracts that Congress wished to exclude from CFTC-designated exchanges. 7 U.S.C. § 7a-2(c)(5)(C)(i). The CTFC, however, specifically prohibited gaming contracts such as Kalshi's under 17 C.F.R. § 40.11(a)(1). *See infra* at §I.B(1).

[6] Kalshi could self-certify a contract for 101 dalmatians deliverable immediately, but Maryland's puppy mill laws would still apply because such a contract is neither a swap nor a commodity future. Like retail puppy contracts, sports wagers are not in the CFTC's exclusive jurisdiction. *See infra* § I.A.

In actuality, the CFTC's exclusive jurisdiction covers just two types of transactions: commodity futures and swaps.  *See* 7 U.S.C. § 2(a)(1)(A) (covering certain accounts, agreements, and transactions "involving swaps or contracts of sale of a commodity for future delivery" traded or executed on a DCM or swap execution facility).  Thus, as a threshold issue, and for the CFTC's exclusive jurisdiction to apply, Kalshi's gaming devices must either be (1) commodity futures or (2) swaps.  They are neither.  Because the CFTC does not have "exclusive jurisdiction" over these gaming devices, any preemption argument is irrelevant and Maryland may regulate these transactions under its laws.  *Id.*

### 1.  **Kalshi's Gaming Devices Are Not Commodity Futures**.

A "contract of sale of a commodity for future delivery" is expressly defined by the CEA; it is an agreement to sell "a commodity" that can be delivered.  *See* 7 U.S.C. § 1a(13). "Commodity" includes "goods," "articles," "services, rights, and interests … in which contracts for future delivery are presently or in the future dealt in." *Id.* § 1a(9). Such commodity futures are the CEA's core concern – "purchases and sales of contracts for delivery at some future date of certain quantities of specified commodities at fixed prices."  S. Rep. No. 93-1131, 1974 U.S.C.C.A.N. 5843, 5856 (1974). Kalshi's gaming devices do not fit within this core concern or ordinary meaning of the text because the outcome of a sports game is not a "good," "article," "service," "right," or "interest" that can be "delivered" by a contract.  The District Court of Nevada appeared to suggest that the outcome of a sports game or election might qualify as an "excluded commodity," which covers "an occurrence, extent of an occurrence, or contingency ... that is ... beyond the control of the parties to the relevant contract, agreement, or transaction; and ... associated with a financial, commercial, or economic consequence."  7 U.S.C. § 1a(19)(iv); *see Hendrick*, 2025 WL 1073495, at *3, *5 (D. Nev. Apr. 9, 2025).  Even assuming that the Nevada

11

court was correct, it would not matter because Kalshi is not offering "contracts of sale of [sports events] for future delivery," and "excluded commodity" does not appear in the CFTC's exclusive jurisdiction. 7 U.S.C. § 2(a)(1)(A).  Thus, Kalshi's gaming devices do not qualify as "contracts of sale of commodities for future delivery."

> **2.  Kalshi's Gaming Devices Are Not Swaps Within the Ordinary Meaning of the CEA, Canons of Statutory Interpretation, or the CEA's Legislative History.**

>> **a.  Kalshi's Gaming Devices Are Not Associated with a Potential Financial, Economic, or Commercial Consequence.**

The CEA defines "swap" as an agreement, contract, or transaction, that "is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence."  7 U.S.C. § 1a(47)(A)(ii).[7]  Kalshi has previously conceded that sporting events are not "associated with potential financial, economic, or commercial consequence."  In its brief to the D.C. Circuit in a related manner, Kalshi acknowledged that "as the legislative history directly confirms, Congress did not want sports betting to be conducted on derivatives markets."  Appellee's Br. at 41, *KalshiEX LLC v. CFTC*, No. 24-5205, 2024 WL 4802698 (D.C. Cir. Nov. 15, 2024).  Kalshi further explained:

> The basic purpose of Designated Contract Markets is to allow "hedging" of economic risk. 156 Cong. Rec. S5907. Contracts that "serve[] no commercial purpose at all" may therefore not deserve to be traded on a regulated exchange. *Id*. at S5906. And, at least in general, contracts relating to *games* – again, activities conducted for diversion or amusement – are unlikely to serve any "commercial or hedging interest.'

---

[7] The CEA provides for several other definitions of "swap," but Kalshi argues that its sports gaming contracts fit this definition. ECF 2 at 6.

Appellee's Br. at 45, *KalshiEX LLC*, 2024 WL 4802698.  Kalshi's concession is consistent with the plain meaning of the statute.  *See Wisconsin Cent. Ltd v. United States*, 585 U.S. 274, 277 (2018) ("As usual, our job is to interpret the words consistent with their ordinary meaning") (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)).  In particular, the subject of Kalshi's gaming devices, the outcome of a sporting event, is not "an event or contingency associated with a potential financial, economic, or commercial consequence."  7 U.S.C. § 1a(47)(A)(ii).

Kalshi's gaming devices do not involve the sporting event *itself*, but rather the *outcome* of the event, *i.e.*, which team will win the game.  Kalshi and the District of New Jersey miss this important distinction; Kalshi argues and the District of New Jersey acknowledged that some sporting events have economic impact.  *See KalshiEX, LLC v. Flaherty, et al.,* No. 25–cv–02152–ESK–MJS, 2025 WL 1218313, at *6 (D. N. J. April 28, 2025).  Being outcome-focused, however, Kalshi's gaming devices are simply a speculative wager on who will win a particular sporting event.  They are not dependent upon, or otherwise related to, any potential economic impact of the underlying sporting event taking place, let alone any legitimate hedging activity.  The only people who benefit economically from the *outcome* of the sporting event are the participants themselves.  As such, whether one competitor wins or loses does not change the economic, financial, or commercial outcome for anyone but the competitors themselves.

Roughly a month ago, Kalshi's leading gaming device concerned the "Masters Tournament Winner." *Sports*, KALSHI, https://perma.cc/9SNV-3WUQ (captured Apr. 12, 2025).  While the Tournament itself does generate significant revenue, Kalshi's gaming device was concerned *only* with who won the Tournament, not with the Tournament itself.  No matter the Tournament's winner, the television networks, on-site vendors, etc. would still profit from the Tournament itself.  Regardless of whether Rory McIlory or Justin Rose won their epic, sudden-death playoff, the

outcome of the event had no financial, economic, or commercial consequences for anyone other than McIlory or Rose. Because it was dependent only on the *outcome* of the underlying game, Kalshi's contract could not be said to be associated with a financial, commercial, or economic consequence in the ordinary sense.

From a categorical perspective, the outcomes of sporting events generally do not have direct financial consequences. Sporting events include youth, high school, adult recreational leagues, and even many college contests that are not revenue-generating. In such events, nearby food trucks might sell more hot dogs if the local team wins, but nobody would characterize the outcome of most sporting events as associated with potential financial, economic, or commercial consequences.

If the surrounding economic activity is considered "associated with" the outcome of a sporting event, the CFTC would need to undertake a case-by-case inquiry as to whether a particular sporting event is likely to have sufficient economic consequences such that bets on their outcomes qualify as "swaps" immune from state regulation. This approach would be an administrative nightmare for the CTFC and cannot be what Congress intended when it passed Dodd-Frank. It makes far more sense to read the CEA's definitions of "swaps" as referring to types or categories of *events* typically associated with potential financial consequences, *e.g.* whether an earthquake takes place in Los Angeles. *See* ECF at ¶29. As a category, however, the *outcome* of a sporting event is not "an event or contingency associated with a financial, commercial, or economic consequence."

> ### b. Gaming Devices Cannot Be "Swaps" Under Numerous Canons of Statutory Interpretation.

> #### i. Canon Against Implied Repeal.

If sports gaming contracts were "swaps," it would impliedly repeal several federal statutes. The Supreme Court has noted repeatedly that interpreting statutes in a manner that would impliedly repeal others is disfavored. *See, e.g., Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (applying "the strong presumption that repeals by implication are disfavored and that Congress will specifically address preexisting law when it wishes to suspend its normal operations in a later statute") (cleaned up). However, including sports gaming contracts in the CEA's definition of "swaps" would impliedly repeal two other federal statutory schemes governing gaming: the Wire Act and the Indian Gaming Regulatory Act ("IGRA").

The Wire Act criminalizes businesses engaged in "betting or wagering" that "use[] a wire communication facility" to transmit "bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest" where such wagering is illegal under state law. 18 U.S.C. § 1084(a)-(b). Currently, Kalshi is likely in violation of the Wire Act by assisting in the placing of bets or wagers in multiple sports events in violation of Maryland law. *See* Md. Ann., Crim. Law § 12-113.  In asking this court to enjoin Maryland law and declare sports gaming to be "swaps," Kalshi also asks this court to repeal the Wire Act by implication; this is simply not a plausible reading of 7 U.S.C. § 1a(47)(A)(ii).  If Congress had intended to repeal the Wire Act in passing Dodd-Frank, it would have done so.

In addition, the IGRA designates sports gambling as "Class III" gaming and prohibits such activity on tribal lands unless the relevant Tribe and State where the tribal land is located both authorize sports gaming pursuant to a "Tribal-State compact." *See* 25 U.S.C. § 2703(8); 25 C.F.R. § 502.4(c); 25 U.S.C. § 2710(d)(1). The purpose of the IGRA is "to provide a statutory basis for

the operation of gaming by Indian [T]ribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C. § 2702(1). Tribes often receive a substantial degree of exclusivity to offer gaming, including sports betting, as a benefit of their bargain in these compacts. *See* Matthew L.M. Fletcher, *Bringing Balance to Indian Gaming*, 44 Harv. J. on Legis. 39, 75 & n.243 (2007). Just like the Wire Act, if this court deems sports gaming contracts to be swaps, it would be eviscerating the IGRA as well.

## ii.    The Specific Governs the General.

"The specific governs the general," especially when, as here, "a general permission or prohibition [*i.e.*, the CEA's definition of 'swap'] is contradicted by a specific prohibition or permission [*i.e.*, the Wire Act's express prohibition against interstate gambling on sports or IGRA's express prohibition against Class III gaming on tribal lands absent compliance with the three requirements in 25 U.S.C. § 2710(d)(1)]." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (citation omitted). Thus, this canon complements the canon against implied repeal. Congress cannot be understood to have repealed the Wire Act and IGRA when it passed Dodd-Frank. Moreover, the specific, express prohibition against sports gaming in the Wire Act and IGRA governs over the broad, general definition of "swap."

## iii.    *Noscitur a sociis*.

Under the principle of *noscitur a sociis* – a word is known by the company it keeps – courts must avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus "giving unintended breadth to the Acts of Congress." *Yates v. United States*, 574 U.S. 528, 543 (2015) (plurality) (citation and quotation marks omitted). When "several items in a list share an attribute," the principle favors "interpreting the other items as possessing that attribute as well." *Beecham v. United States*, 511 U.S. 368, 371 (1994). Here, surrounding sub-clause (ii) that defines swaps as "associated with a potential financial, economic, or commercial consequence"

16

are other sub-clauses that define a swap as an "option" that hinges on "1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind" or an exchange of "1 or more payments based on the value or level of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind."  7 U.S.C. § 1a(47)(A)(i), (iii).

Kalshi contends that its gaming devices fit the definition of 7 U.S.C. § 1a(47)(A)(ii). ECF 2 at 6.  But under *noscitur a sociis*, it follows that "event or contingency associated with a potential financial, economic, or commercial consequence," as used in sub-clause (ii), refers to the company it keeps in sub-clauses (i) and (iii) – consequences that directly affect "rates, currencies, commodities, securities, instruments of indebtedness, indices, [or] quantitative measures."  The outcome of a sporting event does not satisfy this requirement.

###    iv.    Canon Against Superfluity.

Even if *noscitur a sociis* is ignored, calling Kalshi's gaming devices "swaps" would violate the canon against superfluity.  Under this canon, courts are "obliged to give effect, if possible, to every word Congress used."  *United States v. Weiss*, 52 F.4th 546, 552 (3d Cir. 2022) (quotation omitted).  However, if "event or contingency associated with a potential financial, economic, or commercial consequence" were so broad as to cover events with attenuated financial, economic, or commercial connections, then all the other sub-clauses defining "swap" would be superfluous. For example, a contract that hinges on "currencies" or "commodities" under clause (i), is also associated with "financial, economic, or commercial consequences" under clause (ii). If one considers Kalshi's sports gaming contracts "swaps," the remainder of the definition is rendered superfluous.

###### v.    Congress Does Not Hide Elephants in Mouseholes.

Congress does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns., Inc.*, 531 U.S. 457, 468 (2001); *see also Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*, 583 U.S. 416, 431 (2018) ("Congress does not make 'radical – but entirely implicit – change[s]' through 'technical and conforming amendments.'").  Reading one of several possible definitions of "swap" to preempt the longstanding regime of leaving regulation of sports gaming contracts to the States and Tribes would violate this precept.

When Congress passed the Dodd-Frank Act, it sought to remedy regulatory failures believed to be at the heart of the 2008 Financial Crisis.  *See supra* at 7.  Sports betting was not at the heart of the financial crisis; at the time Dodd-Frank was passed, sports wagering was prohibited by the Wire Act and IGRA and banned in 46 states pursuant to PASPA.  *Murphy*, 584 U.S. at 453.  Dodd-Frank could not have contemplated the addition of wagering contracts to its definition of swaps with no mention of the Wire Act, IGRA or PASPA's existence.  By adding "swaps" to CEA jurisdiction, Congress cannot be understood to be legalizing and centralizing sports betting under the authority of the CEA and, in the process repealing in part or in whole the Wire Act, IGRA, and PASPA, and preempting numerous states' gaming laws.

###### c.    Legislative History Confirms that Sports Gaming Contracts Are Not Swaps.

The legislative history of the Dodd-Frank Act confirms that Congress did not intend to hide the sports gaming elephant in the mousehole of the "swaps" definition.  *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, Title VII, Part II, § 722, 124 Stat. 1376, 1672; *DTCC Data Repository*, *supra,* 25 F. Supp. 3d at 9.  Kalshi repeatedly relies on the legislative history of the Commodity Futures Trading Commission Act of 1974, Pub. L. No. 93-463, 88 Stat. 1389, which added the exclusive jurisdiction" language to Section 2(a)(1)(A) for

18

the first time. *See* ECF No. 2 at 12-14. But the 1974 Act was concerned with commodity futures and did not use the term "swap." The fact that the 1974 "Act's proponents were concerned that the states … might step in to regulate the futures markets themselves" has no bearing on the meaning of the term "swaps" because Congress did not give the CFTC "exclusive jurisdiction" over transactions involving "swaps" until Dodd-Frank in 2010. *Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992).

In enacting Dodd-Frank, Congress did not want investors' funds tied up in "gambling" contracts that "served no commercial purpose at all." 156 Cong. Rec. S5902, S5906-7 (daily ed. July 15, 2010) (Sen. Feinstein) (expressing concern about "derivative contract[s]" being "used predominantly by speculators or participants not having a commercial or hedging interest"). There is no evidence in the legislative history that anyone in Congress intended for the addition of "swaps" to the CFTC's jurisdiction to displace States' or Tribes' authority over traditional forms of gambling or override state gambling laws nationwide.

Dodd-Frank's "swap" definition was intended to cover transactions in the heartland of the CFTC's authority, like swaps pertaining to a farmer's crop yield or changes in corporate asset purchases. *See* Concept Release on the Appropriate Regulatory Treatment of Event Contracts, 73 Fed. Reg. 25,671 (May 7, 2008). The transactions relating to Kalshi's gaming devices, however, concern to the offer, purchase, and sale of wagers on the outcomes of sporting events and are not associated with a "potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii); *see supra* at §I.A(2)(a). Dodd-Frank's legislative history demonstrates that Congress, anticipated just such a contingency: "It would be quite easy to construct an 'event contract' around sporting events;" it then made clear that "[t]hese types of contracts would not serve any real commercial purpose," but instead "would be used solely for gambling." 156 Cong.

19

Rec. S5902-01, S5907 (July 15, 2010) (statement of Senator Lincoln).  Rather evidencing an intent

to the CFTC jurisdiction over sports gaming, legislative history indicates just the opposite.

### B.  The CTFC Has Expressly Prohibited Gaming Devices from Being Offered on a DCM.

#### 1.  17 C.F.R. § 40.11 Prohibits Listing any Contract Involving Gaming.

Pursuant to the CEA's Special Rule, the CFTC was delegated authority to determine if

certain "Event Contracts" should be prohibited as being "contrary to the public interest."  7 U.S.C.

§ 7a-2(c)(5)(C)(i).  The CFTC's discretion extended to contracts involving: "(I) activity that is

unlawful under any Federal or State law; (II) terrorism; (III) assassination; (IV) war; (V) gaming;

or (VI) other similar activity determined by the Commission, by rule or regulation, to be contrary

to the public interest."  *Id.*   As admitted by Kalshi, the CFTC then adopted Regulation

40.11(a)(1),(2) to implement the discretion delegated to it by the Special Rule.  ECF 2 at 7.

Consistent with the CEA's delegation, Regulation 40.11(a)(1) expressly prohibits *ex ante*

gaming and otherwise illegal contracts from being offered on a DCM. The Rule states that a

"registered entity ***shall not*** list for trading" any "agreement, contract, transaction, or swap based

upon an excluded commodity ... that involves, relates to, or references terrorism, assassination,

war, ***gaming***, or an activity that is unlawful under any State or Federal law." 17 C.F.R. §

40.11(a)(1). (emphasis added).   Kalshi has admitted previously that the term "gaming" in

Regulation 40.11(a)(1) was intended to include sports wagering.  Addressing the term "gaming"

in the Special Rule, Kalshi noted: "An event contract therefore involves 'gaming' if it is contingent

on a game or a game-related event – like the Kentucky Derby, Super Bowl, or Masters golf

tournament, all of which were mentioned in the provision's only legislative history." Brief of

Appellee at 17, *KalshiEX LLC*, *supra,* 2024 WL 4802698 (emphasis added).  In its Motion, Kalshi

admits that Regulation 40.11 was the CFTC's implementation of the Special Rule.  ECF 2 at 7.

By Kalshi's own admission, its gaming devices are prohibited from DCM listing under the plain language of Regulation 40.11(a)(1) because they are contracts involved with gaming.

Kalshi and the District Courts of New Jersey and Nevada ignore the blanket prohibition in Regulation 40.11(a)(1) and instead focus only on the existence of the Special Rule authorizing the CFTC's review. *See Hendrick*, 2025 WL 1073495, at *6 (D. Nev. Apr. 9, 2025) (noting that Kalshi's gaming devices would only "subject Kalshi to the special rule that allows the CFTC to conduct a public interest review"); *Flaherty. et al.,* 2025 WL 1218313, at *5 (D. N. J. April 28, 2025).  This argument ignores that the CFTC has already undertaken a review pursuant to the Special Rule and categorically prohibited gaming contracts under Regulation 40.11(a)(1).

Because gaming contracts are prohibited under Regulation 40.11(a)(1) on registered entities (including DCMs), they cannot fall within the CFTC's exclusive jurisdiction.  A prerequisite for exclusive jurisdiction is that the contract is offered on a regulated entity, including DCMs.  Since gaming contracts are prohibited from being offered on these entities, such contracts cannot possibly fall within the CFTC's exclusive jurisdiction.

Regulation 40.11(a)(1) is consistent with other federal and Maryland laws in prohibiting Kalshi's gaming devices.  As previously noted, the Wire Act criminalizes businesses engaged in "betting or wagering" that "use[] a wire communication facility" to transmit "bets or wagers or information assisting the in the placing of bets or wagers on any sporting event or contest" where such operations are illegal under state law. 18 U.S.C. § 1084(a)-(b); *see supra* at §I.A(2)(b)(i). Similarly, IGRA prohibits sports gambling unless the relevant Tribe and State where the tribal land is located both authorize sports gaming pursuant to a "Tribal-State compact." *See* 25 U.S.C. § 2703(8); 25 C.F.R. § 502.4(c); 25 U.S.C. § 2710(d)(1); *see also supra* at §I.A(2)(b)(i).  Finally,

the gaming devices constitute a violation of Maryland's gaming laws.  Md. Code Ann., St. Gov.,

§ 9-1E-03(b), § 9-1E-04(b)(6)(ii); Md. Code Ann., Crim. Law § 12-104, § 12-113.

### 2.  The Court May Enforce the Provisions of Regulation 40.11(a)(1).

Kalshi and the District Court of Nevada contend that the CFTC must undertake a review

pursuant to Regulation 40.11(c) in order for an event contract to be prohibited.  *See Hendrick*,

2025 WL 1073495, at *4.  But the CFTC need not undertake an additional review under 40.11(c)

to prohibit gaming contracts; they have already prohibited these contracts under Regulation

40.11(a).  Regulation 40.11(c) simply describes the CFTC's *ex post*, case-by-case review process

for violations of Regulation 40.11(a); any argument to the contrary eviscerates Regulation

40.11(a)(1).

Notwithstanding any CFTC inaction, this Court is empowered to enforce Regulation

40.11(a)(1).  Although the decision to take an enforcement action is normally left to an agency's

discretion, *see Heckler v. Chaney*, 470 U.S. 821, 828, 837-38 (1985), "an agency's expression of

a broad or general enforcement policy based on the agency's legal interpretation is subject to

review."  *Casa De Maryland v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 699 (4th Cir. 2019)

(collecting cases).

Regulation 40.11(a)(1) is more than a "broad or general enforcement policy."  As a

regulation issued through notice-and-comment rulemaking, it is the law, and this court "[t]o the

extent necessary to decision and when presented . . . shall decide all relevant questions of law,

interpret constitutional and statutory provisions, and determine the meaning or applicability of the

terms of an agency action."  *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 391 (2024)

(quoting 5 U.S.C. § 7).  *Loper* characterizes this proposition as "unremarkable, yet elemental . . .

reflected by judicial practice dating back to *Marbury*: that courts decide legal questions by

applying their own judgment." *Id.* Accordingly, this Court is free to determine whether Kalshi's

gaming devices are prohibited from being offered on its DCM.

### 3. Self-Certifying Listing an Otherwise Prohibited Contract on a DCM Does Not Foreclose Judicial Review of the Listing.

Taking advantage of the self-certification process, Kalshi certified to the CTFC earlier this

year that its gaming devices "complie[d] with the [CEA] and [CFTC] regulations" *despite* the

gaming devices involving "gaming" and being illegal under Maryland and federal law, including

Regulation 40.11(a)(1). *Supra* at §I.A(2)(b)(i). Because the CFTC did not act within a 10-day

period pursuant 7 USC § 7(a)-2(c)(2), Kalshi argues that the CTFC "has already authorized

Kalshi's event contracts by declining to restrict them after Kalshi self-certified them." ECF 2 at

18. This assertion is false. The CFTC's failure to act during the initial 10-day period does not

imply CFTC approval of the contracts or foreclose future CFTC review:

> [A]ll the CEA and the Commission rules provide is that the Commission *could* block an unlawful rule change—but not that it *must.* Moreover, the brief ten-day review period Congress supplied in the CEA further supports the conclusion that Congress did not intend to impose a duty on the Commission to do a searching review of every rule or rule amendment that passes through the self-certification process.

*DTCC Data Repository (U.S.) LLC, supra,* 25 F. Supp. 3d at18; *see also Sprint Nextel Corp. v.

FCC,* 508 F.3d 1129, 1132 (D.C.Cir.2007); *Amador Cnty. v. Salazar,* 640 F.3d 373, 382

(D.C.Cir.2011). Thus, the CFTC's inaction in response to Kalshi's self-certification does not

constitute the type of final agency action that would pre-empt Maryland law.

### C. Federal Preemption is Not Applicable to Maryland's Regulation of Kalshi's Gaming Devices.

A strong presumption exists against preemption. "[A]ll preemption cases 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680, 687 (3d Cir. 2016) (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)). Applying even this baseline presumption, courts must disfavor preemption when faced with two plausible readings of a statute. *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005); *see also Bruesewitz v. Wyeth, Inc.*, 561 F.3d 233, 240 (3d Cir. 2009). This presumption is even stronger when Congress has legislated "in a field which the States have traditionally occupied." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996); *Pennsylvania v. Navient Corp.*, 967 F.3d 273, 288 (3d Cir. 2020) (same).

The Supreme Court and Fourth Circuit have recognized that state gambling regulations are core, traditional police powers. *See Ah Sin v. Wittman*, 198 U.S. 500, 505–06 (1905) ("The suppression of gambling is concededly within the police powers of a state."); *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 302 (4th Cir. 2009) ("[R]egulating gambling is at the core of the state's residual powers as a sovereign in our constitutional scheme."); *Johnson v. Collins Entm't Co., Inc.*, 199 F.3d 710, 720 (4th Cir. 1999) (same); *see also Murphy*, 584 U.S. at 458-59. Gambling is a potentially harmful "vice activity," and states have an interest in reducing "the social costs associated with" it, *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 185 (1999), to promote the "welfare, safety, and morals" of their citizens, *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 737) (9th Cir. 2003).

Given Maryland's core, traditional interest in policing gambling, a "plausible reading" of the CFTC's "exclusive jurisdiction," 7 U.S.C. § 2(a)(1)(A)), is that Kalshi's gaming devices do

24

not satisfy the prerequisites of being a swap or commodity future. *See surpra* §I.A. In contrast,

the preemption arguments raised in Kalshi's Motion address only the regulation of swaps *after*

they are lawfully listed on a DCM. ECF 2 at 9-16. Neither Kalshi nor the prior federal courts

rulings, however, provide even a plausible reading of "swap" or "contracts of sale of a commodity

for future delivery" or Regulation 40.11(a)(1) that would place Kalshi's gaming devices in the

CFTC's exclusive jurisdiction. Certainly, nothing presented by Kalshi or the prior court rulings is

persuasive enough to overcome strong presumption that the CFTC's "exclusive jurisdiction" was

not intended to supersede Maryland's exclusive police power to regulate gaming within its borders.

The statute's text and legislative history make clear that Kalshi's gaming devices are not within

the CFTC's exclusive jurisdiction because they are neither swaps nor commodity futures and are

expressly prohibited by Regulation 40.11(a)(1).

Where a particular transaction does not fall within the CFTC's exclusive jurisdiction, the

CEA expressly preserves state law: "Except as [provided in the exclusive-jurisdiction provision],

nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred

… under the laws of … any State, or (II) restrict … such other authorities from carrying out their

duties and responsibilities in accordance with such laws." 7 U.S.C. § 2(a)(1)(A). As courts have

recognized, this clause "makes clear that other agencies" still "retain their jurisdiction over all

matters beyond the confines of" the exclusive-jurisdiction provision. *FTC v. Ken Roberts Co.*, 276

F.3d 583, 591 (D.C. Cir. 2001). Kalshi's gaming devices are neither commodity futures nor swaps,

and are prohibited from listing on DCMs and, therefore, are outside the CFTC's exclusive

jurisdiction. Because Kalshi's gaming devices are outside this jurisdiction, preemption is not an

issue and Maryland may properly regulate these gaming devices under its sports gaming laws.

The CEA and Regulation 40.11 complement state gaming laws by reserving to the states the ability to regulate gaming contracts that cannot be lawfully listed on a DCM.  If Kalshi's gaming devices are not permitted on DCMs, Kalshi cannot self-certify them into the CFTC's "exclusive jurisdiction" to evade state gaming laws; Kalshi cannot break federal law to claim a preemption for the purpose of evading state law.

## II.    ANY HARM KALSHI MAY SUFFER AS A RESULT OF THE CEASE AND DESIST LETTER WAS OF ITS OWN MAKING.

Kalshi's self-certification of its gaming devices in blatant disregard of Regulation 40.11(a)(1)'s clear and unambiguous prohibitions and in violation of the Wire Act is sufficient grounds for this Court to dismiss Kalshi's request for injunctive relief.  It is axiomatic that, when seeking the equitable relief of a preliminary injunction, a plaintiff must approach the Court with "clean hands."  *Smith v. Cessna Aircraft Co.*, 124 F.R.D. 103, 105 (D. Md. 1989) ("He who comes into equity must come with clean hands"); *Age of Majority Educ. Corp. v. Preller*, 512 F.2d 1241, 1244 (4th Cir. 1975) (plaintiffs barred from obtaining injunctive relief due to unclean hands). Here, with knowledge and forethought, Kalshi certified its gaming devices as compliant with CTFC regulations, despite the plain language of Regulation 40.11(a)(1) and the prohibitions under the Wire Act. To the contrary, any alleged irreparable harm accruing to Kalshi from the Commission's Cease and Desist letter is the result of Kalshi's own bad acts and not entitled to equitable relief from this Court.

Kalshi knew that its gaming devices were contracts that involved gaming.  It advertised its gaming devices as "sports betting" and specifically marketed the ability of individuals to wager on March Madness in states where sports wagering was otherwise prohibited.  Exhibit 2, at 3, 6, 8. In its Motion, Kalshi states that its gaming devices "allow[ed] users to place positions on" which

teams would advance in the NCAA Tournament or "who w[ould] win the U.S. Open Golf Tournament." ECF 2 at 8.

Kalshi previously argued in court that its gaming devices were exactly the type of gaming contracts that the CTFC was referring to when it promulgated Regulation 40.11(a)(1), (2) pursuant to the Special Rule.  On January 25, 2024, Kalshi filed its motion for summary judgement in the matter *KalshiEX LLC v. Commodity Futures Trading Commission*, 2024 WL 397419 (D.D.C.) arguing that the Special Rule's "'gaming' category reaches contracts contingent on *games*--for example, whether someone will win the Powerball lottery by a certain date, or whether a certain team will win the Super Bowl."  Motion for Summary Judgment at 24, *KalshiEX LLC*, 2024 WL 397419 (emphasis original).  On appeal to the D.C. Circuit Court, Kalshi continued this argument stating that "[a]n event contract therefore involves 'gaming' if it is contingent on a game or a game-related event – like the Kentucky Derby, Super Bowl, or Masters golf tournament, all of which were mentioned in the provision's only legislative history." Brief of Appellee at 17, *KalshiEX LLC* v. CFTC, *supra,* 2024 WL 4802698.

Regulation 40.11(a)(1)'s language is clear and unambiguous:  contracts involving gaming "shall not" be listed on a registered exchange.  At the time it self-certified its gaming devices, Kalshi was aware of the existence of Regulation 40.11(a)(1) and, more importantly, was aware that Regulation 40.11(a)(1) was the CTFC's implementation of the Special Rule.  ECF 2 at 7 ("*see also* 40.11(a)(1)-(2) (implementing the Special Rule)").  Despite this awareness, Kalshi has not quoted the language of Regulation 40.11(a)(1) to this Court or in any of its filings in the Nevada or New Jersey courts.  Instead, Kalshi disingenuously argues that the Special Rule requires a public interest review of event contracts involving gaming, completely ignoring the plain language of

Regulation 40.11(a)(1) instructing Kalshi not to list contracts involving gaming on its registered market. *See* ECF 2 at 5, 6.

Kalshi now cries crocodile tears and exclaims that it is being forced into "a Hobson's Choice" by the Cease and Desist letter. ECF 2 at 17-19. However, it was Kalshi affirmative act of self-certifying gaming devices clearly prohibited by Regulation 40.11(a)(1) that created Kalshi's current dilemma, and any harm resulting from that act lies squarely on Kalshi's shoulders. As further evidence of this self-imposed harm, Kalshi acknowledges that "[t]he CTFC had initiated its 90-day review period of [NADEX/crypto.com's] sports related contracts on January 14, 2025" and "requested NADEX/crypto.com suspend its sports-related contracts during the pendency of that review." ECF 1 at ¶ 50 (emphasis added). Despite this, Kalshi self-certified its own sports-related contracts on January 22, 2025, *eight days after the CFTC requested that NADEX/crypto.com suspend its listing of similar contracts.* Exhibit 2 at 4.

Kalshi's certification of its gaming devices constituted misconduct "directly related to the subject of th[is] suit." *Smith*, 124 F.R.D. at 106. This Court should close "the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief" by dismissing Kalshi request for injunctive relief. *Smith*, 124 F.R.D. at 105–06 (quoting *Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co.,* 324 U.S. 806, 814–15, (1945) and citing 1 J. Pomeroy, *A Treatise on Equity Jurisprudence* section 397, at 738 (4th ed. 1918)).

## III.   THE BALANCE OF THE HARDSHIPS IN THIS MATTER FAVORS THE PROTECTION OF MARYLAND'S CITIZENS AND BUSINESSES.

"When a plaintiff seeks preliminary injunctive relief against the Government, the balance of the equities and the public interest factors merge." *Coreas v. Bounds*, 451 F. Supp. 3d 407, 429 (D. Md. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009) and *Roe v. Department of Def.*,

947 F.3d 207, 230 (4th Cir. 2020)).  Here and as set forth in this Response's supporting affidavits, Kalshi's unlicensed practice of sports wagering threatens to undercut Maryland's licensed sports book operators and endangers the revenues flowing to the State from those entities as wells as the secondary benefits Maryland gains from entities reliant on the State thriving gaming industry. Exhibit 3 at ¶¶ 13-17; Exhibit 4 at ¶¶ 10-21.  In addition, Kalshi's unlicensed business has not demonstrated that it has the necessary integrity, financial stability, and responsible gaming practices to ensure that Marylanders are not preyed upon.  *See* Exhibit 6 at ¶¶ 4, 8-12, 13-14, 19; Exhibit 4 at ¶¶ 17, 18.q1  In light of these factors and Kalshi's unclean hands, the balance of hardships weigh heavily in the Defendants favor.

## CONCLUSION

Based on the foregoing, this Court should deny Kalshi's Motion for a Preliminary Injunction.

## CERTIFICATE OF SERVICE

I certify that, on this 25th day of April 2025, the foregoing was served by CM/ECF on all registered CMF users.


/s/ Erik J. Delfosse

_____

Erik Delfosse