UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
NORTHERN DIVISION

| | |
|---|---|
| KALSHIEX LLC,<br><br>*Plaintiff*,<br><br>vs.<br><br>JOHN A. MARTIN, et al.<br><br>*Defendants*. | Case No.: 25-cv-1283-ABA<br><br>**PLAINTIFF'S REPLY IN SUPPORT OF PRELIMINARY INJUNCTION**<br><br>**(HEARING SCHEDULED MAY 28, 2025)** |

## INTRODUCTION

Shortly before filing suit in this case, Kalshi obtained a preliminary injunction in Nevada on the ground that "Congress intended to occupy the field and preempt state law from applying to CFTC-designated exchanges." *KalshiEX, LLC v. Hendrick*, No. 2:25-cv-00575, 2025 WL 1073495, at *6 (D. Nev. Apr. 9, 2025). Since filing this suit, Kalshi obtained yet another preliminary injunction in a New Jersey case presenting almost identical issues. *KalshiEX LLC v. Flaherty*, No. 25-cv-02152, 2025 WL 1218313 (D.N.J. Apr. 28, 2025). Like the *Hendrick* court, the *Flaherty* court concluded that "Kalshi's sports-related event contracts fall within the CFTC's exclusive jurisdiction." *Id.* at *6. The court further concluded that Kalshi showed a likelihood of irreparable harm because "at minimum," "harms to its reputation and goodwill" are "both likely without injunctive relief and not able to be remedied following trial." *Id.* at *7. And the other equities favored Kalshi because "[t]he public interest [is] not served by the enforcement of an unconstitutional law." *Id.* at *7 (quoting *N.J. Retail Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 389 (3d Cir. 2012)). Two federal courts have thus agreed that Kalshi is entitled to a preliminary injunction. Defendants offer no reason for this Court to break with that consensus and expose Kalshi to irreparable harm while this case proceeds.

Defendants do not dispute that Congress granted the CFTC exclusive jurisdiction to regulate trading on designated contract markets ("DCMs"), or that subjecting DCMs to state regulation would conflict with this uniform federal regulatory scheme. Defendants instead devote most of their preemption argument to the proposition that Kalshi's sports event contracts do not fall within the CFTC's jurisdiction because they are not "swaps." That proposition is incorrect. Congress defined swaps to include event contracts, and the Special Rule enacted by Congress in 2010 contemplates that event contracts involving "gaming" are permissible swaps

1

unless the CFTC deems them contrary to the public interest—which the CFTC has not done here. Defendants' position that sports events are categorically not "associated with a potential financial" consequence is mistaken. The sports events for which Kalshi offers contracts have clear financial consequences, and they certainly have *potential* financial consequences. The canons of interpretation that Defendants invoke do not support them and ignore direct textual evidence that contracts involving sports events fall within the CFTC's jurisdiction.

Defendants erroneously claim that Kalshi self-certified its sports event contracts in violation of a CFTC regulation. While Section 40.11(a) generally prohibits contracts involving gaming, Section 40.11(c) gives the CFTC discretion to approve such contracts on a case-by-case basis. *See* 17 C.F.R. § 40.11. Defendants' reliance on Section 40.11 thus undermines their argument. By Defendants' own admission, Section 40.11 reaffirms CFTC jurisdiction over sports event contracts. As courts have uniformly held, where "the CFTC has jurisdiction, its power is exclusive." *Chicago Mercantile Exch. v. S.E.C.*, 883 F.2d 537, 548 (7th Cir. 1989). While Congress in the Special Rule noted concerns with event contracts involving gaming, Defendants fail to acknowledge Congress's solution to those concerns. Congress did not ban gaming contracts outright, but instead delegated to the CFTC—not 50 separate states—the authority to approve or reject these contracts after public-interest review.

The other injunction factors favor a modest injunction that would allow Kalshi to litigate this matter without incurring irreparable harm. Defendants do not dispute that Kalshi would suffer irreparable harm absent an injunction, but instead claim that Kalshi comes to this court with unclean hands. Quite the contrary, Kalshi's harm results from Defendants' intrusion into the exclusive federal domain of regulating trading on DCMs. Defendants are not entitled to tax revenue from Kalshi's activities they have no authority to regulate, and many of the consumer-

protection requirements they tout have federal analogs with which Kalshi complies. There is no question that Kalshi should be regulated; the question is only by whom. Congress's clear answer is that the CFTC's jurisdiction is exclusive. This Court should grant a preliminary injunction.

## ARGUMENT

### A. Kalshi Is Likely To Succeed Because Maryland's Gaming Laws Are Preempted By The CEA And Its Implementing Regulations.

As both the *Hendrick* and *Flaherty* courts have held, the Commodity Exchange Act's ("CEA") text, purpose, history, and comprehensive framework clearly evince "congressional intent to occupy the field of regulating CFTC-designated exchanges and the transactions conducted on those exchanges." *Hendrick*, 2025 WL 1073495, at *6; *Flaherty*, 2025 WL 1218313, at *6. The "plain and unambiguous language" of Section 2's "exclusive jurisdiction" provision, and every other marker of congressional intent, confirm that state laws regulating transactions on DCMs are field-preempted. *Hendrick*, 2025 WL 1073495, at *6. Defendants' contrary arguments cannot overcome that evidence.

*1. Kalshi's event contracts are swaps subject to the CFTC's exclusive jurisdiction.* Defendants do not dispute that Congress has preempted the field of derivatives trading on DCMs, nor do they dispute that subjecting Kalshi to concurrent state and federal law would present a direct conflict with the CFTC's core principles. Defendants instead rest their case regarding preemption on the proposition that sports event contracts are not "swaps" within the meaning of the CEA, and therefore do not fall within the CFTC's exclusive jurisdiction. The plain text of the CEA easily refutes Defendants' position.

Section 2 grants the CFTC "exclusive jurisdiction" over all "accounts," "agreements," and "transactions involving *swaps*" that are "traded or executed on a contract market designated" by the CFTC. 7 U.S.C. § 2(a)(1)(A) (emphasis added). The CEA in turn defines a "swap" to

3

include "event" contracts—that is, any contract "that provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence . . . of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). The CEA's Special Rule in turn makes clear that Congress understood that event contracts involving the outcomes of sports events qualify as swaps. The Special Rule provides that "event contracts" and "swaps contracts" may involve "gaming," and further requires the CFTC to approve such contracts unless they are "contrary to the public interest." *Id.* § 7a-2(c)(5)(C)(i)(V). The Special Rule thus conclusively establishes Congress's understanding that swaps may encompass contracts involving outcomes of sports events. That is "the only workable interpretation of the special rule." *Flaherty*, 2025 WL 1218313, at *5.[1]

Defendants relegate (at 10 n.5) the text of the Special Rule to a footnote, contending that its reference to "event contracts" involving enumerated categories only "specif[ies] contracts that Congress wished to exclude from CFTC-designated exchanges." But the Special Rule does not *exclude* gaming-related event contracts; it *delegates* the power to determine a gaming contract's permissibility to the CFTC. *Id.* § 7a-2(c)(5)(C)(i)(V) ("The Commission *may* determine that such . . . contracts . . . are contrary to the public interest") (emphasis added). The title of the Special Rule itself refers to "review and *approval* of event contracts" involving the enumerated categories, including gaming. *Id.* § 7a-2(c)(5)(C) (emphasis added). Congress thus authorized the CFTC to permit contracts on sports events that are not contrary to the public interest— exactly what the CFTC has done with Kalshi's contracts.

---

[1] This Court therefore need not address the question whether event contracts are also "contract[s] of sale of a commodity for future delivery" under the exclusive jurisdiction provision. *See also* 7 U.S.C. § 1a(19) ("excluded commodity" includes "an occurrence, extent of an occurrence, or contingency . . . that is (I) beyond the control of the parties to the relevant contract, agreement, or transaction; and (II) associated with a financial, commercial, or economic consequence").

Defendants' argument (at 12-14) that sports events as a "categorical" matter lack "a potential financial, economic, or commercial consequence" is incorrect. Sports events can have significant financial consequences for a wide range of stakeholders: local communities, sponsors, television networks, advertisers. While Defendants cite (at 12-13) Kalshi's D.C. Circuit brief, in which Kalshi explained that "at least" some "contracts relating to games" do not serve a "commercial or hedging interest," Kalshi does not offer contracts on such events. Kalshi, unlike sportsbooks, does not offer "prop bets" on events like the coin-toss or the color of a Gatorade shower. The sports events for which Kalshi offers contracts have clear financial implications.

To take one example related to Kalshi's contract on the winner of the 2025 Masters: When Rory McIlroy won in a playoff against Justin Rose, television viewership rose by 33% over 2024, with significant financial consequences for CBS and advertisers.[2] Defendants' assertion (at 13-14) that the "outcome of [that] event had no financial, economic, or commercial consequences for anyone other than McIlroy or Rose" would come as a surprise to CBS or sponsors like Nike. To take another (closer-to-home) example: When No. 16 seed UMBC prevailed over No. 1 seed UVA in the 2018 NCAA Tournament, its victory was worth "a staggering amount of money" for the school and stakeholders.[3] These are *actual* and *significant* financial consequences; they easily qualify as "potential" economic consequences under the CEA. 7 U.S.C. § 1a(47)(A)(ii); *Flaherty*, 2025 WL 1218313, at *6 (rejecting same argument).[4]

---

[2] Jay Coffin, *Rory McIlroy's Master Victory Delivered The Most-Watch Final Round in 7 Years*, GolfDigest (Apr. 14, 2025), https://www.golfdigest.com/story/rory-mcilroy-masters-2025-win-delivered-most-watched-final-round-in-7-years.

[3] Jeff Eisenberg, *UMBC's Upset Has Generated Publicity Worth a Staggering Amount of Money*, Yahoo! Sports (Mar. 18, 2018), https://sports.yahoo.com/publicity-umbcs-upset-generated-worth-staggering-amount-money-054324907.html.

[4] Defendants note (at 13) that Kalshi's event contracts "do not involve the sporting event *itself*, but rather the *outcome* of the event." But, as the UMBC example shows, the winner of a sports

5

Defendants claim (at 14) that Kalshi's position would result in an "administrative nightmare" because it would require the CFTC to "undertake a case-by-case inquiry as to whether a particular sporting event is likely to have sufficient economic consequences." But whether an event has potential economic consequences is built into the broad definition of a swap irrespective of whether the swap relates to gaming, *see* 7 U.S.C. § 1a(47)(A)(ii), and there is no indication this scheme has created administrability challenges in other contexts. And the statute's broad reference to "potential" economic consequences means that the CFTC need not ask whether any particular event in fact yielded economic consequences, but instead whether it is the sort of event capable of yielding economic consequences.

Defendants rely on several canons of statutory interpretation to support their view that sports event contracts cannot be swaps. Defendants' deployment of these canons ignores the direct evidence of congressional intent in the broad definition of a swap and the text of the Special Rule. In any event, the canons do not support Defendants. Defendants first suggest (at 15) that Kalshi's position "would impliedly repeal several federal statutes." Not at all. Both the Wire Act and the Indian Gaming Regulatory Act ("IGRA") continue to govern—just not as applied to event contracts listed on DCMs. Defendants identify no authority holding that Kalshi's event contracts violate these federal statutes, nor could they. The Wire Act's "safe harbor" for "wagering" "to and from states" where that activity "is lawful," *W. Flagler Assocs., Ltd. v. Haaland*, 71 F.4th 1059, 1069 (D.C. Cir. 2023), applies here because Maryland's laws are preempted, meaning that Kalshi's contracts are lawful in Maryland. And IGRA's regulation of gaming "on Indian lands," 25 U.S.C § 2701, easily coexists with the CFTC's exclusive

---

event, not just the event's occurrence, can have significant economic consequences. The distinction between an event and its outcome gets Defendants nowhere.

jurisdiction over event contracts "traded or executed" on a DCM, 7 U.S.C. § 2(a)(1)(A). IGRA's definition of "gaming" does not refer to sports event contracts, 25 U.S.C § 2703(7)-(8), and even if it did, the CEA's exclusive jurisdiction provision would displace any attempt by tribes to regulate those contracts. The argument (at 16) that the "specific governs the general" fails for similar reasons. The CEA's grant of exclusive jurisdiction to the CFTC over trading on DCMs is more specific than the federal laws generally regulating gambling outside of DCMs.

Defendants suggest (at 18) that Kalshi's position would result in an elephant hidden in a mousehole. But the preemption of state gaming laws as applied to the narrow category of trading event contracts on DCMs is not an elephant—it leaves state gaming laws, the Wire Act, and IGRA operative in the vast majority of applications. Nor is anything hidden—Congress's preemption of state laws as applied to event contracts is the clear consequence of the addition of "swaps" to the CFTC's exclusive jurisdiction. The change in the landscape derives not from the CFTC's exclusive jurisdiction over trading on DCMs, but rather from the recent laws in states like Maryland legalizing sports betting in the wake of the Supreme Court's decision in *Murphy v. National Collegiate Athletic Association*, 584 U.S. 453, 486 (2018).

Defendants claim (at 17) that *noscitur a sociis* limits the definition of a "swap" to contracts with "consequences that directly affect 'rates, currencies, commodities, securities, instruments of indebtedness, indices, [or] quantitative measures.'" But that argument ignores that the definition of a swap broadly encompasses events "associated with a *potential* financial, economic, or commercial consequence." *See* 7 U.S.C. § 7a-2(c)(5)(C)(i) (emphasis added). The canon of superfluity likewise does not apply: Sections 1a(47)(A)(i) and (iii) apply to contracts based on the "value" or "level" of certain financial instruments. Section 1a(47)(A)(ii), on the other hand, applies to contracts based on the "occurrence, nonoccurrence, or the extent of the

7

occurrence" of a defined "event" "*other than* a change in price, rate, *value*, or *levels* of a commodity." *See* 7 U.S.C. § 7a-2(c)(5)(C)(i) (emphasis added).

    *2. <u>The purposes of the CEA require preemption of state gaming laws as applied to trading on DCMs</u>.*  As both the District of Nevada and the District of New Jersey found, Congress in 1974 granted the CFTC exclusive jurisdiction over futures traded on designated exchanges because it was "concerned that the states . . . might step in to regulate the futures markets themselves."  *Am. Agric. Movement v. Bd. of Trade*, 977 F.2d 1147, 1156 (7th Cir. 1992), *abrogated on other grounds by Time Warner Cable v. Doyle*, 66 F.3d 867, 875 (7th Cir. 1995).  Congress intended to bring exchanges "under a uniform set of regulations" because "a contract market could not operate efficiently, and perhaps not at all," if subject to competing legal regimes.  *Id.*  The conference report to the 1974 Amendments eliminated any doubt: "Under the exclusive grant of jurisdiction," the CEA "would *preempt the field insofar as futures regulation is concerned*."  CFTC Act of 1974 Committee Report, U.S. Senate Committee on Agriculture and Forestry, 93rd Cong., 2d Sess., at 11 (Nov. 15, 1974) (emphasis added).

    Defendants do not dispute that Congress sought to subject trading on DCMs to a single set of federal regulations rather than concurrent state and federal regulations.  Defendants instead argue that this legislative purpose is irrelevant because "swaps" were not added to the CFTC's exclusive jurisdiction until 2010.  But Defendants concede (at 19) that Congress in 1974 granted the CFTC "exclusive jurisdiction" over "accounts" and "agreements" on DCMs.  *See* 7 U.S.C. § 2(a)(1)(A).  Defendants also concede (at 25) that Congress preserved state law only "except" as provided in the "exclusive jurisdiction" provision.  Thus, when Congress added "swaps" to the exclusive jurisdiction provision in 2010, it plainly intended to preempt state law as to swaps traded on DCMs.  The addition of swaps in 2010 is especially strong evidence of Congress's

intent given the uniform pre-2010 precedent holding that the exclusive jurisdiction provision "preempts the application of state law" regarding trading on DCMs. *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (Friendly, J.); *Am. Agric. Movement*, 977 F.2d at 1156-57 (any state law that "would directly affect trading on or the operation of a futures market" regulated by the CFTC "is preempted"); *FTC v. Ken Roberts Co.*, 276 F.3d 583, 590-91 (D.C. Cir. 2001) ("the CFTC's jurisdiction was to be exclusive with regard to the trading of futures *on organized contract markets*").

Defendants cite a CFTC release (at 19) for the proposition that swaps were only "meant to cover" events "in the heartland of the CFTC's authority" like "a specific farmer's crop yield." *See* Concept Release, 73 Fed. Reg. 25,671 (May 7, 2008). But that is not a faithful account of the release, which contemplates contracts involving "a multitude of subcategories, such as political or *entertainment . . . events*." *Id.* at 25,671 (emphasis added). The release adds that the CEA "supersedes and preempts other laws*,* including state and local gaming and bucket shop laws, with respect to transactions executed on or subject to the rules of a Commission-regulated market." *Id.* at 25,673.

Defendants cite (at 19) Senate floor statements during debate over the Dodd-Frank Act, claiming they evince an intent to exclude gaming contracts from the definition of swaps. But, even if relevant, the floor statements suggest the opposite. Two Senators noted that "gaming" contracts raise public-interest concerns, which the Senators recognized would be addressed by the Special Rule giving the "CFTC . . . the power" either to approve or prohibit them. *See* Cong. Rec. S5906-07 (daily ed. July 15, 2010) (statements of Senators Feinstein and Lincoln).[5]

It is undisputed that Congress, in bringing swaps within the CFTC's exclusive jurisdiction,

---

[5] Available at: https://www.congress.gov/111/crec/2010/07/15/CREC-2010-07-15-senate.pdf.

recognized that swaps involving gaming raised public-interest concerns. Congress's solution was not to ban gaming contracts outright, but rather to adopt the Special Rule authorizing the CFTC to review and approve these contracts if they comport with the public interest. And attitudes about gaming have changed dramatically since Congress enacted the Special Rule. In 2010, federal law broadly prohibited sports betting. But the Supreme Court in the 2018 *Murphy* decision allowed states to legalize sports betting, and a majority of states—including Maryland in 2021—have done so. Sports betting is now a ubiquitous nationwide industry. One of the reasons Congress granted the CFTC discretion to engage in public-interest review rather than banning gaming contracts outright was to allow the CFTC to account for this kind of evolution.

       3. <u>CFR 40.11 reinforces the CFTC's exclusive jurisdiction over Kalshi's event contracts</u>. Defendants rely heavily (at 20) on 17 C.F.R. 40.11, which they contend "expressly prohibits *ex ante* gaming" contracts on DCMs. But the text of Section 40.11 refutes Defendants' position. Section 40.11 is not, as Defendants allege (at 20), a "blanket prohibition" of gaming contracts. While Section 40.11(a) generally bars DCMs from offering a contract that "involves, relates to, or references" "gaming," Section 40.11(c) proceeds to reserve the CFTC's discretion to determine whether a contract is nevertheless permissible. Under Section 40.11(c), a DCM may offer contracts that "involve, relate to, or reference an activity enumerated in Section 40.11(a)(1)" by either self-certifying the contract under "Section 40.2" or preclearing the contract with the CFTC under "Section 40.3." 17 C.F.R. § 40.11(c). The contract becomes effective upon self-certification or preclearance. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.11(c). The CFTC may then decide whether to take action, such as by subjecting the contract "to a 90-day review" from the date that the CFTC notifies the DCM of a "potential violation." 17 C.F.R. § 40.11(c). The CFTC must then make a determination whether the contract is prohibited under

40.11(a) and "shall issue an order approving or disapproving" the contract.  17 C.F.R. § 40.11(c).

The CFTC has not interpreted Section 40.11(a) as a wholesale elimination of its discretion regarding contracts that relate to a 40.11(a) category.  It has instead always understood 40.11(c) to preserve its discretion.  The CFTC's 2011 Release adopting Section 40.11 explains:

> "[R]egistered entities *may always* certify products pursuant to the procedures in § 40.2.  If the Commission determines during its review of a product that the submission may violate the prohibitions in § 40.11(a)(1)–(2), the Commission may request that the registered entity suspend the trading or clearing of the contract pending the completion of a 90-day extended review."

Adopting Release, 76 Fed. Reg. 44,786 (July 27, 2011) (emphasis added); *accord* Voting Copy of Proposed Amendments to the Special Rule (May 10, 2024), at 14 n.36.

The CFTC therefore did not, as Defendants allege (at 21), eliminate its own discretion to evaluate contracts' compliance with the public interest.  Indeed, reading the provision as a "blanket prohibition" would run afoul of the CEA's text.  The Special Rule allows the CFTC to prohibit contracts involving gaming if—but only if—the CFTC "determine[s]" that these contracts are "contrary to the public interest."  7 U.S.C. § 7a-2(c)(5)(C)(i)(V).  Neither Section 40.11 nor its implementing rule contains any finding purporting to conclude that all contracts involving gaming are categorically contrary to the public interest.  Section 40.11(c) thus preserves the CFTC's ability to determine that gaming contracts comport with the public interest.

Defendants' reliance on Section 40.11 undermines rather than supports their argument.  Defendants concede that the CFTC in Section 40.11 has regulated event contracts involving gaming.  While Defendants misinterpret this regulation, the regulation unquestionably shows that the CFTC understands itself to possess jurisdiction over these contracts.  The concession that the CFTC has jurisdiction over this field shows that concurrent state regulation is preempted.  Where "the CFTC has jurisdiction, its power is exclusive."  *Chicago Mercantile Exch.*, 883 F.2d at 548.

11

Defendants suggest (at 22) that this Court "may enforce the provisions of [Section] 40.11(a)(1)." But Defendants offer no support for the remarkable suggestion that a federal court in a preemption case could, at the defendant state officials' suggestion, enforce an agency regulation that the agency itself has declined to enforce. If Defendants were to bring a suit *against the CFTC* under the APA challenging the decision not to enforce Section 40.11, that challenge would face its own obstacles. *See Heckler v. Chaney*, 470 U.S. 821, 832 (1985) (holding that "[a]n agency's decision not to take enforcement action [is] presumed immune from judicial review"). But Defendants go much further, asking this Court to apply a federal law *directly against Kalshi* that the CFTC has declined to enforce. Defendants offer no example of a court doing anything like what they propose, and the plain terms of the CEA prohibit it. Section 13a-2 authorizes appropriate officials "of any State" to bring suit regarding "any act or practice constituting a violation of any provision of this chapter or any rule . . . of the [CFTC]" against parties "*other than a [designated] contract market*." 7 U.S.C. § 13a-2(1) (emphasis added). Congress thus expressly refused to allow state officials to bring suit against DCMs.

Defendants' claim that Maryland laws are "consistent" with Section 40.11(a) is both irrelevant and incorrect. It is irrelevant because the CEA grants the CFTC "exclusive jurisdiction" over event contracts traded on DCMs, regardless of whether concurrent regulation by states could be described as being consistent with federal law at a high level of generality. *See Arizona v. United States*, 567 U.S. 387, 401 (2012) ("Where Congress occupies an entire field . . . even *complementary* state regulation is impermissible.") (emphasis added). And Defendants' argument is also incorrect. Complying with Maryland's cease-and-desist letter would squarely conflict with federal law—it would deny impartial access to Kalshi's platform, risk market disruptions of the kind the CFTC's core principles prohibit, and result in the

patchwork of state regulation that Congress created the CFTC to avoid.

  4. *The presumption against preemption does not apply*.  Defendants fall back on the presumption against preemption.  But the presumption does not apply to the field of regulating derivatives markets—"an area where there has been a history of significant federal presence." *PPL EnergyPlus, LLC v. Nazarian*, 753 F.3d 467, 477 (4th Cir. 2014).  The presumption is particularly inapposite given that the CEA does not preempt state gambling laws in all applications, but merely as applied to the narrow field of trading on DCMs, which has always been the subject of federal rather than state authority.

  Even if the presumption applied, it is "overcome" where "the text and structure" of the relevant federal statute "unambiguously apportion[] control" over the field to the federal agency. *Id.*  Congress's intent to preempt state laws through the CEA is clear for all the reasons already noted.  Defendants' reliance on the presumption against preemption is especially untenable given the breadth of their argument.  While this case arises in the context of state gambling laws, Defendants' interpretation of the CEA (at 24) would mean that states may regulate *any* event contracts traded on DCMs that fall within their "traditional police powers."  No limiting principle confines their argument to gambling laws, and their interpretation would result in a radical revision of the CEA—yet another reason to reject it.

  **B. Kalshi Will Suffer Irreparable Harm Without A Preliminary Injunction.**

  As the Districts of Nevada and New Jersey concluded, "Kalshi has met its burden of showing a likelihood of irreparable harm." *Hendrick*, 2025 WL 1073495, at *7; *see also Flaherty*, 2025 WL 1218313, at *7.  Defendants' cease-and-desist letter threatens Kalshi with a Hobson's choice: It must either continue offering its contracts in Maryland and "expose [itself] to potentially huge liability," or "suffer the injury of obeying the law during the pendency of the proceedings" and risk irreparable costs, the potential loss of its CFTC designation, and

significant reputational harm. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). Loss of goodwill alone can constitute irreparable harm. *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994).

      Defendants do not dispute—and thus concede—that Kalshi would suffer harm in the absence of a preliminary injunction that could not be recouped through damages due to Eleventh Amendment immunity. Defendants instead claim (at 26) that Kalshi is not entitled to relief because any harm it may suffer is "of its own making." The same argument was made in *Hendrick* and *Flaherty*, and both courts rejected it. Since the CFTC approved Kalshi as a DCM in 2020, Kalshi has sought to comply with the CFTC's core principles. Kalshi "enact[s] and enforce[s] rules to ensure fair and orderly trading, including rules designed to prevent price manipulation, cornering and other market disturbances." *Am. Agric. Movement*, 977 F.2d at 1150-51. It "make[s] public daily information on settlement prices, volume, open interest, and opening and closing ranges" for contracts, 17 C.F.R. § 38.450; it keeps records of most transactions for at least 5 years, *id.* §§ 38.950, 1.31(b)(1); it offers "impartial access" to its platform, *id.* § 38.151(b); it makes its records "open to inspection by any representative of the" CFTC or DOJ, *id.* § 1.31(d)(1); and it maintains financial resources to "cover its operating costs for a period of at least one year," *id.* § 38.1101(a)(2). These are the only regulations Kalshi had any reason to believe apply to it. The harm in this case arose when Defendants chose to issue a cease-and-desist letter purporting to subject Kalshi to preempted state laws and threatening Kalshi with civil and criminal action for noncompliance.

      **C.**    **The Other Equitable Factors Favor A Preliminary Injunction.**

As the Districts of Nevada and New Jersey held, "[t]he balance of hardships tips in Kalshi's favor given that it is facing substantial monetary expenditures, reputational damage, or civil and criminal prosecution based on the defendants' demands that the defendants likely

14

cannot make because they are preempted." *Hendrick*, 2025 WL 1073495, at *7; *see also Flaherty*, 2025 WL 1218313, at *7. Defendants do not meaningfully contend otherwise.

*First*, Defendants claim that the public interest favors them because Kalshi "undercuts" sportsbooks and "endangers" the state's tax revenue. But Maryland is not entitled to tax revenue from an activity that it is preempted from regulating, and whether Kalshi threatens Maryland's "thriving gaming industry" (at 29) is irrelevant because Defendants have no authority to regulate trading on a DCM. *See Flaherty*, 2025 WL 1218313, at *6 (rejecting the same argument).

*Second*, Defendants claim (at 29) that "Kalshi's unlicensed business has not demonstrated that it has the necessary integrity, financial stability, and responsible gaming practices to ensure that Marylanders are not preyed upon." But Kalshi *is* licensed federally, and federal law imposes a panoply of consumer-protection requirements on DCMs. Kalshi proactively complies with the federal "Anti-Money Laundering (AML) and Know Your Customer (KYC) protections" that Defendants identify (at 16). *See KalshiEX LLC Rulebook*, KalshiEx, at 3.5(a), 3.4(c), 3.6(g).[6] Kalshi must also maintain its own investigation mechanisms and processes for addressing customer complaints. 17 CFR § 38.158. And federal law requires Kalshi's contracts to be fully collateralized via a clearinghouse that maintains its own funds and pays amounts due to traders. *See DTCC Data Repository (U.S.) LLC v. CFTC*, 25 F. Supp. 3d 9, 12 (D.D.C. 2014). The question in this case is not whether Kalshi should be subject to regulation, but rather by whom. Congress's answer is clear: The CFTC has exclusive jurisdiction.

## CONCLUSION

For the foregoing reasons, the Court should grant a preliminary injunction.

---

[6] Available at: https://kalshi-public-docs.s3.amazonaws.com/regulatory/rulebook/Kalshi%20Rulebook%20v1.17.pdf.

Dated this 19th day of May, 2025.   /s/ *Neal Kumar Katyal*

Neal Kumar Katyal (D. Md. Bar No. 21694)
Joshua B. Sterling (pro hac vice)
William E. Havemann (D. Md. Bar No. 19164)
Milbank LLP
1850 K Street, Suite 1100
Washington D.C. 20006
Telephone: 202-835-7505
Facsimile: 213-629-5063

Mackenzie Austin (pro hac vice)
Milbank LLP
2029 Century Park East, 33rd Floor
Los Angeles, California 90067
Telephone: 424-386-4000
Facsimile: 213-629-5063

ATTORNEYS FOR PLAINTIFF