## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| KalshiEX, LLC | | |
| | * | |
| *Plaintiff* | | Case No.: 25-cv-1283-ABA |
| | * | |
| v. | | |
| | * | |
| John A. Martin, et al., | | |
| | * | |
| *Defendants*. | | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

ANTHONY G. BROWN
Attorney General of Maryland


ERIK J. DELFOSSE                           MAX F. BRAUER
Federal Bar No. 18881                      Federal Bar No. 30162
Assistant Attorney General                 Assistant Attorney General
Maryland Lottery and Gaming Control Agency Securities Division
1800 Washington Boulevard                  200 Saint Paul Place
Suite 330                                  25th Floor
Baltimore, Maryland 21230                  Baltimore, Maryland 21202

Attorneys for Defendants, John A. Martin, Maryland Lottery and Gaming Control Commission, Maryland Lottery and Gaming Control Agency, Everett D. Browning, Sr., E. Randolph Marriner, Ade Adebisi, Diane Croghan, George L. Doetsch, Jr., Harold E. Hodges, and James J. Stakem, and Anthony G. Brown

June 13, 2025

## TABLE OF CONTENTS

I.   Kalshi Is Judicially Estopped from Asserting That Its Sports Event Contracts Are Not Gaming Contracts and That These Contracts Do Not Have Potential Financial, Economic or Commercial Consequence..................................................................2

    A.  The Standard of Law for Judicial Estoppel in the Fourth Circuit..................................... 3

    B.  In the Prior Litigation, Kalshi Made Factual Assertions That Are Diametrically Opposed to Its Allegations in the Pending Litigation. ............................ 4

    C.  Kalshi's Positions in the Prior Litigation Were Adopted by the Court and Were Not Based on Inadvertence or Mistake. ....................................................... 8

    D.  Kalshi's Arguments in the Prior Litigation Bar Kalshi From Contesting That Their Gaming Contracts Are Not Swaps. ..................................................... 9

II.  Even if Judicial Estoppel Is Inapplicable, Kalshi's Prior Position that Gaming Contracts Are Not Swaps Is Persuasive. ....................................................................9

    A.  Kalshi Prohibits Its Gaming Contracts from Being Used for Hedging. ....................... 10

    B.  Unlike Swaps, Gaming Contracts Do Not Facilitate Any Potential Financial, Economic, or Commercial Consequence. ..................................................... 11

    C.  Sports Wagers Have No Need for a Pervasive Federal Regulatory Scheme to Stabilize the Economy. ............................................................................ 13

III. The Special Rule and Subsequent Rulemaking Remove Gaming from the CFTC's Exclusive Jurisdiction..................................................................................15

    A.  The Legislative History of Dodd-Frank Demonstrates That Congress Never Intended the CFTC to Have Exclusive Jurisdiction Over Sports Wagering. ............................................................................................... 15

    B.  The Congressional Delegation Contained in the Special Rule in Conjunction with 17 C.F.R. § 40.11 Excludes Gaming Contracts From the CFTC's Exclusive Jurisdiction. ..................................................................... 17

    C.  The Practical Application of Kalshi's Interpretation of the Special Rule as Implemented by § 40.11 Is Inconsistent with the Legislative Intent of Dodd-Frank and Leads to Absurd Results. ......................................................... 19

IV. Even if Kalshi's Gaming Contracts Are Swaps Within the CFTC's Exclusive Jurisdiction, Maryland's Sports Wagering Laws Are Not Preempted by the CEA. ..............................................................................................................21

    A.  The CEA's Exclusive Jurisdiction Provides for Conflict Preemption, Not Field Preemption. ..................................................................................... 21

    B.  Compliance with Maryland Sports Wagering Laws Does Not Frustrate Kalshi's Ability to Comply with the CEA. ................................................... 24

C.   Maryland's Sports Wagering Laws Do Not Conflict with the CEA................................ 25

V.   Kalshi's Violations of Federal and State Law. ...................................................................26

A.   Kalshi's Gaming Contracts Violate the Wire Act................................................ 27

B.   Kalshi's Gaming Contracts Violate the Indian Gaming Reserve Act............................ 28

C.   The Dodd-Frank Amendments Did Not Grant the CFTC Exclusive
Jurisdiction Over Illegal Transactions. ................................................................ 29

D.   Kalshi's Gaming Contracts Violate State Law. ................................................ 29

CONCLUSION.........................................................................................................................30

# TABLE OF AUTHORITIES

**Cases**

*American Agric. Movement, Inc. v. Bd. of Trade of City of Chicago*,
  977 F.2d 1147 (7th Cir. 1992) ............................................................................................ *passim*

*Chicken Ranch Rancheria of Me-Wuk Indians v. California*,
  42 F.4th 1024 (9th Cir. 2022) ........................................................................................... 28

*Coeur d'Alene Tribe v. Idaho*, 842 F. Supp. 1268 (D. Idaho 1994) ........................................... 29

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000) ................................................... 24

*CSX Transp. Inc. v. Easterwood*, 507 U.S. 658 (1993) ............................................................... 21

*Fellner v. Tri-Union Seafoods, LLC*, 529 F.3d 237 (3d Cir. 2008) ........................................... 26

*FTC v. Ken Roberts Co.*, 276 F.3d 583 (D.C. Cir. 2001) ............................................................. 22

*In re: Chicago Board Options Exchange Volatility Index Manipulation Antitrust*
  *Litigation*, 390 F.Supp. 3d 916 (N.D. Ill 2019) ........................................................................ 22

*Int'l Paper Co. v. Ouellette*, 479 U.S. 481 (1987) ........................................................................ 23

*Inv. Co. Inst. v. CFTC*, 891 F. Supp. 2d 162 (D.D.C. 2012), as amended (Jan. 2, 2013),
  *aff'd*, 720 F.3d 370 (D.C. Cir. 2013) .............................................................................. 14

*John S. Clark Co. v. Faggert & Frieden, P.C.*, 65 F.3d 26 (4th Cir. 1995) ..................................... 3

*KalshiEX LLC v. Commodity Futures Trading Comm'n*, 119 F.4th 58 (D.C. Cir. 2024) ........... 1, 4

*KalshiEX LLC v. Commodity Futures Trading Comm'n*, 2024 WL 4164694 (D.D.C.
  Sept. 12, 2024), *dismissed*, No. 24-5205, 2025 WL 1349979 (D.C. Cir. May 7, 2025) ......... 1, 4

*New Hampshire v. Maine*, 532 U.S. 742 (2001) ................................................................... 2, 3, 9

*Patry v. Rosenthal & Co.*, 534 F. Supp. 545 (D. Kan. 1982) ...................................................... 24

*Power v. Arlington Hosp. Ass'n*, 42 F.3d 851 (4th Cir. 1994) .................................................... 20

*Speiser v. Randall*, 357 U.S. 513 (1958) .................................................................................... 20

*Taylor v. Bear Stearns & Co.*, 572 F.Supp. 667 (N.D. Ga 1983) ............................................... 24

*U.S. v. Lyons*, 740 F.3d 702 (1st Cir. 2014) ................................................................................ 28

*U.S. v. McDonough*, 835 F.2d 1103 (5th Cir.1988) .................................................................... 28

*US v. Bala*, 489 F.3d 334 (8th Cir. 2007) ............................................................................. 27, 28

*Witzel v. Chartered Systems Corp. of N.Y.*, 490 F.Supp. 343 (D.Minn. 1980) ........................... 24

*WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292
  (4th Cir. 2009) ........................................................................................................... 14

*Zyla Life Sciences, LLC v. Wells Pharma of Houston, LLC*, 134 F. 4th 326
  (5th Cir. 2025) .................................................................................................................. 26

## Statutes

7 U.S.C. § 1a(47)(A)(ii) ............................................................................................ 3, 29

7 U.S.C. § 1a(47)(A)(iii) .................................................................................................. 12

7 U.S.C. § 2(a)(1)(A) .......................................................................................... 2, 19, 29

7 U.S.C. § 2(a)(1)(G)(i) .................................................................................................... 19

7 U.S.C. § 2(e) .................................................................................................................. 23

7 U.S.C. § 6d(a)(1) ........................................................................................................... 23

7 U.S.C. § 7a-2(c)(5)(C)(i) ........................................................................................ *passim*

18 U.S.C. § 1084 .......................................................................................................... 2, 27

25 U.S.C. § 2702 ............................................................................................................... 28

25 U.S.C. § 2710(d)(3)(A) ............................................................................................... 28

Md. Code Ann., Crim. Law, §12-101(d)(1)(ii) .............................................................. 30

Md. Code Ann., Crim. Law, §12-113(b) ......................................................................... 30

Md. Code Ann., St. Gov., § 9-1E-07(b)(6) ........................................................ 14, 25, 26

Md. Code Ann., St. Gov., § 9-1E-11(a) ........................................................................... 14

Md. Code Ann., St. Gov., § 9-1E-15(o) .......................................................................... 25

## Other Authorities

120 Cong. Rec. 30, 464 (Sept. 9, 1974) .......................................................................... 23

156 Cong. Rec. S5902-01, S5907 (July 15, 2010) ......................................................... 16

*Commodity Futures Trading Commission Act: Hearings Before the Senate Committee on Agriculture & Forestry*, 93d Cong., 2d Sess. 685 (1974) ......................................... 23

H. R. Rep. No. 975, 93d Cong., 2d Sess. 1 ..................................................................... 13

H. R. Rep. No. 87–967 (1961), *as reprinted in* 1961 U.S.C.C.A.N. 2631 ............................ 27, 28

Provisions Common to Registered Entities, 76 FR 44776 (July 27, 2011) .................................. 18

## Treatises

Graham Purcell & Abelardo Lopez Valdez, *The Commodity Futures Trading Commission Act of 1974: Regulatory Legislation for Commodity Futures Trading in a Market–Oriented Economy,* 21 S. D. L. Rev. 555 (1976) ................................................ 14

Kevin T. Van Wart, *Preemption and the Commodity Exchange Act,* 58 Chi.–Kent L. Rev. 657 (1982) ................................................................................................................ 13

Philip F. Johnson, *The Commodity Futures Trading Commission Act: Preemption as Public Policy,* 29 Vand. L. Rev. 1 (1976) ............................................................... 13

**Regulations**

17 C.F.R. § 40.11 ................................................................................................... *passim*

25 C.F.R. § 502.4 ......................................................................................................... 28

On May 28, 2025, the parties appeared before this Court and presented oral argument on the Motion for Preliminary Injunction and Temporary Restraining Order filed by plaintiff KalshiEX LLC ("Kalshi"). At the hearing, the Court requested supplemental briefing on the effect of Kalshi's prior statements made in *KalshiEX LLC v. Commodity Futures Trading Comm'n*, No. CV 23-3257 (JMC), 2024 WL 4164694, at *1 (D.D.C. Sept. 12, 2024), *dismissed,* No. 24-5205, 2025 WL 1349979 (D.C. Cir. May 7, 2025) and *KalshiEX LLC v. Commodity Futures Trading Comm'n*, 119 F.4th 58 (D.C. Cir. 2024) (collectively the "Prior Litigation"). The Court is also permitting the parties to supplement their prior brief with anything else they believe should be brought to the Court's attention. In response to the Court's instructions, the Defendants John A. Martin, Maryland Lottery and Gaming Control Commission, Maryland Lottery and Gaming Control Agency, Everett D. Browning, Sr., E. Randolph Marriner, Ade Adebisi, Diane Croghan, George L. Doetsch, Jr., Harold E. Hodges, and James J. Stakem, and Anthony G. Brown (collectively "Defendants") provide this supplementation.

Based on its statements in the Prior Litigation, Kalshi is judicially estopped from asserting that its gaming contracts have a potential financial, economic, or commercial consequence and, therefore, are swaps. Even if this Court chooses not to invoke judicial estoppel regarding Kalshi's prior statements, the Court should still find the statements are persuasive to the finding that gaming contracts have no underlying economic value, cannot be used as a hedging device, do not facilitate any commercial value, and do not require a pervasive federal regulatory scheme to stabilize the sports wagering market.

At the May 28, 2025 hearing, the Court also questioned the effect of the Congressional delegation in 7 U.S.C. § 7a-2(c)(5)(C)(i) (the "Special Rule"), the potential for conflict preemption resulting from the "exclusive jurisdiction" granted to the Commodities Futures Trading

Commission ("CFTC") in 7 U.S.C. § 2(a)(1)(A), and the specific federal and state laws that were violated by Kalshi listing gaming contracts on its DCM. As to the Congressional delegation, the Special Rule and 17 C.F.R. § 40.11(a) make clear that Congress did not intend for sports wagers to be within the CFTC's exclusive jurisdiction. Even if they are, however, Maryland's sports wagering laws do not conflict with the CEA. Finally, by conducting unlicensed, interstate sports wagering, Kalshi is violating the Wire Act,[1] the Indian Gaming Regulatory Act ("IGRA"),[2] and Maryland criminal law[3] relating to unlicensed sports wagering.

## I.    Kalshi Is Judicially Estopped from Asserting That Its Sports Event Contracts Are Not Gaming Contracts and That These Contracts Do Not Have Potential Financial, Economic or Commercial Consequence.

Judicial estoppel prohibits Kalshi from undermining the integrity of the judicial process by advancing inconsistent arguments "according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 749–50 (2001). In the Prior Litigation, Kalshi took the position that gaming event contracts relied on an underlying game and, as such, they did not have any extrinsic economic value. *Infra* at 5-7. The categorical lack of any economic consequence to a sporting event was integral to Kalshi's definition of the term "gaming" as it is used in the Commodities Exchange Act ("CEA").[4] Exhibit 1, May 30, 2024, Oral Argument Transcript Excerpt at page 21, Lines 11-18 ("Exhibit 1 at __ (__)"). Kalshi now asserts to this Court that its gaming contracts *do* have a potential commercial interest because "[s]ports events can have significant financial interests." ECF 29 at 6. Pursuant to the tenets underlying judicial estoppel, it is fundamentally

---

[1] 18 U.S.C. § 1084

[2] 25 U.S.C. §§ 2701 *et seq.*

[3] Md. Code Ann., Crim. Law § 12-102

[4] 7 U.S.C. § 1 to § 27f

unfair to the Defendants and detrimental to the integrity of the federal court system to allow Kalshi to gain an advantage by performing this abrupt legal about face. Accordingly, Kalshi's gaming contracts are not swaps because they are based on an event that has no "potential financial economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii).

### A.    The Standard of Law for Judicial Estoppel in the Fourth Circuit.

"Judicial estoppel is an equitable doctrine invoked by a court at its discretion" and is "designed to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 749–50 (2001). Because it is equitable in nature, however, whether or not "judicial estoppel should be invoked depends on the 'specific factual context' of a case, rather than 'any general formulation' or 'inflexible' rule or standard." *Martineau v. Wier*, 934 F.3d 385, 394 (4th Cir. 2019) (quoting *New Hampshire*, 532 U.S. at 750–51 (alterations omitted)).

The Fourth Circuit "has identified four elements that must be met before a court may apply judicial estoppel." *Minnieland Priv. Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co., Inc.*, 867 F.3d 449, 458 (4th Cir. 2017) (quoting *Lowery*, 92 F.3d at 223–24). First, "the party sought to be estopped must be seeking to adopt a position that is inconsistent with a stance taken in prior litigation." *Id.* Second, "the position sought to be estopped must be one of fact rather than law or legal theory." *Id.* Third, "the prior inconsistent position must have been accepted by the court." *Id.* Finally, "judicial estoppel applies only when 'the party who is alleged to be estopped intentionally misled the court to gain unfair advantage,' and not when 'a party's prior position was based on inadvertence or mistake.'" *Martineau*, 934 F.3d at 393 (quoting *John S. Clark Co. v. Faggert & Frieden, P.C.*, 65 F.3d 26, 29 (4th Cir. 1995)).

**B.    In the Prior Litigation, Kalshi Made Factual Assertions That Are Diametrically Opposed to Its Allegations in the Pending Litigation.**

In November 2023, Kalshi filed suit in the U.S. District Court for the District of Columbia challenging a final order of the Commodity Futures Trading Commission ("CFTC"). The CFTC's final order prohibited Kalshi from listing "Congressional Control Contracts" ("Election Contracts") that allowed buyers to wager[5] on which political party would control the houses of Congress on a specified date. *KalshiEX LLC*, 119 F.4th at 61-63. On September 12, 2024, the court granted Kalshi's motion for summary judgment finding that "'gaming,' as used in 7 U.S.C. § 7a-2(c)(5)(C)(i) (the "Special Rule"), refers to "playing games or playing games for stakes." *KalshiEX*, 2024 WL 4164694, at *13. [6] The CFTC appealed the D.C. district court ruling to the U.S. Circuit Court for the District of Columbia. *KalshiEX LLC*, 119 F.4th at 63. After briefing and oral argument, the CFTC dismissed their appeal on May 7, 2025.

Contesting the CFTC's September 22, 2023 order, Kalshi asserted that the underlying event of a gaming contract, a game, had no inherent economic value while the underlying event of its Election Contracts did. Kalshi's assertions regarding the defining features of a gaming contract and the economic impact of gaming contacts constituted the factual foundation upon which the court predicated its determination that the Election Contracts did not qualify as "gaming contracts" under the Special Rule as a matter of law. *KalshiEX*, 2024 WL 4164694, at *13. In contrast, Kalshi now takes the position that its "sports event contracts" do have a potential commercial interest because "[s]ports events can have significant financial interests." ECF 29 at 6. More than

---

[5] Throughout Defendants' Supplemental Brief the terms "bet" and "wager" are used interchangeably.

[6] The D.C. district court also found that Kalshi's Election Contracts were not unlawful because the underlying event, elections, did not constitute an illegal act. *KalshiEX*, 2024 WL 4164694, at *13.

inconsistent, Kalshi's current position is diametrically opposed to and irreconcilable with its position in the Prior Litigation.

In both written and oral argument before the D.C. federal courts, Kalshi argued that event contracts involving a sporting event constitute gaming contracts:

> The 'gaming' category [of the Special Rule] reaches contracts contingent on games – for example, whether someone will win the Powerball lottery by a certain date, or whether a certain team will win the Super Bowl. It thus functions as a check on attempts to launder casino-style or sports gambling through the derivatives markets. Jan. 25, 2024, Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment, *KalshiEX*, 2024 WL 397419, Docket No. 17-1 at 26 ("Motion for Summary Judgment, 2024 WL 397419, Docket No. 17-1 at __ ").

> The only relevant legislative history, moreover, confirms that contracts on "sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament" were *precisely* what Congress had in mind as "gaming" contracts. *Id.* at 33 (citing 156 Cong. Rec. S5907 (daily ed. July 15, 2010))(emphasis original).

> Senator Lincoln's litany of 'sporting events' – a football game, a horse race, and a golf tournament – is perfectly consistent with Kalshi's reading of 'gaming.' March 27, 2024, Reply in Support of Plaintiff's Motion for Summary Judgment, *KalshiEX*, 2024 WL 4164694, Docket No. 36 at 25 ("March 27, 2024, Reply, 2024 WL 4164694, Docket No. 36 at __ ")(citations omitted).

> An event contract thus involves "gaming" if it is contingent on a game or a game-related event. The classic example is a contract on the outcome of a sporting event; as the legislative history directly confirms, Congress did not want sports betting to be conducted on derivatives markets. Nov. 15, 2024, Brief of Appellee, *KalshiEX LLC, v. CFTC*, 2024 WL 4802698, at *41 (citations omitted).

In the pending litigation, Kalshi neither admits nor denies that its "sports event contracts" are, in fact, gaming contracts. *See generally* ECF 1, ECF 2 and ECF 29. To the extent that Kalshi posits to this Court that they are not, its position would be inconsistent with the position it took in the Prior Litigation.

After arguing that gaming contracts must be based on games, Kalshi explained to the D.C. courts how gaming contracts categorically differed from its Election Contracts:

[E]lections – again, unlike games – have extrinsic effects outside the contest itself, and indeed carry significant economic consequences in the real world. Buying or selling election event contracts therefore does not amount to "gaming."

Jan. 25, 2024, Motion for Summary Judgment, 2024 WL 397419, Docket No. 17-1 at 37; *see also* November 15, 2024, Brief of Appellee, *KalshiEX LLC, v. CFTC*, 2024 WL 4802698, at \*45.

Such "contests" [horseraces or boxing matches] are staged purely for entertainment and to facilitate betting. They have no independent significance; their outcomes carry no economic risks. Elections are nothing like the other terms on those lists. They have extrinsic effects and vast economic consequences.

*Id.* at 40.

An election is not a game. It is not staged for entertainment. It has vast extrinsic and economic consequences. Does the CFTC really believe there is no difference between the 2024 Super Bowl and the 2024 congressional elections? That the identity of the next President has the same impact on Americans as which horse wins the Kentucky Derby? That control of the House and the Senate is economically comparable to the outcome of the Masters?

March 27, 2024, Reply2024 WL 2873875, Docket No. 36 at 25-26.

[W]hat is a game? It's something that has no inherent economic significance. It's something that is done for amusement. It may be done for sport. It may be done purely to facilitate the betting itself, right, for its own sake.

Exhibit 1 at 15 (7-11).

Contracts that involve games are probably not the type of contracts that we want to be listed on an exchange, because they don't have any real economic value to them. But again, what's tying that together is the existence of the game because the game is the thing that doesn't have intrinsic economic significance.

*Id.* at 15(13-18).

Congress sought to prevent exchanges from facilitating casino-style or sports gambling. On a policy level, that makes some sense: The basic purpose of Designated Contract Markets is to allow "hedging" of economic risk. Contracts that "serve[] no commercial purpose at all" may therefore not deserve to be traded on a regulated exchange. And, at least in general, contracts relating to *games*--again, activities conducted for diversion or amusement--are unlikely to serve any "commercial or hedging interest."

Brief of Appellee, *KalshiEX LLC, v. CFTC*, 2024 WL 4802698, at \*45 (citing 156 Cong. Rec. S5906-07)(emphasis and alterations original).

The defining feature of a game is that it doesn't have economic consequences outside the game itself; it has no extrinsic consequences. While whoever wins the Super Bowl will be very happy, it doesn't have widespread economic consequences. It made sense for Congress to say 'we only want those contracts that

> have economic effects.' … Games are out. Games don't have economic consequences.
> January 17, 2025, Oral Argument, https://www.courtlistener.com/audio/94558/ kalshiex-llc-v-cftc/ at 63:15 – 65:00, *KalshiEX LLC*, 119 F.4th 58 (last visited June 10, 2025).

Thus, according to Kalshi, the fundamental difference between its Election Contracts and gaming contracts is that gaming contracts have no inherent economic value.

At oral argument on Kalshi's Motion for Summary Judgement, the D.C. district court expressly agreed with Kalshi "that a game doesn't have any external economic significance." Exhibit 1 at 20 (20-21). The court pressed Kalshi to explain why this was "relevant to [Kalshi's] specific argument" regarding the definition of gaming. *Id.* at 20 (22-23). Kalshi explained that "games don't matter in the real world; they're games," and that this distinction provided meaning to the "categorization that Congress laid out." *Id.* at 21 (7-8, 10-11). According to Kalshi, gaming's lack of intrinsic economic value was the "unifying policy rational" that separated gaming contracts from Kalshi's Election Contracts. *Id.* at 21 (11-18).

To this Court, Kalshi characterizes its position in the Prior Litigation as intended to "explain[] that 'at least' some 'contracts relating to games' do not serve a 'commercial or hedging interest.'" ECF 29 at 6. Nowhere in the Prior Litigation's briefings did Kalshi indicate that *any* gaming contracts could serve a "commercial or hedging interest." After asserting that an integral and pervasive aspect of their position in the Prior Litigation only applied to "some contracts relating to games," Kalshi now boldly states that it "does not offer contracts on such events." *Id.* According to Kalshi, "[t]he sports events for which Kalshi offers contracts have clear financial implications." *Id.* Yet, the examples cited by Kalshi to this Court as having "clear financial implications," the Super Bowl and the Master's Tournament, are the exact examples that Kalshi

previously used to argue that gaming contracts *do not* have any commercial consequences. *Compare infra* at 5-7, ECF 29 at 6.

Kalshi cannot deny now that the very events it previously claimed constitute gaming are not *in fact* games. Nor can it deny the fact that the legislative history stated clearly that those events – "Senator Lincoln's litany of 'sporting events'" (including the Master's Tournament) – "are *precisely* what Congress had in mind as 'gaming' contracts,'" and that "Congress did not want sports betting to be conducted on derivatives markets" because they "serve[] no commercial purpose at all." *See* March 27, 2024, Reply, 2024 WL 4164694, Docket No. 36 at 25; Motion for Summary Judgment, 2024 WL 397419, Docket No. 17-1 at 26, 33; Brief of Appellee, *KalshiEX LLC, v. CFTC*, 2024 WL 4802698, at *41, *45.

**C.    Kalshi's Positions in the Prior Litigation Were Adopted by the Court and Were Not Based on Inadvertence or Mistake.**

Since November 1993, Kalshi has affirmatively asserted that gaming contracts have no commercial value; the D.C. district court expressly adopted Kalshi's position and ruled in Kalshi's favor. *Infra* at 5-7. As late as January 17, 2025, merely days before it filed the self-certification for its gaming contracts, Kalshi argued to the D.C. circuit court that the "defining feature of a game is that it doesn't have economic consequences outside the game itself; it has no extrinsic consequences."    January    17,    2025,    Oral    Argument, https://www.courtlistener.com/audio/94558/kalshiex-llc-v-cftc/ at 63:15 – 65:00, *KalshiEX LLC*, 119 F.4th 58 (last visited at June 10, 2025). Yet, to this Court, Kalshi characterizes its gaming contracts as "sports events contracts" based on an underlying event with a real commercial value. ECF 1 at ¶¶ 47-51; ECF 2 at 6; ECF 29 at 6-7. Kalshi's abrupt change of positions was not due to mistake or inadvertence, it was a callous attempt to play "fast and loose" with the federal court system to the detriment of the Defendants. *Minnieland*, 867 F.3d at 457.

**D.** **Kalshi's Arguments in the Prior Litigation Bar Kalshi From Contesting That Their Gaming Contracts Are Not Swaps.**

For approximately eighteen months, Kalshi persuasively argued to this Court's fellow federal courts that gaming contracts have no potential commercial or economic consequences. In light of this, this Court should exercise its discretionary authority to bar Kalshi from contesting this fact in the pending litigation. It is well within the Court's discretionary authority to do so and, pursuant to the tenets underlying judicial estoppel, not an abuse of that discretion. *New Hampshire v. Maine*, 532 U.S. 742, 749–50 (2001).

The plain language of 7 U.S.C.A. §1a(47)(A)(ii) requires a swap to be an "agreement, contract, or transaction" dependent "on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." In light of its prior claims, Kalshi cannot now contest the fact that Kalshi's gaming contracts have no potential commercial or hedging interest. Accordingly, Kalshi's gaming contracts cannot be swaps and are subject to Maryland's sports wagering laws.

**II.** **Even if Judicial Estoppel Is Inapplicable, Kalshi's Prior Position that Gaming Contracts Are Not Swaps Is Persuasive.**

Kalshi's statements in the Prior Litigation – that sports bets are gaming contracts serving `no commercial purpose that Congress did not want conducted on derivatives markets – is persuasive in the pending litigation for three reasons: (1) Kalshi prohibits their gaming contracts from being used for hedging by participants, thus eliminating any prospect of economic consequence; (2) unlike traditional swaps, gaming contracts do not facilitate any potential financial, economic, or commercial consequence, and (3) also unlike traditional swaps, sports wagers have no need for a pervasive federal regulatory scheme to promote economic stability and

efficiency. Accordingly, Kalshi's gaming contracts cannot be an "agreement, contract, or transaction" dependent "on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C.A. §1a(A)(47)(ii).

### A.    Kalshi Prohibits Its Gaming Contracts from Being Used for Hedging.

Kalshi's gaming contracts do not involve the sporting event itself, but rather the outcome of the event, *i.e.* which participant will win the game. ECF 26 at 19-20; Exhibit 2, May 28, 2025, Oral Argument Transcript Excerpt at 31(13-15), 31(24)-32(2). In Kalshi's self-certification filing with the CFTC for the "Will <team> win <title>?" contract, it included the following condition in "Appendix B – Trading Prohibitions:"

- Current and former players, coaches, and staff of the National Football League, the National Hockey League, National Basketball Association, and the National Collegiate Athletic Association;
- Paid employees of the league and league participants;[7]
- Owners of teams and the league;
- and household members and immediate family of all above.

ECF 28-6 at 10.

Under the rules filed by Kalshi, its gaming contracts cannot be used for hedging by event participants. Opposing counsel highlighted in oral argument that UMBC's upset victory over Virginia in the NCAA Men's Basketball Tournament presented significant financial consequences and hedging opportunities for the universities. ECF 29 at 6; Exhibit 2 at 32(7-14). But the only people acknowledged by opposing counsel to have potential economic consequences – "the school[s] and stakeholders" – are banned from taking positions on Kalshi in their own events.  ECF 29 at 6; *see also* ECF 28-6 at 10. Because they present no hedging opportunities, Kalshi's gaming

---

[7] The Contract defines "league" as "any of the four organizations in the first bullet point."

contracts are just what they described in the Prior Litigation – sports wagering that serves no financial, economic, or commercial consequence. And without a potential financial, economic, or commercial consequence, Kalshi's gaming contracts are not swaps.

> **B.** **Unlike Swaps, Gaming Contracts Do Not Facilitate Any Potential Financial, Economic, or Commercial Consequence.**

Kalshi's concession in the Prior Litigation that sports wagering "did not have any extrinsic value" is consistent with the plain meaning of the statute. By definition, a "swap" is an agreement, contract, or transaction "associated with a potential financial, economic, or commercial consequence." 7 U.S.C.A. §1a(A)(47)(ii). Two important limiting terms in this statutory definition are "associated" and "consequence."

This Court routinely looks to dictionaries to define statutory terms that have a "common usage." *United States v. Helton*, 944 F.3d 198, 207 (4th Cir. 2019), as amended (Dec. 4, 2019) ("Following our practice, we look to dictionaries of common usage to discern the ordinary meaning"). "Associate[d]" means "join[ed] or connect[ed] together." *Associate*, MERRIAM-WEBSTER ONLINE, https://www.merriam-webster.com/dictionary/associate (last visited June 8, 2025). "Consequence" means "something produced by a cause or necessarily following from a set of conditions." *Consequence*, MERRIAM-WEBSTER ONLINE, https://www.merriam-webster.com/dictionary/consequence (last visited June 8, 2025). Synonyms for "consequence" include "result," "outcome," and "effect" (among others). *Consequence*, MERRIAM-WEBSTER ONLINE, https://www.merriam-webster.com/thesaurus/consequence (last visited June 8, 2025). Thus, a swap event must be "joined or connected together" with a potential financial, economic, or commercial result.

The potential financial, economic, or commercial result must be something extrinsic to the swap event itself. Any monetary transaction, including any wager, involves money changing

hands. Interpreting "associated with financial, economic, or commercial consequence" as just the exchange of money would effectively write this phrase out of the statute. Traditional swaps are used to produce extrinsic financial, economic, or commercial effects. The definition of "swap" lists a number of commonly known swaps, such as "an interest rate swap" or a "currency swap." *See* 7 U.S.C. §§ 1a(47)(A)(iii)(I) & (VII). These two examples highlight how swaps are actually associated with producing extrinsic financial, economic, and commercial consequences.

Interest rate swaps, the most popular types of swaps, allow two parties to exchange fixed and floating rates. *See* Shobit Seth, *Different Types of Swaps*, INVESTOPEDIA, https://www.investopedia.com/articles/investing/052915/different-types-swaps.asp#:~:text=The%20most%20popular%20types%20of,not%20offer%20preferred%20loan%20solutions (last visited June 8, 2025). The interest rate swap allows business to secure cost-effective loans to further activity in the marketplace. *Id.* In this instance, the financial, economic, or commercial consequence is not the monetary difference between the fixed and floating rate, but rather that the swap allows the business to operate more cost-effectively, enhancing economic efficiency. Similarly, currency swaps allow businesses to hedge foreign exchange risk efficiently. *Id.* Currency swaps allow businesses to secure low-cost loans and hedge against interest rate fluctuations. *Id.* Just like interest rate swaps, currency swaps enhance economic efficiency.

Contrary to interest rate and currency swaps, wagers on sports events have no such potential use and, therefore, are not swaps. As Kalshi consistently posited in the Prior Litigation, no marketplace underlies a sports wager; the only thing underlying the sports wager is a game. *See* Exhibit 1 at 15 (7-11). Individuals making wagers via Kalshi's gaming contracts do so for entertainment value and do not use such wagers to further commercial activity. Jan. 25, 2024, Motion for Summary Judgment, 2024 WL 397419, Docket No. 17-1 at 37; *see also* November 15,

2024, Brief of Appellee, *KalshiEX LLC, v. CFTC*, 2024 WL 4802698, at *41. Thus, while swaps events are associated with potential financial, economic, or commercial consequence, wagers on sporting events wagers are associated with no such effect and provide no use to the economy. Kalshi's gaming contracts are just bets.

### C.    Sports Wagers Have No Need for a Pervasive Federal Regulatory Scheme to Stabilize the Economy.

Congress never intended for sports wagers to be part of the CEA -- a "comprehensive regulatory scheme to oversee the volatile and esoteric futures trading complex." ECF 2 at 14. Congress passed the 1974 Act in the wake of "a drastic surge in commodities trading, rapidly rising food costs, and a highly publicized and costly futures trading scandal" and saw a need to "fill some fairly significant regulatory gaps." *American Agriculture Movement, Inc. v. Board of Trade of City of Chicago*, 977 F.2d 1147 (7th Cir. 1992) (citing Kevin T. Van Wart, *Preemption and the Commodity Exchange Act,* 58 Chi.–Kent L. Rev. 657, 672–76 (1982); Philip F. Johnson, *The Commodity Futures Trading Commission Act: Preemption as Public Policy,* 29 Vand. L. Rev. 1, 2–5 (1976)). As Van Wart further explains, the country was experiencing devastating grain shortages, and a public perception existed that manipulation of commodities futures trading caused or exacerbated the economic problems. Van Wart, 58 Chi.-Kent L. Rev. at 672.

In light of these national challenges, Congress's solution "was to put 'all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned.'" *Id.* (citing H. R. Rep. No. 975, 93d Cong., 2d Sess. 1 at 76; Graham Purcell & Abelardo Lopez Valdez, *The Commodity Futures Trading Commission Act of 1974: Regulatory Legislation for Commodity Futures Trading in a Market–Oriented Economy,* 21 S. D. L. Rev. 555, 573–74 (1976)). Similarly, Congress added "swaps" to the CFTC's exclusive jurisdiction in the 2010 Dodd-Frank Act to illuminate "previously dark markets in the complex derivative

instruments at the heart of the [2008 financial] crisis." *Inv. Co. Inst. v. CFTC*, 891 F. Supp. 2d 162, 174 (D.D.C. 2012), as amended (Jan. 2, 2013), *aff'd*, 720 F.3d 370 (D.C. Cir. 2013) (quotation omitted). Thus, the CFTC's exclusive jurisdiction was designed to address the need for nationwide regulation of two areas intimately affecting the United States' economy's foundational stability.

In contrast, sports wagers occur on the margins of the United States economy and have always been within the scope of the states' police powers. *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 302 (4th Cir. 2009) (states have a "historic interest in regulating gambling pursuant to the state police power. It is well recognized that regulating gambling is at the core of the state's residual powers as a sovereign in our constitutional scheme"). Consistent with those traditional police powers, Maryland prohibits sports wagering by those who may be able to influence the outcome of sporting events. Md. Code Ann., St. Gov. § 9-1E-11(a). Given gambling's historic links to criminal endeavors, Maryland conducts extensive background checks to ensure that those individuals authorized to conduct gaming in Maryland have no criminal associations or backgrounds. *Id.* at § 9-1E-07(b)(6) (ii), (iii); ECF 28-5 at ¶¶ 4-6.

No facts suggest that sports wagers are part of a "volatile and esoteric" market that in any way impacts the foundational stability or efficiency of the United States economy. Sports wagers undergird no economic activity other than the simple exchange of money for winning or losing a bet. As Kalshi highlighted in the Prior Litigation, sports wagering is betting on a game for entertainment purposes. *See* Exhibit 1 at 15 (7-11); Jan. 25, 2024, Motion for Summary Judgment, 2024 WL 397419, Docket No. 17-1 at 40. Sports wagers facilitate no commerce or trade and provide no greater certainty to the financial sector, and, logically, the funds to participate in sports wagering will generally come from the bettor's disposable income rather than from funds necessary to transact business.

14

Regulation of commodity futures helps stabilize the United States commodities markets, most importantly our robust agriculture and farming industries. Regulation of swaps provides transparency to previously opaque swaps markets that contributed to the 2008 financial crisis. Sports wagers do nothing other than allow the two sides to exchange money based on the results of a game; they cannot be swaps.

### III.    The Special Rule and Subsequent Rulemaking Remove Gaming from the CFTC's Exclusive Jurisdiction.

Kalshi concedes that "states traditionally have had primary police power … over gambling laws." Exhibit 2 at 22 (21-25). The Court questioned whether Congress intended to preempt this traditional police power in enacting Dodd-Frank. Exhibit 2 at 3 (19-23). That Congress did not intend to do so is evidenced by legislative history, the text of the Special Rule, and the CFTC's blanket prohibition on gaming contracts in 17 C.F.R. §40.11(a)(1). Specifically, only swaps "traded or executed on" a DCM are within the CFTC's exclusive jurisdiction (the section Kalshi claims provides preemption). 7 U.S.C. § 2. Both Maryland and Kalshi agree that Congress did not intend sports betting to be "traded or executed on" a DCM (and therefore not in the CFTC's exclusive jurisdiction). ECF 26 at 13-14, 18, 25. Though that fact alone should end the inquiry, Special Rule and 17 C.F.R. §40.11(a)(1) acting together specifically prohibit gaming contracts from being "traded or executed on" a DCM, removing such contracts from the CFTC's "exclusive jurisdiction" and any possible preemptive effect.

### A.    The Legislative History of Dodd-Frank Demonstrates That Congress Never Intended the CFTC to Have Exclusive Jurisdiction Over Sports Wagering.

The CFTC's "exclusive jurisdiction" is limited to regulated derivatives markets, specifically, contracts "traded or executed on" a regulated exchange such as a DCM. 7 U.S.C. § 2(a)(1)(A). If a swap is not "traded or executed on" a regulated exchange such as a DCM, it is not

in the CFTC's exclusive jurisdiction. Only the CFTC's exclusive jurisdiction potentially preempts state gaming laws. If a contract is not in the CFTC's exclusive jurisdiction, preemption analysis cannot apply.

While Kalshi cites some legislative history of the 1974 Act providing for the CFTC's exclusive jurisdiction, it ignores legislative history excluding gaming contracts in Dodd-Frank. The entire legislative history of the 1974 Act and Dodd-Frank must rise or fall together too;. the Court cannot rely on the history of one law at the expense of another. In the pending litigation, Kalshi asks this Court to do exactly that by ignoring the indicia for excluding gaming contracts from the CFTC's exclusive jurisdiction in 2010.

Dodd-Frank was intended to shine a light on derivatives markets that contributed to the 2008 Financial Crisis. ECF 26 at 7. Swaps were of particular concern. ECF 26 at 7. Congress, as Kalshi recognized, defined "swap" broadly to ensure that broad oversight existed over these transactions to prevent another financial crisis. Exhibit 2 at 34(25)-35(1). Despite the broad definition it gave to swaps, Congress was also concerned about preventing certain transactions from being improperly swept into the "swap" definition – including sports wagering.

Specifically, all parties agree that Congress intended to prevent event contracts "around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament" from being traded on CFTC regulated markets. *See* 156 Cong. Rec. S5902-01, S5907 (July 15, 2010). Citing to the Congressional record, Kalshi accurately stated in the Prior Litigation that "the legislative history [of Dodd-Frank] directly confirms, Congress did not want sports betting to be conducted on derivatives markets." *See* Brief of Appellee at 17*, KalshiEX LLC v. CFTC*, No. 24-5205, 2024 WL 4802698 (D.C. Cir. Nov. 15, 2024) (citing *Id*. at S5906-7).

16

If Congress did not intend for sports betting to be conducted on derivatives markets, it did not intend for sports bets to be within the CFTC's "exclusive jurisdiction." And if Congress did not intend sports bets to be within the CFTC's exclusive jurisdiction, it did not intend to preempt state gaming laws. This showing of intent alone should end the preemption inquiry.

### B.     The Congressional Delegation Contained in the Special Rule in Conjunction with 17 C.F.R. § 40.11 Excludes Gaming Contracts From the CFTC's Exclusive Jurisdiction.

In light of Dodd-Frank's broad swaps definition and DCMs' pre-existing ability to self-certify contracts, Congress recognized that it needed a scalpel to keep gaming contracts off derivatives markets. A broad swaps definition required a surgical exception to prevent gaming on derivatives markets, and the self-certification process required a mechanism to delist prohibited contracts. Given these two considerations, Congress enacted the Special Rule delegating to the CFTC the authority to determine the best way to implement Congress's intent to *carte blanche* exclude certain categories of contracts, such as gaming, from regulated exchanges and delist them if they had been self-certified.

Pursuant to the Special Rule, CFTC "may determine" that certain event contracts "are contrary to the public interest" for one of six listed reasons – including gaming, and if the CFTC does so, "such" event contracts are "prohibited." 7 U.S.C. § 7a-2(c)(5)(C).[8] Fundamentally, if a transaction is prohibited, it cannot be "traded or executed on" a DCM, and thus is outside the CFTC's exclusive jurisdiction. By enacting the Special Rule, Congress delegated to the CFTC the authority to prohibit "such" event contracts, placing them outside the CFTC's exclusive jurisdiction, and delist such prohibited contracts that had been self-certified.

---

[8] The Special Rule's enumerated activities are: "(I) activity that is unlawful under any Federal or State law; (II) terrorism; (III) assassination; (IV) war; (V) gaming; or (VI) other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest."

Pursuant to the authority delegated to it under the Special Rule, shortly after Dodd-Frank the CFTC engaged in notice-and-comment rulemaking and promulgated 17 C.F.R. § 40.11. This regulation provides a blanket ban on trading and clearing of any event contract that "involves, relates to, or references" gaming or any of the other six enumerated activities in the Special Rule. 17 C.F.R. § 40.11(a)(1). In contrast, for contracts "similar" to any of the Special Rule's enumerated activities, the CFTC *may* prohibit them from being listed if it determines them "to be contrary to the public interest." 17 C.F.R. § 40.11(a)(2). Once a prohibited contract has been self-certified, 17 C.F.R. § 40.11(c) provides the process for the CFTC to require a DCM to delist it. Neither the public interest review for "similar" contracts under § 40.11(a)(2), nor the delisting process in 40.11(c), invalidate the plain language of § 40.11(a)(1) prohibiting contracts such as Kalshi's that "involves, relates to, or references" gaming. Section 40.11(a)(1) sets forth a *per se* prohibition on any event contract which "involves, relates to, or references" any of the enumerated categories in the Special Rule and involves no further case-by-case review or public interest test.

In the Final Rule, the CFTC explained that "its prohibition of certain 'gaming' contracts is consistent with Congress's intent to 'prevent gambling through the futures markets' and to 'protect the public interest from gaming and other events contracts." Provisions Common to Registered Entities, 76 FR 44776 (July 27, 2011). As explained by CFTC Acting Chairman Caroline D. Pham:

> In promulgating Rule 40.11(a)(1) pursuant to Section 5c(c)(5)(C), the Commission determined that an event contract that "involves, relates to, or references" terrorism, assassination, war, gaming, or illegal activity is prohibited because it is contrary to the public interest. *There is no further public interest test in Rule 40.11(a)(1).*

CFTC, Dissenting Statement of Commissioner Caroline D. Pham Regarding the Review and Stay of KalshiEX LLC's Political Event Contracts (Aug. 26, 2022), https://www.cftc.gov/PressRoom/SpeechesTestimony/phamstatement082622 ("Pham

18

Statement") (emphasis added). Thus, by promulgating § 40.11(a)(1), the CFTC made the public interest determination, delegated by Congress in the Special Rule, to prohibit gaming and other event contracts and "[t]he [CFTC] has no discretion to infer an additional case-by-case public interest test under Rule 40.11(a)(1) because the plain meaning of . . . the rule text is clear and unambiguous." *Id.*

The CFTC's promulgation of § 40.11(a)(1) was a *carte blanche* prohibition of gaming contracts "traded or executed on" DCMs in furtherance of the Congressional intent set forth in the Special Rule. Thus, these contracts can never be traded or executed on DCMs. Since gaming contracts cannot by "traded or executed on" DCMs, they cannot be within the CFTC's exclusive jurisdiction. *See* 7 U.S.C. § 2(a)(1)(A). Because gaming contracts cannot be within the CFTC's "exclusive jurisdiction," such jurisdiction cannot possibly preempt state gaming laws.

### C.    The Practical Application of Kalshi's Interpretation of the Special Rule as Implemented by § 40.11 Is Inconsistent with the Legislative Intent of Dodd-Frank and Leads to Absurd Results.

Kalshi argues that the permissive language of the Special Rule effectively expands the CFTC's exclusive jurisdiction to include any contracts listed on its DCM unless and until the CFTC takes action pursuant to § 40.11(c). ECF 7, 12. To interpret the Special Rule and § 40.11(a) as Kalshi does would frustrate not only the Congressional intent behind Dodd-Frank, but effectively allow anyone to launder illegality by self-certifying through a DCM. In effect, Kalshi's "self-certification equals exclusive jurisdiction" argument would allow a party to engage in regulatory arbitrage and frustrate key provisions of Dodd-Frank.

As an example of the flawed premise of Kalshi's argument, the Act made clear that the SEC – not the CFTC – has jurisdiction over security-based swaps. *See* 7 U.S.C. § 2(a)(1)(G)(i). If a party self-certifies a security-based swap on a DCM, such a move would be "unlawful under any

Federal or State law" and prohibited pursuant to the CFTC's implementation of the Special Rule in § 40.11(a)(1). According to Kalshi's argument, that security-based swap would now be under the CFTC's exclusive jurisdiction and the SEC would be preempted from regulating it if the CFTC failed to delist the security-based swap under § 40.11(c). Essentially, Kalshi's interpretation of the Special Rule and § 40.11 is counter to, rather than consistent with, Congress's intent to prohibit certain categories of contracts from being listed on DCMs.

Though the Court gave the example of an assassination contract, two other hypotheticals are further illustrative: drug trafficking and puppies. Drug trafficking violates a range of various state and federal laws. What if a person self-certifies cocaine swaps on a DCM and the CFTC does not swiftly move to delist? Under Kalshi's argument, this drug trafficker could continue his or her trade freely. The cocaine swap would be "on a DCM" and preempt state and federal law enforcement. Similarly, a person could list a swap for 101 dalmatians on a DCM and claim preemption of Maryland's puppy mill laws. ECF 26 at 10. Simply put, if this court were to adopt Kalshi's argument, it would approve the use of DCMs to launder illegal activity.

Under Kalshi's interpretation of the Special Rule and § 40.11, the CFTC would have sole power to determine whether a particular contract not only included gaming but also violated *any* federal or state law. Though the CFTC has expertise in the futures markets, it is not an agency of generalists staffed with interpreting and applying any law, federal or state. Where "a federal statute expressly incorporates state law," such as the Special Rule, it makes sense that a "preemption analysis is inappropriate." *Power v. Arlington Hosp. Ass'n*, 42 F.3d 851, 864 (4th Cir. 1994).

In enacting the Special Rule, Congress could not possibly have intended to turn the CFTC into so broad a general practitioner. *See Speiser v. Randall*, 357 U.S. 513, 522 n.7 (1958) (noting it is a "basic constitutional principle that the construction of state laws is the exclusive

responsibility of the state courts."). The CFTC's "exclusive jurisdiction" notwithstanding, federal and state agencies must still possess the authority to prohibit unlawful conduct under their respective jurisdictions even when such conduct involves an event contract on a DCM. The Special Rule and § 40.11 preserves such jurisdiction.

**IV.    Even if Kalshi's Gaming Contracts Are Swaps Within the CFTC's Exclusive Jurisdiction, Maryland's Sports Wagering Laws Are Not Preempted by the CEA.**

Maryland's regulation of sports wagering cannot, as a matter of law, frustrate, impede, or otherwise conflict with the CEA because there is no real economic market, or financial or commercial activity, to frustrate. *See supra* at 5-7, 9-14. Even if this were not the case, the CFTC's "exclusive jurisdiction" does not create field preemption to the exclusion of Maryland sports wagering laws. In addition, conflict preemption does not exist because Maryland's regulation of sports wagering furthers the goals of the CEA consistently. Accordingly, Maryland is not preempted from exercising its traditional police powers and regulating the conduct of sports wagering within its boundaries.

**A.    The CEA's Exclusive Jurisdiction Provides for Conflict Preemption, Not Field Preemption.**

A federal statute is presumed not to preempt a state provision. *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996); *CSX Transp. Inc. v. Easterwood*, 507 U.S. 658, 664 (1993) ("[P]re-emption will not lie unless it is 'the clear and manifest purpose of Congress.'" (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947))). This presumption is strongest when Congress legislates a field traditionally occupied by the states. *See Medtronic, Inc.*, 518 U.S. at 485. And as noted *supra* states have long possessed primary responsibility over gambling. Given that both Kalshi and Maryland acknowledge that the clear and manifest purpose of Dodd-Frank was not to legalize sports betting and preempt the states traditional police powers, and the CEA is constructed

with both a savings clause in its "exclusive jurisdiction" and in the Special Rule (and subsequent regulation) prohibiting sports betting on DCMs, evidence is lacking that the "clear and manifest" purpose of Congress to preempt the field, including state gaming laws. Just the opposite, Congress' intent appears to have been to keep sports bets off derivatives markets.

In *American Agric. Movement, Inc. v. Bd. of Trade of City of Chicago*, 977 F.2d 1147 (7th Cir. 1992), the Seventh Circuit specifically held that the CEA's exclusive jurisdiction provides for conflict preemption, not field preemption, and for good reason.[9] *American Agriculture* and its progeny affirm that the Seventh Circuit "approached the preemption issue cautiously," noting that "the [CEA] does not expressly preempt state law nor is it impossible to comply with both state and federal law." *Effex Capital, LLC v. National Futures Association*, 933. F.3d 882, 894 (7th Cir. 2019) (citing *Am. Agric. Movement, Inc.*, 977 F.2d at 1154); *see also, In re: Chicago Board Options Exchange Volatility Index Manipulation Antitrust Litigation*, 390 F.Supp.3d 916, 938 (N.D. Ill 2019) (citing *Am. Agric. Movement, Inc.*, 977 F.2d at 1155). In addition, *American Agriculture* "determined that the [CEA] did not manifest an intent to occupy completely the entire field of commodity futures regulation" pointing to the savings clause in the CEA. *See Effex Capital, LLC*, 933. F.3d at 894 (citing *Am. Agric. Movement, Inc.*, 977 F.2d 1155); *accord FTC v. Ken Roberts Co.,* 276 F.3d 583, 591 (D.C. Cir. 2001) ("[T]he CFTC was created to regulate all commodities and commodities trading; it does not follow from this, however, that Congress intended to preempt the activities of all other federal agencies in their regulatory realms.")

---

[9] Aside from the recent *Flaherty* and *Henrick* decisions and a law review article from 1976 (two years after the birth of the CFTC), Kalshi relies primarily on *American Agriculture* to assert that the CEA created field preemption in regards to states' regulatory authority over its gaming contracts. ECF 1 at ¶¶ 4, 37, 68; ECF 2 at 6, 8-9, 16; Exhibit 2 at 4(23)-6(11).

A savings clause generally precludes field preemption because it "negates the inference that Congress left no room for state causes of action." *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 492 (1987). As the Court noted at oral argument, Section 2 of the CEA contains two savings clauses in the definition of the CFTC's exclusive jurisdiction. Exhibit 2 at 24(2-6); 7 U.S.C. § 2(a)(1)(A). Although precluding field preemption, these savings clauses "leave[] open the possibility of conflict preemption." *Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chicago*, 977 F.2d at 1155 (7th Cir. 1992).

Moreover, additional legislative history from 1974 provides indicia of conflict preemption. *See* 120 Cong. Rec. 30, 464 (Sept. 9, 1974) (statement of Senator Curtis noting that the Act would only preempt state law if it "were contrary to or inconsistent with Federal law.") *See Commodity Futures Trading Commission Act: Hearings Before the Senate Committee on Agriculture & Forestry*, 93d Cong., 2d Sess. 685 (1974) (opposition of Senator Clark to incompatible state laws) But there is no indication that Congress had the "clear and manifest" intent to field preempt an state law, such as sports bets, that theoretically may touch CFTC "exclusive jurisdiction."

In fact, Kalshi's textual argument for field preemption rests solely on the words "exclusive jurisdiction" and leads to absurd results. The CFTC's exclusive jurisdiction covers swaps on all regulated exchanges, and the CEA outlaws swaps outside such exchanges for most all persons. *See* 7 U.S.C. §§ 2(e); 6d(a)(1). Thus, field-preempted "exclusive jurisdiction" over gaming "swaps" makes the CFTC the gambling regulator for the entire country, not just sports bets on DCMs.

Conflict preemption arises only under (1) direct conflict preemption, "where compliance with both federal and state regulations is impossible" or (2) obstacle preemption, "when a state law stands as an obstacle to the accomplishment and execution of the full purposes of the federal law." *Northern Virginia Hemp and Agric., LLC v. Virginia*, 125 F.4th 472, 493 (4th Cir. 2025).

"[C]ourts should not seek out conflicts where none clearly exist." *Id.* Whether conflict preemption applies "is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000).

In prior CEA cases, courts have noted that state law would have to frustrate the purposes of Congress in enacting the CEA. *Effex Capital, LLC*, 933. F.3d at 894 (citing *Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chicago*, 977 F.2d at 1155); *see also Patry v. Rosenthal & Co.*, 534 F. Supp. 545 (D. Kan. 1982) ("the remaining state law claims envision no administrative agency involvement which might conflict with the CFTC's regulatory role") (quoting *Witzel v. Chartered Systems Corp. of N.Y.*, 490 F.Supp. 343, 347-48 (D.Minn. 1980)); *Taylor v. Bear Stearns & Co.*, 572 F.Supp.667 (N.D. Ga 1983) (holding that Georgia Fair Business Practices Act does not entail an inconsistency with the regulatory scheme of the CEA).

### B. Compliance with Maryland Sports Wagering Laws Does Not Frustrate Kalshi's Ability to Comply with the CEA.

Kalshi bears the burden to overcome the assumption and strong disfavor that federal law does not supersede Maryland's historic police powers over sports wagering. *See* ECF 26 at 30-32. It cannot meet this burden here; it is simply not impossible for Kalshi to comply with both the CEA and Maryland law, nor does Maryland law stand as an obstacle to the full purposes of the CEA. *See Northern Virginia Hemp and Agric., LLC*, 125 F.4th at 493. Maryland's sports wagering law does not impede or otherwise conflict with the regulatory scheme intended by the CEA, and Kalshi cannot point to any provision in Maryland law that actually does.

Kalshi asserts that it cannot comply with Maryland's geofencing requirements because they may conflict with certain CFTC core principles. ECF 1 at ¶70, ECF 2 at 18, ECF 2-1 at ¶¶ 37-44. However, Kalshi's argument on this point is pure speculation. *Id.* at ¶38 ("Complying with

Maryland state law *could be* understood to put Kalshi out of compliance with these Core Principles"). ¶ 39 (geofencing "*could be* understood" to cause price distortion), ¶ 40 (geofencing could "at least *arguably* conflict" with anti-discrimination requirements), ¶41 (the speculative violations from geofencing "*could subject* Kalshi" to CFTC enforcement) (collectively, emphasis added). Other than these speculative assertions, Kalshi fails to identify any real conflict with Maryland's gaming laws. Instead, Kalshi relies on its circular argument that, because the CFTC has exclusive jurisdiction, Maryland's traditional police powers conflict with the CFTC's exclusive jurisdiction. *See* ECF 2 at 16-18.

### C.    Maryland's Sports Wagering Laws Do Not Conflict with the CEA.

Rather than conflicting with the CEA regulatory scheme, Maryland's sports wagering laws align with the Special Rule's explicit concern for the public interest and enhance the market viability of gaming contracts if actually permitted to be placed on a DCM by ensuring gaming integrity, requiring transparency, and facilitating responsible gaming. As a prerequisite to obtaining a sports wagering license, an applicant must first demonstrate that their licensure is in the public interest. Md. Code. Ann., St. Gov. § 9-1E-15(o). Further, sports wagering applicants and licensees must demonstrate by "clear and convincing evidence" their "financial stability, integrity, and responsibility;" the integrity of their "financial backers, investors, mortgagees, bondholders, and holders of other evidences of indebtedness;" and their "good character, honesty, and integrity[.]" *Id.* at § 9-1E-07(b)(6).

The Maryland Lottery and Gaming Control Commission ("MLGCC") regulates the "standards, procedures, and rules that govern the conduct of sports wagering" including the "minimum uniform standards of accountancy methods, procedures, and forms as are necessary to ensure consistency, comparability, and effective disclosure of all financial information, including

percentages of profit[.]" *Id.* at § 9-1E-04(b)(6). Licensees are prohibited from engaging in any false or deceptive advertising, *id.* at § 9-1E-03(c)*,* and from accepting "wagers on injuries, penalties, the outcome of player disciplinary rulings, replay reviews, and other types or forms of wagering that are contrary to public policy or unfair to bettors." *Id.* at §9-1E-04(b)(6)(ii). Accordingly, Maryland's regulation of sports wagering is consistent with the CEA's legislative history and its concern "over sports betting [being] conducted on derivatives markets." Nov. 15, 2024, Brief of Appellee, *KalshiEX LLC, v. CFTC*, 2024 WL 4802698, at *41 (citations omitted).

Absent any conflict, Kalshi is left with the untenable argument that Maryland's sports-wagering laws are conflict-preempted because the CFTC has not yet delisted Kalshi's gaming contracts. However, "many federal statutes grant the Executive Branch extensive enforcement discretion," but "those statutes do not preclude parallel or non-parallel state regulation of the same conduct." *Zyla Life Sciences, LLC v. Wells Pharma of Houston, LLC*, 134 F.4th 326, 338 (5th Cir. 2025). "Mere deliberate agency inaction" will "not alone preempt state law." *Fellner v. Tri-Union Seafoods, LLC*, 529 F.3d 237, 247 (3d Cir. 2008).

## V.    Kalshi's Violations of Federal and State Law.

In the Prior Litigation, Kalshi described "gaming" as a subset of gambling. March 27, 2024, Reply, *KalshiEX*, 2024 WL 4164694, Docket No. 36 at 21 ("To be sure, all 'gaming' is a form of 'gambling'"). Consistent with that interpretation, Kalshi's gaming contracts constitute wagering on the outcome of a specific sporting event, ECF 28-06 at 1, 7-9, and permit sports wagering across state lines, ECF 2-1 at ¶ 34. By doing so, Kalshi is in violation of federal and State law and subject to the police powers of those governments.

A.      **Kalshi's Gaming Contracts Violate the Wire Act.**

The Wire Act expressly prohibits anyone "in the business of betting or wagering" from using wire communications to transmit "interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest." 18 U.S.C.A § 1084(a). The specific purpose of the Wire Act was to bolster the states' traditional police powers. H. Rep. No. 87–967 (1961), *as reprinted in* 1961 U.S.C.C.A.N. 2631, 2632-33. Despite the Wire Act's plain language, Kalshi points to the Act's "safe harbor" which permits the transmission of "information assisting in the placing of bets or wagers on any sporting event or contest" between two states where such betting is otherwise legal. 18 U.S.C.A § 1084(b); *see* Exhibit 2 at 69(16-22). Kalshi relies on *W. Flagler Assocs., Ltd. v. Haaland*, 71 F.4th 1059, 1069 (D.C. Cir. 2023), *cert. denied*, 144 S. Ct. 2671 (2024) in support of its position that the safe harbor permits the transmission of *wagers* across state lines in addition to information. Exhibit 2 at 69(16-22).

In its analysis of the safe harbor provision, *W. Flagler Assocs., Ltd.* states only that the "Act has a safe harbor provision for bets placed to and from states or foreign countries where sports betting is lawful." *W. Flagler Assocs., Ltd. v. Haaland*, 71 F.4th at 1069 (citing 18 U.S.C.A § 1084(b)). The *Flagler* court provided no analysis as to how it reached this conclusion and, ultimately, found the Wire Act inapplicable to the matters at issue in the case.

Both the First and Eighth Circuit have confirmed that the Wire Act's safe harbor does not apply to the transmission of wagers across state lines, even where it is legal to place wagers on sporting events in both the sending and receiving jurisdictions. In *US v. Bala*, 489 F.3d 334 (8th Cir. 2007), the Court found that:

> The prohibition in § 1084(a) encompasses bets and wagers as well as information assisting bets and wagers, whereas the exception in § 1084(b) is limited to information assisting bets and wagers. Thus, the plain language suggests that Congress intended to prohibit *all* interstate wagering by wire, whether or not legal

in the States between which the bets are transmitted. There is explicit support for
this interpretation in the legislative history."

*Bala*, 489 F.3d 342 (citing H. Rep. No. 87–967 (1961), *as reprinted in* 1961 U.S.C.C.A.N. 2631,

2633)(emphasis original). Four years after the passage of Dodd-Frank, the First Circuit held that

"the safe harbor provision only applies to the transmission of 'information assisting in the placing

of bets.' *The safe harbor provision does not exempt from liability the interstate transmission of*

*bets themselves.*" *U.S. v. Lyons*, 740 F.3d 702, 713 (1st Cir. 2014) (citing *U.S. v. McDonough,* 835

F.2d 1103, 1104–05 (5th Cir.1988); *U.S. v. Bala,* 489 at 342 (8th Cir.2007)) (emphasis added).

Unlike *Flagler*, the federal courts in *Bala* and *Lyon* were analyzing the intent and purpose of the

safe harbor and how it was applicable to the matters at issue in those cases. Accordingly, Kalshi's

conduct of interstate wagering under the guise of its gaming contracts violates the Wire Act.

**B.      Kalshi's Gaming Contracts Violate the Indian Gaming Reserve Act.**

In 1988, Congress enacted IGRA to codify tribes' "exclusive right to regulate gaming

activity on Indian lands" subject to limited exceptions. 25 U.S.C. § 2702. Under IGRA, tribes and

states are authorized to negotiate compacts to regulate "Class III gaming" on a government-to-

government basis. 25 U.S.C. § 2710(d)(3)(A). Class III gaming includes sports betting. 25 C.F.R.

§ 502.4. Under IGRA, gaming is "not only a source of substantial revenue for tribes, but the

lifeblood on 'which many tribes have come to rely." *Chicken Ranch Rancheria of Me-Wuk Indians*

*v. California*, 42 F.4th 1024, 1032 (9th Cir. 2022) (internal quotations and alterations omitted).

Class III gaming activity conducted on Indian lands is lawful only when such activity is:

(1) authorized by a tribal ordinance or resolution; (2) located in a state where such gaming is

permitted; and (3) conducted pursuant to an IGRA compact. 25 U.S.C. § 2710(d)(1). Accordingly,

Kalshi's gaming contracts must be authorized by the tribe on whose land the gaming activity

occurs. 25 U.S.C. § 2710(d)(1), *see Coeur d'Alene Tribe v. Idaho*, 842 F. Supp. 1268, 1282 (D.

Idaho 1994) (finding that state lottery conducted on tribal lands in the absence of a tribal gaming ordinance or compact violated IGRA). However, Kalshi's gaming contracts are not geographically restricted to avoid tribal lands, and are therefore offered on all tribal lands in violation of IGRA. *See* ECF 2-1 at ¶ 34.

> **C.     The Dodd-Frank Amendments Did Not Grant the CFTC Exclusive Jurisdiction Over Illegal Transactions.**

In the Prior Litigation, Kalshi asserted that "if trading a contract violated a 'federal' law, that instrument would be banned regardless of the Special Rule." Brief of Appellee, *KalshiEX LLC, v. CFTC*, 2024 WL 4802698, at \*31. In another legal about-face, Kalshi *now* argues that listing gaming contracts on DCMs would preempt the Wire Act and IGRA, but the statutes would otherwise apply to gaming off-DCM. Exhibit 2 at 69 (13-18). The federal laws provide no such distinction; they provide *carte blanche* prohibitions. Further, the statutes governing the CFTC's exclusive jurisdiction, the definition of swaps, and the Special Rule are *all* silent as to their effect on either the Wire Act or IGRA. *See* 7 U.S.C. at §1a(47)(A)(ii), § 2(a)(1)(A), § 7a-2(c)(5)(C)(i).

Once again, Kalshi was correct the first time. If, as it *now* argues, the CEA's silence preempts enforcement of the Wire Act and IGRA for gaming contracts listed on a DCM, the practical ramifications will be ridiculous. Contrary to the public interest, and in order to conduct unfettered interstate sports wagering and avoid prosecution by federal authorities, the entire sports gaming industry will simply shift to self-certifying bets on DCMs and launder otherwise illegal conduct through regulatory arbitrage.

> **D.     Kalshi's Gaming Contracts Violate State Law.**

As both parties agree, the unlicensed conduct of sports wagering is a crime in Maryland and is within the traditional police powers of the State. ECF 2 at 7; ECF 26 at 3-4; Exhibit 2 at 22 (21-25); *see also*, Md. Code Ann., Crim. Law §12-102. Maryland's sports wagering laws

specifically address the State's traditional concerns regarding the conduct of illegal gaming. *Infra* at 25-26; ECF 26 at 3-4. Kalshi's gaming contracts are gaming devices as defined by the Maryland's Code. Md. Code Ann., Crim. Law §12-101(d)(1)(ii)("gaming device" means "a game or device at which money or any other thing or consideration of value is bet, wagered, or gambled"). The MLGCC is charged with the final determination as to whether a gaming device is legal or illegal in the State. *Id.* §12-113(b). The MLGCC has determined that Kalshi's gaming contracts constitute illegal gaming devices in Maryland. ECF 1-1.

As with the Wire Act and IGRA, Kalshi argues that merely by listing a contract on its DCM, Kalshi can prohibit the State from exercising its traditional police powers regarding the regulation of gaming. Exhibit 2 at 23(9-19). The absurd result of Kalshi's argument is that CFTC inaction immunizes criminal conduct through the regulatory arbitrage, even when that conduct falls within state's traditional police powers. Given the Special Rule's explicit concern for the public interest, Kalshi's argument cannot be correct.

## CONCLUSION

Based on the foregoing, this Court should deny Kalshi's Motion for a Preliminary Injunction.

## <u>CERTIFICATE OF SERVICE</u>

I certify that, on this 13th day of June 2025, the foregoing was served by CM/ECF on all registered CMF users.

/s/ Erik J. Delfosse

_____

Erik Delfosse