## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
## NORTHERN DIVISION

| | |
|---|---|
| KALSHIEX LLC, | Case No.: 25-cv-1283-ABA |
| *Plaintiff,* | |
| vs. | **PLAINTIFF'S SUPPLEMENTAL RESPONSE BRIEF** |
| JOHN A. MARTIN, et al. | |
| *Defendants.* | |

# TABLE OF CONTENTS

Page

INTRODUCTION ......................................................................................................... 1

ARGUMENT ................................................................................................................ 2

    I.      The Extraordinary Relief Of Estoppel Is Unwarranted ......................................... 2

    II.    Defendants Are Mistaken That Kalshi's Sports-Event Contracts Are Not Swaps ................................................................................................................... 6

    III.   The Special Rule Confirms That Sports-Event Contracts Are Swaps Subject To Exclusive CFTC Jurisdiction.............................................................. 9

CONCLUSION ............................................................................................................. 15

# TABLE OF AUTHORITIES

Page(s)

*Am. Agric. Movement v. Bd. of Trade of Chi.*,
    977 F.2d 1147 (7th Cir. 1992) ........................................................................9, 12, 13

*Arizona v. United States*,
    567 U.S. 387 (2012) ................................................................................................15

*Chicago Mercantile Exch. v. SEC*,
    883 F.2d 537 (7th Cir. 1989) ..................................................................................11

*Effex Cap., LLC v. Nat'l Futures Ass'n*,
    933 F.3d 882 (7th Cir. 2019) ..................................................................................13

*English v. Gen. Elec. Co.*,
    496 U.S. 72 (1990) ..................................................................................................13

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ................................................................................................11

*Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*,
    458 U.S. 141 (1982) ................................................................................................12

*FTC v. Ken Roberts Co.*,
    276 F.3d 583 (D.C. Cir. 2001) ......................................................................9, 12, 13

*Gordon v. New York Stock Exch., Inc.*,
    422 U.S. 659 (1975) ................................................................................................14

*Hines v. Davidowitz*,
    312 U.S. 52 (1941) ..................................................................................................15

*Int'l Paper Co. v. Ouellette*,
    479 U.S. 481 (1987) ................................................................................................14

*Jones v. B. C. Christopher & Co.*,
    466 F. Supp. 213 (D. Kan. 1979) ...........................................................................13

*KalshiEX LLC v. CFTC*,
    No. 23-3257, 2024 WL 4164694 (D.D.C. Sept. 12, 2024) ...............................2, 3, 6

*KalshiEX, LLC v. Hendrick*,
    No. 25-cv-00575, 2025 WL 1073495 (D. Nev. Apr. 9, 2025) ...............1, 13, 14, 15

*Leist v. Simplot*,
    638 F.2d 283 (2d Cir. 1980) ...............................................................................9, 12

*Lopez v. Davis*,
   531 U.S. 230 (2001) .............................................................................10

*Martineau v. Wier*,
   934 F.3d 385 (4th Cir. 2019) ...............................................................3

*Minnieland Priv. Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co.*,
   867 F.3d 449 (4th Cir. 2017) ...............................................................2

*New Hampshire v. Maine*,
   532 U.S. 742 (2001) .............................................................................4

*Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*,
   81 F.3d 355 (3d Cir. 1996) ...................................................................1

*Shufeldt v. Baker, Donelson, Bearman, Caldwell & Berkowitz, PC*,
   855 F. App'x 239 (6th Cir. 2021) .........................................................3

*U.S. Dep't of Labor v. Wolf Run Mining Co.*,
   452 F.3d 275 (4th Cir. 2006) ...............................................................2

*Zinkand v. Brown*,
   478 F.3d 634 (4th Cir. 2007) ...............................................................3

**Statutes**

7 U.S.C. § 1a(47)(A)(ii) .............................................................5, 6, 12

7 U.S.C. § 1a(47)(B) ...........................................................................8

7 U.S.C. § 1a(47)(B)(iii) ....................................................................12

7 U.S.C. § 2(a) .........................................................................6, 9, 13

7 U.S.C. § 7a-2(c)(5)(B) ....................................................................10

7 U.S.C. § 7a-2(c)(5)(C) ........................................................9, 10, 11

7 U.S.C. § 16(e)(1)(B)(i) ...................................................................14

31 U.S.C. § 5362(1)(E) .....................................................................14

NRS § 464.010(1) ..............................................................................15

N.Y. Penal Law § 225.00(2) ..............................................................15

Reg. 36.10.16.03 ...............................................................................14

Reg. 36.10.14.06(A)................................................................................................14

**Legislative Materials**

156 Cong. Rec. S5907 (daily ed. July 15, 2010) ....................................................5, 10

H.R. Conf. Rep. 93-1383 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5894 ....................13

**Regulations**

17 C.F.R. § 40.11(a).............................................................................................10, 11

17 C.F.R. § 40.11(c).............................................................................................10, 11

**Other Authorities**

*Bad Faith*, Black's Law Dictionary (12th ed. 2024) ....................................................3

Jack Otway, *Rory McIlroy Could Land Millions More as Bonuses Explained Following Electrifying Masters Win*, GB News (Apr. 19, 2025) .............................7

Jeff Eisenberg, *UMBC's Upset Has Generated Publicity Worth a Staggering Amount of Money*, Yahoo! Sports (Mar. 18, 2018)...........................................7

Shaofeng Yuan & Ying Gao, *When Sports Sponsorship Incurs Brand Risk: The Roles of Team Performance, Brand Familiarity, and Team Identification*, 23 Int'l J. of Sports Marketing and Sponsorship 767 (2022)...........................................7

Sports Business Journal, *Nike Drops Well-Timed Ad After McIlroy's Victory* (Apr. 14, 2025) ....................................................................................................7

# INTRODUCTION

Defendants fail to justify their assertion of the extraordinary remedy of judicial estoppel, and, with respect to most elements of estoppel, they do not try. Defendants do not attempt to show that the position they ascribe to Kalshi involved a question of fact—and it plainly involved a question of law. Nor do Defendants make any effort to establish that a court accepted this supposed position—and no court did. And Defendants do not acknowledge the bad-faith requirement, let alone satisfy it. This Court can therefore reject Defendants' assertion of estoppel at the outset.

If the Court reaches the issue, there is no inconsistency between Kalshi's position in the D.C. litigation and its position here. In the D.C. litigation, Kalshi argued that Congress had concerns with gaming contracts, including because they may not be used for bona fide commercial or hedging purposes. The upshot of this argument was that Congress subjected these contracts to public-interest review *by the CFTC*, not that it banned them outright, and certainly not that it permitted states to regulate them. That position is fully consistent with Kalshi's position here. Kalshi never argued that sports-event contracts are not "swaps," an argument that would have rendered its position incoherent. Judicial estoppel is an "extraordinary remedy to be invoked when a party's inconsistent behavior will otherwise result in a miscarriage of justice"; it is "not meant to be a technical defense for litigants seeking to derail potentially meritorious claims." *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 365 (3d Cir. 1996) (quotation marks omitted). The Court should reject estoppel, just as the District of Nevada did. *See KalshiEX, LLC v. Hendrick*, No. 25-cv-00575, 2025 WL 1073495, at *6 (D. Nev. Apr. 9, 2025).

Defendants do not contend that the Court may bind Kalshi to any prior statement unless estoppel formally applies. Instead, Defendants recapitulate many of their previous arguments that sports-event contracts are not swaps. Those arguments are refuted by the Commodity Exchange

Act's definition of "swap," which Defendants correctly concede is "broad," and by the plain text of the Special Rule, which contemplates that contracts involving gaming are swaps. And Defendants cannot otherwise overcome Congress's clear command giving the CFTC exclusive jurisdiction over trading on DCMs. This Court should grant a preliminary injunction.

## ARGUMENT

### I.    The Extraordinary Relief Of Estoppel Is Unwarranted.

*First*, Defendants' assertion of estoppel falters at the outset. Defendants failed to assert judicial estoppel in their opposition to Kalshi's motion for a preliminary injunction. Although the failure to make an argument in response to a preliminary-injunction motion normally forfeits the issue, *see U.S. Dep't of Labor v. Wolf Run Mining Co.*, 452 F.3d 275, 283 (4th Cir. 2006), Defendants offer no basis to excuse their forfeiture.

Even after receiving an additional opportunity to address estoppel, Defendants' supplemental brief offers no argument on some elements of estoppel. After conceding (at 3) that "the position sought to be estopped must be one of fact rather than law or legal theory," *Minnieland Priv. Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co.*, 867 F.3d 449, 458 (4th Cir. 2017), Defendants nowhere explain why the position they ascribe to Kalshi is factual rather than legal. They offer no argument whatsoever, even though whether gaming contracts are swaps is plainly a question of law, even though the D.C. district court made clear that "the entire case on review is a question of law," and even though the court did not "engage in fact finding." *KalshiEX LLC v. CFTC*, No. 23-cv-3257, 2024 WL 4164694, at *6 (D.D.C. Sept. 12, 2024).

Defendants concede (at 3) that Kalshi's prior position "must have been accepted" by a court for estoppel to apply, *Minnieland*, 867 F.3d at 458, but they also fail to meaningfully address this requirement. Defendants do not claim the D.C. district court ever adopted Kalshi's alleged

position. Defendants instead assert (at 8) that "the D.C. district court expressly adopted" the position Kalshi has espoused "[s]ince November 1993 [sic]" that "gaming contracts have no commercial value." But Defendants cite nothing to support the claim that the court "expressly adopted" that view, and the district court's decision never so much as hinted at it. The court's decision simply concluded that "gaming" means "the practice or activity of playing games" and "playing games for stakes," and that Kalshi's congressional control contracts did not meet that definition and therefore did not involve gaming. *KalshiEX*, 2024 WL 4164694, at *8 (quoting *Gaming*, Merriam-Webster.com, https://perma.cc/9JZW-SRS2). While Defendants point (at 7) to the district court's statement at a hearing "that a game doesn't have any external economic significance," the court's very next statement expressed doubt as to whether that was "relevant for the specific argument [Kalshi was] making." Dkt. No. 37-1, Defts.' Ex. 1 at 20:20-23. A court's statement at a hearing certainly does not entail acceptance of a position for estoppel purposes. *See Shufeldt v. Baker, Donelson, Bearman, Caldwell & Berkowitz, PC*, 855 F. App'x 239, 247 (6th Cir. 2021) (reversing grant of estoppel because there "was no judicial acceptance of" party's prior statement, though the court at argument "did at least seem inclined" to accept the statement).

Nor do Defendants contend that Kalshi's statements were made in bad faith, even though the "bad faith requirement is the 'determinative factor'" for estoppel. *Zinkand v. Brown*, 478 F.3d 634, 638 (4th Cir. 2007) (quotation marks omitted). Bad faith requires "[d]ishonesty of belief, purpose, or motive," *Bad Faith*, Black's Law Dictionary (12th ed. 2024), and, as Defendants concede (at 3), a party must have "*intentionally* misled the court," *Martineau v. Wier*, 934 F.3d 385, 393 (4th Cir. 2019) (emphasis added) (citation omitted). Defendants do not attempt to satisfy this standard, nor could they. As Kalshi explained in its supplemental brief, its representations in the D.C. litigation were not remotely dishonest or intentionally deceptive, but rather were directed

to resolving the fundamentally different question presented in that case, which was whether the act of trading political-event contracts was itself a type of gaming subject to the Special Rule. Kalshi's subsequent decision to offer sports-event contracts responded to a competitor's decision to enter this space, and since then, the CFTC has never hinted at any doubt whether these contracts qualify as swaps. In fact, the CFTC put certain of Kalshi's competitor's sports-event contracts under review pursuant to the Special Rule, which it had authority to do only if these contracts *were* swaps. Defendants' estoppel argument therefore fails at the threshold.

*Second*, Defendants focus almost exclusively on whether Kalshi's statements in the D.C. litigation are "clearly inconsistent" with its position in this case. *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001). Although the Court need not reach the issue, there is no inconsistency.

Kalshi's position in the D.C. litigation was that Congress did not categorically ban contracts involving "gaming," but instead delegated the CFTC the power to subject those contracts to public-interest review. The bottom line of its argument was that it was "sensible for Congress to empower the CFTC *to at least review the category of game-based contracts*." D.C. Cir. Br., *KalshiEX*, 2024 WL 4802698, at *45 (emphasis added). Kalshi made clear that this was a job for the CFTC, not 50 different states, because "the CFTC's 'exclusive jurisdiction' over the derivatives markets preempts any state law that purports to prohibit the trading of a contract on a regulated exchange." *Id.* at *31 (quoting 7 U.S.C. § 2(a)(1)(A)).

That remains Kalshi's position in this case. Kalshi has not disputed whether its sports-event contracts involve gaming. Nor has Kalshi disputed that Congress had concerns with gaming contracts when it enacted the Special Rule in 2010. Instead, Kalshi has explained that Congress effectuated its concerns by authorizing CFTC public-interest review of these contracts, not by

banning them.  Kalshi has always accepted the CFTC's authority to initiate review.  But the CFTC has not done so, which means the contracts are permitted under federal law.

Defendants cite (at 6-7) numerous statements by Kalshi's counsel in the D.C. litigation that games lack "intrinsic economic significance" or "hedging value," but Defendants misunderstand these statements.  The purpose of the statements was to distinguish between contracts that involve gaming—which Congress subjected to public-interest review—from contracts that do not involve gaming—which Congress exempted from public-interest review.  Kalshi explained Congress's view that "at least in general, contracts relating to games … are unlikely to serve any 'commercial or hedging interest.'"  D.C. Cir. Br., *KalshiEX*, 2024 WL 4802698, at *45 (quoting 156 Cong. Rec. S5907 (daily ed. July 15, 2010)).  Kalshi also explained that "the CEA's public-interest determination may properly account for economic considerations such as hedging utility."  Reply Br. in Supp. of Summ. J., *KalshiEX*, 2024 WL 2873875.  Again, the bottom line was that Congress authorized the CFTC to review gaming contracts.

Defendants claim (at 9) that Kalshi's statements to the D.C. courts mean that "Kalshi's gaming contracts cannot be swaps."  But Kalshi never argued that gaming contracts are not swaps.  The CEA defines a "swap" in relevant part as a contract that provides for a payment dependent on the occurrence "of an event or contingency associated with a *potential* financial, economic, or commercial consequence."  7 U.S.C. § 1a(47)(A)(ii) (emphasis added).  Kalshi generally qualified its statements about the commercial implications of sports events, explaining that "at least in general," such contracts are unlikely to serve hedging interests.  D.C. Cir. Br., *KalshiEX*, 2024 WL 4802698, at *45; *see also* Dkt. No. 36-2, Katyal Decl. Ex. A, at 20:2-4 ("games don't have any external economic significance, generally speaking").  These statements do not mean that games *categorically* lack commercial consequences, and certainly not *potential* commercial

consequences. Indeed, Kalshi made clear that "there may be some games that do have extrinsic consequences." Dkt. No. 36-3, Katyal Decl. Ex. B, at 74:12-16. Defendants are therefore mistaken in asserting (at 7) that "[n]owhere . . . did Kalshi indicate that *any* gaming contracts could serve a 'commercial or hedging interest.'"

Context makes clear that Kalshi's arguments about the commercial consequences of games spoke to the CFTC's authority to conduct public-interest review, not whether gaming contracts are swaps. The CFTC's order prohibiting Kalshi's congressional-control contracts found that they involved gaming (but never suggested they were not swaps) and were "contrary to the public interest" because elections lack a "sufficiently direct, predictable, or quantifiable economic consequences" for the contracts "to serve an effective hedging or risk mitigating function." *KalshiEX*, 2024 WL 4164694, at *6. It was thus common ground that an event's commercial consequences were relevant to the CFTC's public-interest decision; whether the contracts were swaps was not at issue. Kalshi's argument would otherwise be incoherent, because if gaming contracts were not swaps, the CFTC would lack authority to review them. *See* 7 U.S.C. § 2(a).

## II. Defendants Are Mistaken That Kalshi's Sports-Event Contracts Are Not Swaps.

Defendants do not contend that Kalshi can be bound to any statement in the D.C. litigation absent judicial estoppel. Defendants instead argue (at 9) that Kalshi's prior statements are "persuasive" in showing that sports-event contracts are not swaps. Defendants are mistaken.

To begin, Defendants give short shrift to the statutory text, which, as noted, defines a swap to encompass any contract that provides for a payment "that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency *associated with a potential financial, economic, or commercial consequence*." 7 U.S.C. § 1a(47)(A)(ii) (emphasis added); *see also* 7 U.S.C. § 1a(19)(iv) ("excluded commodity" includes "an occurrence, extent of

an occurrence, or contingency … that is … associated with a financial, commercial, or economic consequence"). While Defendants contend (at 11) that "associated" and "consequence" are "limiting terms," Defendants fail to support that contention. Defendants concede (at 11) that "associated" means "connected" and that "consequence" means "result." Thus, a swap merely requires an event that is connected to a potential financial, economic, or commercial result.

Sports-event contracts fit comfortably within this definition, which Defendants concede (at 17) is "broad." The outcomes of sports events have significant economic consequences for many stakeholders, including teams, communities, sponsors, advertisers, television networks, and more. Examples abound. When Rory McIlroy won the 2025 Masters, his sponsor Nike reportedly paid him a seven-figure bonus and promptly aired an advertisement promoting McIlroy's win.[1] When an underdog overperforms in the NCAA tournament—as with No. 16 seed UMBC's win over No. 1 seed UVA in 2018—stakeholders see substantial financial benefits.[2] And when a favorite exits the tournament early, stakeholders face unexpected losses.[3] These are actual and significant financial consequences; they *a fortiori* qualify as *potential* financial consequences. Defendants certainly cannot show that sports events *categorically* lack potential financial consequences, as needed to sustain their theory that *none* of Kalshi's sports-event contracts are swaps.

---

[1] Jack Otway, *Rory McIlroy Could Land Millions More as Bonuses Explained Following Electrifying Masters Win*, GB News (Apr. 19, 2025), available at https://www.gbnews.com/sport/golf/rory-mcilroy-bonuses-masters; Sports Business Journal, *Nike Drops Well-Timed Ad After McIlroy's Victory* (Apr. 14, 2025), available at https://www.sportsbusinessjournal.com/Articles/2025/04/14/nike-drops-well-timed-ad-after-mcilroys-victory/.

[2] Jeff Eisenberg, *UMBC's Upset Has Generated Publicity Worth a Staggering Amount of Money*, Yahoo! Sports (Mar. 18, 2018), available at https://sports.yahoo.com/publicity-umbcs-upset-generated-worth-staggering-amount-money-054324907.html?guccounter=1.

[3] Shaofeng Yuan & Ying Gao, *When Sports Sponsorship Incurs Brand Risk: The Roles of Team Performance, Brand Familiarity, and Team Identification*, 23 Int'l J. of Sports Marketing and Sponsorship 767, 779-780 (2022).

Defendants compare sports-event contracts to currency swaps and interest-rate swaps, and contend (at 12) that sports-event contracts are not swaps because they do not "enhance economic efficiency." But enhancing economic efficiency is nowhere to be found in Congress's definition of a swap. Congress set out a list of "exclusions" from its definition of a swap, 7 U.S.C. § 1a(47)(B), but it did not exclude contracts that do not enhance economic efficiency. Instead, Congress authorized the CFTC to evaluate whether certain categories of contracts serve a legitimate hedging function via public-interest review. Congress intended questions about hedging utility to be resolved by the CFTC, not by tacking atextual requirements onto the definition of a swap—let alone by letting states resolve the question as they see fit.

Defendants maintain (at 10) that because Kalshi protects against manipulative trading by insiders or decisionmakers, its "contracts cannot be used for hedging." But whether a contract serves bona fide hedging purposes is relevant to the CFTC's public-interest review, not to the threshold question whether a contract is a swap. In any event, prohibitions on insider trading and the like do not mean these contracts lack a hedging purpose. To return to the UMBC example, while the players and team would be barred from placing positions on a contract involving UMBC, UMBC's sponsors, not to mention advertisers and television networks, would not be. Defendants' argument is especially puzzling given their later argument (at 14) that "Maryland prohibits sports wagering by those who may be able to influence the outcome of sporting events."

Defendants claim (at 14) that sports events are not "part of a 'volatile and esoteric' market that in any way impacts the foundational stability or efficiency of the United States economy." Defendants offer no authority to support this method of statutory interpretation or for their series of assertions, such as that "sports wagers occur on the margins of the United States economy," that they "facilitate no commerce or trade," and that "logically, the funds to participate in sports

wagering will generally come from the bettor's disposable income." *Id*. These arguments are factually dubious, and they have no role to play in construing the meaning of the term "swap."

### III.    The Special Rule Confirms That Sports-Event Contracts Are Swaps Subject To Exclusive CFTC Jurisdiction.

Any doubt about whether sports-event contracts qualify as swaps is dispelled by the Special Rule and the CEA amendments adopted by Dodd-Frank in 2010. These amendments refute Defendants' arguments in two respects. First, the Special Rule's inclusion of contracts involving "gaming" among the categories of "event contracts and swaps" subject to the CFTC's "review and approval" is irrefutable textual evidence that Congress understood contracts involving the outcome of sports events to be swaps. 7 U.S.C. § 7a-2(c)(5)(C). Second, Congress's addition of "swaps" to the list of transactions subject to the CFTC's "exclusive jurisdiction," *see id*. § 2(a), confirms Congress's intent to preempt state regulation of swaps. When Congress enacted Dodd-Frank in 2010, a well-settled line of precedent made clear that state law was preempted as applied to transactions covered by the CFTC's exclusive jurisdiction. *See Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980); *Am. Agric. Movement v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156-1157 (7th Cir. 1992); *FTC v. Ken Roberts Co.*, 276 F.3d 583, 590-591 (D.C. Cir. 2001). Congress would have been aware of this precedent, and by adding swaps to the provision would have similarly intended swaps to be subject to exclusive federal regulation.

Because the text of the Special Rule forecloses their argument, Defendants resort (at 16) to what they term "legislative history excluding gaming contracts in Dodd-Frank." But Congress quite clearly did not ban gaming contracts. Instead, the statute authorizes CFTC "review and *approval*" of event contracts in the enumerated categories; provides that the CFTC "*may*" conclude that these contracts are "contrary to the public interest"; and otherwise provides that the CFTC "*shall* approve a new contract" unless it violates the law. 7 U.S.C. § 7a-2(c)(5)(B)-(C) (emphases

added).  "Congress' use of the permissive 'may,'" in contrast with the "use of a mandatory 'shall' in the very same section," underscores that it did not require the CFTC to conclude that gaming contracts are contrary to the public interest.  *See Lopez v. Davis*, 531 U.S. 230, 241 (2001).  And the same legislative history on which Defendants rely makes clear that Congress wanted "[t]he Commission"—not 50 states—to decide whether gaming contracts are contrary to the public interest.  *See* 156 Cong. Rec. S5906-07 (daily ed. July 15, 2010) (statement of Sen. Lincoln).

Defendants dedicate much of their argument about the Special Rule to noting that *some* in Congress in 2010 had concerns about contracts involving gaming.  That is undisputed.  But the solution of Congress, *as a whole*, was not to ban these contracts, but to authorize the CFTC to conduct public-interest review, precisely as contemplated in the legislative history Maryland highlights.  And the public-interest determination regarding gaming contracts on DCMs looked very different in 2010—when sports betting was unlawful almost everywhere except Nevada— than in 2025—when sports wagering has been legalized by most states.  The Special Rule permits the CFTC to account for this evolution in evaluating the public interest.

Defendants rely on Section 40.11, but this provision undermines rather than supports their argument.  To begin, Defendants are wrong (at 18) that this regulation is a "blanket ban" on contracts that fall within the enumerated categories.  While Section 40.11(a) generally prohibits these contracts, Section 40.11(c) gives the CFTC discretion to approve such contracts after conducting review.  Defendants argue (at 18) that Section 40.11(c) only "provides the process for the CFTC to require a DCM to delist" a gaming contract, but that the regulation's text authorizes the CFTC to "issue an order *approving* or disapproving" a contract that falls within the enumerated categories, 17 C.F.R. § 40.11(c) (emphasis added).  Defendants claim support (at 18) from a dissenting statement from one Commissioner, but this statement does not represent the views of

the full Commission, let alone Congress. Regardless, while it says that there "is no further public interest test *in Rule 40.11(a)(1)*," it acknowledges that the Commission may ultimately approve gaming contracts under Section 40.11(c)(2). If Section 40.11 were interpreted as a blanket ban, it would run afoul of the statute, which authorizes the CFTC to prohibit a contract only if the agency "determine[s]" the contract is "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C); *see also* Tr. 61 (Court observing that "40.11 is a regulation" and that under *Loper Bright*, "isn't it the statute that I have to interpret?"). Nothing in the regulation purports to find that gaming contracts are categorically contrary to the public interest, let alone to provide the necessary "reasoned explanation" for that conclusion. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

Even if Defendants were correct that these contracts are prohibited by a CFTC regulation, that would simply mean the CFTC would be authorized to pursue enforcement against Kalshi. Nothing about that result would give rise to concurrent state jurisdiction. To the contrary, Section 40.11 shows that the CFTC understands itself to possess jurisdiction over these contracts, meaning states lack jurisdiction. *See Chicago Mercantile Exch. v. SEC*, 883 F.2d 537, 548 (7th Cir. 1989) (where "the CFTC has jurisdiction, its power is exclusive"). Defendants maintain (at 19) that if "gaming contracts cannot by [sic] 'traded or executed on' DCMs," under Section 40.11, "they cannot be within the CFTC's exclusive jurisdiction," but that conclusion does not follow. Even if sports-event contracts ran afoul of a CFTC regulation, they would still be swaps covered by the exclusive-jurisdiction provision, and Defendants would still lack a basis to regulate them.

Defendants argue that various absurd results would follow from the CFTC's exclusive jurisdiction over swaps on DCMs, but these arguments likewise rebound against Defendants. Defendants are mistaken (at 20) that accepting Kalshi's argument would mean that a "security-based swap would now be under the CFTC's exclusive jurisdiction" if it were self-certified on a

DCM and the CFTC failed to delist it. One CEA "exclusion" provides that a "'swap' does not include" a contract involving "any security" subject to the Securities Laws. 7 U.S.C. § 1a(47)(B)(iii). The CEA's exclusive jurisdiction therefore would not extend to such a contract. Defendants' hypotheticals regarding drug trafficking and puppy mills are equally unhelpful. If Defendants' contention is that a party could traffic illegally in drugs or animals by doing so through a DCM, that is incorrect. Neither is an "option," 7 U.S.C. § 1a(47)(A)(i), a contract for a payment "dependent on the occurrence … of an event," *id.* § 1a(47)(A)(ii), or a contract providing for a financial-risk transfer "on an executory basis," *id.* § 1a(47)(A)(iii), and therefore neither is a swap. States (of course) remain free to enforce their laws against these illegal acts. The difference here is that contracts that turn on the outcome of sports events *are* swaps.

## IV. Maryland Laws Are Preempted As Applied To Kalshi's Event Contracts.

Given that sports-event contracts are swaps subject to the CFTC's exclusive jurisdiction, state efforts to prohibit these contracts are both field preempted and conflict preempted.

Beginning with field preemption, the grant to the CFTC of exclusive jurisdiction over trading on DCMs, coupled with the comprehensive regulatory scheme governing DCMs, means that Congress "left no room for the States to supplement" federal regulation. *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982). Judge Friendly's decision in *Leist*, the Seventh Circuit's decision in *American Agriculture*, the D.C. Circuit's decision in *Ken Roberts*, many district court decisions, and the conference report to the 1974 CEA Amendments all support field preemption of trading on DCMs.[4]

---

[4] *Leist*, 638 F.2d at 322 (explaining that the exclusive-jurisdiction provision "preempts the application of state law"); *Am. Agric. Movement*, 977 F.2d at 1156-1157 (any state law that "would directly affect trading on or the operation of a futures market" regulated by the CFTC "is preempted"); *Ken Roberts*, 276 F.3d at 590-591 (D.C. Cir. 2001) ("the CFTC's jurisdiction was

Defendants respond only by addressing *American Agriculture*, which they characterize as rejecting field preemption. But, as Defendants acknowledge (at 22), that case rejected field preemption of "the entire field of commodity futures regulation," *Effex Cap., LLC v. Nat'l Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019) (citing *Am. Agric. Movement*, 977 F.2d at 1155), and correctly so: The CEA does not preempt state regulation of off-exchange futures trading. *American Agriculture* proceeded to hold that "application of state law" is "preempted" when it "would directly affect trading on or the operation of a futures market." *Am. Agric. Movement*, 977 F.2d at 1156-1157. This Court asked at the May 28 hearing whether that holding may sound in conflict rather than field preemption. *See* Tr. 6. Because the Seventh Circuit found that *any* state laws affecting trading on DCMs would be preempted, it can fairly be characterized as a field preemption case. In any case, preemption doctrines are not "rigidly distinct," *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 n.5 (1990), and if conflict preemption applied, the upshot would be the same.

Defendants note that the CEA contains savings clauses that preserve some role for states in regulating derivatives. But the existence of a "savings clause … does not preclude pre-emption of the law of an affected State." *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 493 (1987). Here, the first savings clause in Section 2(a) applies only "except as" provided in the exclusive-jurisdiction provision. As the *Hendrick* court found, this clause "does not give states regulatory authority over CFTC-designated exchanges." 2025 WL 1073495, at *5. And the second savings clause in Section 2(a) addresses the *jurisdiction* of state courts, not the substantive law those courts may apply. Defendants are mistaken (at 23) that a finding of field preemption would make "the CFTC

'to be exclusive with regard to the trading of futures *on organized contract markets*' " ); *see, e.g.*, *Jones v. B. C. Christopher & Co.*, 466 F. Supp. 213, 220 (D. Kan. 1979) ("It is now established . . . that state regulatory agencies are likewise preempted by the 'exclusive jurisdiction' of the CFTC."); *see also* H.R. Conf. Rep. 93-1383 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5894, 5897 (explaining Congress's intent to "preempt the field insofar as futures regulation is concerned").

the gambling regulator for the entire country." Under the CEA, states may regulate "an entity that offered sports … contracts that were not listed on a CFTC-designated exchange." *Hendrick*, 2025 WL 1073495, at *5; *see also* 7 U.S.C. § 16(e)(1)(B)(i) (the CEA does not preempt "the application of any Federal or State statute" to transactions "not conducted on" a DCM). A preemption finding regarding trading on DCMs would not lead to preemption regarding trading off DCMs.[5]

Maryland's laws are likewise conflict preempted as applied to Kalshi for numerous reasons. Maryland requires a license to offer sports wagering and imposes numerous conditions on licensure, some of which Kalshi could not hope to satisfy. Among other requirements, Maryland requires any entity offering "sports wagers" to "ensure that all of its sports wagers are initiated, received, and completed within the State." Reg. 36.10.16.03. If this applied to Kalshi, it would require trades exclusively between Maryland residents—a result that would be anathema to a nationwide exchange and clearly run afoul of the CFTC's impartial access requirement. That no state has yet to impose such a requirement on a DCM does not, as Defendants claim (at 24), make the conflict "pure speculation." Other Maryland requirements, like its cash-reserve requirement, *see* Reg. 36.10.14.06(A), would similarly be both impossible and superfluous for DCMs.

---

[5] Defendants are mistaken (at 27-29) that Kalshi's contracts violate the "Wire Act" and the "Indian Gaming Reserve [sic] Act." These statutes are best interpreted as excluding trading on a DCM from their definitions of "betting," "wagering," and "gaming." A different federal statute, the Unlawful Internet Gambling Enforcement Act of 2006 (UIGEA), defines "bet or wager" to exclude "any transaction conducted on or subject to the rules of a [DCM]" under the CEA. 31 U.S.C. § 5362(1)(E). The UIGEA's definition is instructive in interpreting the other statutes addressing the same subject matter. Even if the Wire Act and IGRA were interpreted to cover trading on a DCM, Congress's decision in Dodd-Frank to subject swaps to the CFTC's exclusive jurisdiction would take precedence. *See Gordon v. New York Stock Exch., Inc.*, 422 U.S. 659, 689 (1975) (later-enacted statute supersedes earlier statute if the laws subject regulated parties "to conflicting standards"). This would not "repeal[]" the Wire Act or IGRA, as Defendants claim, Tr. 54, but would supersede these statutes in the narrow context of trading on DCMs.

Defendants are therefore wrong (at 24) that "Kalshi cannot point to any provision in Maryland law that" conflicts "with the regulatory scheme intended by the CEA."

Subjecting Kalshi to state laws would likewise pose "an obstacle to the accomplishment and execution" of federal law. *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). State regulation would interfere with the CFTC's discretion by allowing 51 different jurisdictions to substitute their views of the public interest for the CFTC's. *See Arizona v. United States*, 567 U.S. 387, 401 (2012). Indeed, if Maryland remains free to regulate trading that it thinks amounts to gambling, other states may subject Kalshi to their own gambling laws as well. Nevada defines sports bets to include betting on "a sporting event *or other event*," NRS § 464.010(1) (emphasis added), and claims the right to prohibit Kalshi's political-event contracts as well as its sports-event contracts, *see* Defts.' Opp. to TRO, *KalshiEX LLC v. Hendrick*, No. 25-cv-575, Dkt. No. 34 at 14 (D. Nev. Apr. 4, 2025). Other states define gambling to encompass "risk[ing] something of value" upon "a future contingent event," which could cover all event contracts, and possibly all futures contracts as well. *See, e.g.*, N.Y. Penal Law § 225.00(2). If Defendants were correct, there would be no logical endpoint to states' authority to regulate trading on federal exchanges. Worse, given the CEA's impartial access requirement, allowing each state to dictate the trading Kalshi may offer in that state would require compliance with those requirements *everywhere* and permit *every other state* to impose their own requirements with which Kalshi would have to comply nationwide. "Preventing the difficulties that would create is the reason Congress granted the CFTC exclusive jurisdiction over CFTC-designated exchanges." *Hendrick*, 2025 WL 1073495, at *7. Maryland's laws are preempted insofar as they seek to regulate trading on Kalshi.

## CONCLUSION

This Court should grant the motion for a preliminary injunction.

Dated this 25th day of June, 2025.

/s/ *Neal Kumar Katyal*

Neal Kumar Katyal (D. Md. Bar No. 21694)
Joshua B. Sterling (pro hac vice)
William E. Havemann (D. Md. Bar No. 19164)
Milbank LLP
1850 K Street NW, Suite 1100
Washington D.C. 20006
Telephone: 202-835-7505
Facsimile: 202-263-7586

ATTORNEYS FOR PLAINTIFF