IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| KalshiEX, LLC | * | |
| *Plaintiff* | * | Case No.: 25-cv-1283-ABA |
| v. | * | |
| John A. Martin, et al., | * | |
| *Defendants*. | * | |
|  | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

**DEFENDANTS' SUPPLEMENTAL REPLY BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**


ANTHONY G. BROWN
Attorney General of Maryland

ERIK J. DELFOSSE
Federal Bar No. 18881
Assistant Attorney General
Maryland Lottery and Gaming Control Agency
1800 Washington Boulevard
Suite 330
Baltimore, Maryland 21230

MAX F. BRAUER
Federal Bar No. 30162
Assistant Attorney General
Securities Division
200 Saint Paul Place
25th Floor
Baltimore, Maryland 21202

Attorneys for Defendants, John A. Martin, Maryland Lottery and Gaming Control Commission, Maryland Lottery and Gaming Control Agency, Everett D. Browning, Sr., E. Randolph Marriner, Ade Adebisi, Diane Croghan, George L. Doetsch, Jr., Harold E. Hodges, and James J. Stakem, and Anthony G. Brown

June 13, 2025

After supplemental briefing, Kalshi cannot meet its burden to show Congress's clear and manifest intent to preempt state gaming laws. Instead, Kalshi presents a radical argument that turns the Commodity Futures Trading Commission ("CFTC") into the nation's gaming regulator and sole gatekeeper of all other illegal contracts on derivatives exchanges. More plausible interpretations are that: (1) the CFTC's exclusive jurisdiction over contracts "traded or executed on" regulated exchanges does not legalize transactions prohibited by other laws, such as unlicensed gaming, the Wire Act,[1] or IGRA;[2] (2) gaming contracts are not "swaps;" (3) the CFTC already categorically prohibited gaming contracts, and they are not subject to an additional case-by-case public interest review; and (4) Maryland's gaming laws do not conflict with the Commodity Exchange Act ("CEA").[3] Any of these four arguments provide a more reasonable, cogent and practical understanding of Congressional intent than that argued by Kalshi. Kalshi was right in the Prior Litigation: Dodd-Frank was not intended to nationalize sports wagering regulation under the CFTC.[4] Accordingly, Maryland's gaming laws are not preempted.

I. **Kalshi Agreed That Congress Did Not Intend to Preempt State Gaming Laws But Now Presents an Unsupported, Radical Argument.**

It is presumed that the states' traditional, historic police powers are not preempted absent the "clear and manifest purpose of Congress." *CSX Transp. v. Easterwood*, 507 U.S. 658, 664 (1993); *Wyeth v. Levine*, 555 U.S. 555, 565 (2009). This presumption is even stronger "in a field which the States have traditionally occupied" such as gaming, where the Supreme Court has

---

[1] 18 U.S.C. § 1084
[2] 25 U.S.C. §§ 2701 *et seq.*
[3] 7 U.S.C. § 1 to § 27f
[4] As in Defendants' Supplemental Brief, "Prior Litigation" refers to Kalshi's prior statements made in *KalshiEX LLC v. Commodity Futures Trading Comm'n*, No. CV 23-3257, 2024 WL 4164694, at *1 (D.D.C. Sept. 12, 2024), *dismissed,* No. 24-5205, 2025 WL 1349979 (D.C. Cir. May 7, 2025) and *KalshiEX LLC v. Commodity Futures Trading Comm'n*, 119 F.4th 58 (D.C. Cir. 2024).

1

acknowledged states having an interest in reducing "the social costs associated with it." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996); *Greater New Orleans Broad. Ass'n, Inc. v. United*, 527 U.S. 173, 185 (1999); *see also* ECF 26 at 24 (collecting Supreme Court and Fourth Circuit cases). Over multiple briefs, Kalshi has failed to show a "clear and manifest [Congressional] purpose" that Dodd-Frank was enacted as a sports wagering law intended to preempt and replace all state and federal gaming laws.

Kalshi argued in the Prior Litigation that Dodd-Frank intended to exclude gaming contracts from being traded on DCMs, and it is estopped from arguing otherwise now. ECF 37 at 11-12. Previously, Kalshi noted that, "as the legislative history directly confirms, Congress did not want sports betting to be conducted on derivatives markets," citing the Congressional Record. *See* Appellee's Brief at 41, 45 *KalshiEX LLC v. CFTC*, No. 24-5205, 2024 WL 4802698 (D.C. Cir. Nov. 15, 2024); (citing 156 Cong. Rec. S5906-07); ECF 26 at 13-14, 18, 25. Those Congressional Record pages Kalshi cites contain a colloquy between Senators Feinstein and Lincoln that manifests Congress's intent to *prevent* sports wagering on regulated exchanges. *See* ECF 26 at 19; 156 Cong. Rec. S5902, S5906-7 (daily ed. July 15, 2010) (Sen. Feinstein) (expressing concern about "derivative contract[s]" being "used predominantly by speculators or participants not having a commercial or hedging interest"); *Id.* at S5907 (Sen. Lincoln) ("It would be quite easy to construct an 'event contract' around sporting events;" "[t]hese types of contracts would not serve any real commercial purpose," but instead "would be used solely for gambling."). The contents of the Congressional Record are facts asserted by Kalshi in the Prior Litigation, and these facts were accepted by the court in rendering its decision. Kalshi is estopped from denying this plain Congressional intent to prohibit sports wagering on derivatives markets.

2

Kalshi was right the first time. As noted in prior briefs in the pending litigation, through Dodd-Frank, Congress added "swaps" to the CEA to increase regulation on complex derivatives that contributed to the 2008 Financial Crisis. *See* ECF 26 at 7 (citing *Inv. Co. Inst. v. CFTC*, 891 F. Supp. 2d 162, 174 (D.D.C. 2012), as amended (Jan. 2, 2013), *aff'd*, 720 F.3d 370 (D.C. Cir. 2013). In adding swaps to the CFTC's exclusive jurisdiction, Congress recognized that the Financial Crisis presented an even bigger threat to economic stability than the commodities crises of the 1970s that birthed the agency. *See* ECF 37 at 13. But Congress did not put sports betting under the same regulatory scheme as grain futures and interest rate swaps, recognizing that one of these things is not like the other.

After Kalshi told the D.C. Circuit that it made "sense for Congress to say . . . Games are out," the "exigencies of the moment" shifted. *See* ECF 36-3 at 64 (18-21);[5] *New Hampshire v. Maine*, 532 U.S. 742, 749–50 (2001). Now Kalshi seeks to turn sports betting laws upside down. In the pending litigation, Kalshi argues that the Special Rule, 7 U.S.C. § 7a-2(c)(5)(C), indicates Congressional intent to preempt state gaming laws by putting sports wagers in the CFTC's exclusive jurisdiction as swaps. ECF 2 at 6-7, ECF 26 at 5, ECF 37 at 7-8.

Kalshi's current argument is radical because it nationalizes sports wagering regulation under the CFTC. If sports wagers are swaps and the CFTC's exclusive jurisdiction field-preempts all other laws, no other sports wagering regulations can exist outside the CEA swap scheme. The CEA prohibits "enter[ing] into a swap unless the swap is entered into on, or subject to the rules

---

[5] In Defendants Supplemental Brief, the referenced quote was identified as being made on January 17, 2025 as part of Oral Argument and citing https://www.courtlistener.com/audio/94558/kalshiex-llc-v-cftc/ at 63:15 – 65:00, *KalshiEX LLC*, 119 F.4th 58 (last visited June 25, 2025). Upon receiving Kalshi's Supplemental brief and its exhibits, counsel determined that the referenced quote had been misattributed. The statement was made on September 19, 2024 as part of oral argument on the CFTC's request for a stay pending its appeal of the D.C. district court's final judgement. *See* ECF 36 at 11-12.

3

of" a DCM and "prohibits anyone from soliciting or accepting orders for swaps or options contracts if they are not registered with the CFTC as a futures commission merchant." 7 U.S.C §§ 2(e), 6d(a)(1). Under a field preemption analysis, the CEA's swaps framework does not allow for parallel state or federal regulation.

Kalshi erroneously contends that, under its current argument, a parallel system could exist where sports wagers on DCMs are regulated by the CFTC, and all other sports wagers are covered by other applicable laws. This contention is incorrect because the CEA would prohibit all sports wagering "swaps" except on registered exchanges or by registered persons. If this Court adopts Kalshi's current argument, all sportsbooks must register under the CEA, and the CFTC becomes the nation's sole gaming regulator.

Alternatively, more persuasively, and as Kalshi argued previously, Congress never intended to make derivatives regulators into gaming commissioners. Appellee's Brief at 41, *KalshiEX LLC,* 2024 WL 4802698. The CFTC has no expertise or experience with sports wagering. The CFTC has fewer than 700 employees, and its nominee for chair recently stated he had no "plans to issue any guidance" on sports wagering "in the near term." *See Commodity Futures Trading Commission (CFTC)*, EEOC, https://perma.cc/PY94-B9EV (last visited June 25, 2025); CoinDesk, *LIVE: Brian Quintenz CFTC Nomination Hearing*, at 1:08:18-21, YouTube (June 10, 2025), https://tinyurl.com/448dfdn4n.

Similarly, Congress cannot have intended for the CFTC to become general practitioners required to interpret and apply any state or federal law. According to Kalshi, under the Special Rule, the CFTC is required to decide whether an event contract is "unlawful under any Federal or State law," and after doing so, determine if the contract is in the public interest despite its illegality. ECF 2 at 7. Under this interpretation, the CFTC would ultimately be required to decide if contracts

4

for assassinations, gaming, security-based swaps, drug trafficking, puppy mills, or any other illegal activity (state or federal) are in the public interest. ECF 37 at 19-21. Based on Kalshi's current argument, if an entity self-certified such an illegal contract and the CFTC failed to act, any other state or federal law enforcement actions would be preempted. ECF 2 at 7, ECF 29 at 9-11, ECF 36 at 30-31.

Kalshi's argument to this Court is patently absurd. The CFTC is not the nation's gambling regulator nor can it condone otherwise illegal agreements. "Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000). In addition to Congress, it would surprise the *Murphy* Court that they were replacing PASPA with the CEA rather than returning the question of sports betting to the states.[6] *See Murphy v. NCAA*, 584 U.S. 453, 484 (2018).

Congress did not intend to squeeze Kalshi's radical, sweeping "elephant" argument into the Special Rule "mousehole." *Whitman v. Am. Trucking Ass'ns., Inc.*, 531 U.S. 457, 468 (2001) (Congress does not "hide elephants in mouseholes."). The Congressional delegation contained in the Special Rule was to apply a scalpel within the existing regulatory framework and not to enact major policy changes. *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) ("Congress intends to make major policy decisions itself, not leave those decisions to agencies"). Finally, Kalshi's radical argument ignores: (1) Specific gaming statutes such as the Wire Act or IGRA govern over general "swap" regulations under the CEA, and (2) Congress disfavors "repeals by implication" because it "will specifically address preexisting law when it wishes to suspend its normal operations in a

---

[6] PASPA is the Professional and Amateur Sports Protection Act, 28 U.S.C. § 3702. The act prohibited sports wagering nationwide except in certain grandfathered jurisdictions.

5

later statute." *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012); *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018).

Congress speaks clearly and unmistakably when it intends to shift the traditional balance of power. *See Bond v. United States*, 572 U.S. 844, 857–59 (2014). Throughout the briefing process, Kalshi failed to meet its burden to show a "clear and manifest" Congressional intent to preempt state gaming laws. Its statements in the Prior Litigation persuasively argue the opposite. Based on these prior statements, all parties agree that Congress did not intend to turn the CFTC into a gaming regulator and preempt traditional state police powers over that sphere by enacting the Special Rule.

## II. The CFTC's Exclusive Jurisdiction Over Contracts "Traded or Executed On" Regulated Exchanges Does Not Legalize Transactions Prohibited by Other Laws.

Kalshi said it best in the Prior Litigation, noting that if a contract violated another law, "that instrument would be banned regardless of the Special Rule." Appellee's Brief at 31, *KalshiEX LLC*, 2024 WL 4802698; *see also* ECF 37 at 29-30 (noting that the CFTC does not have exclusive jurisdiction over illegal transactions). Kalshi's conclusion is correct because the CFTC's "exclusive jurisdiction" is not over DCMs, but over contracts "traded or executed on" DCMs. 7 U.S.C. § 2(a)(1)(A); ECF 37 at 15-16. Prohibited transactions cannot be "traded or executed on" a regulated exchange and thus cannot be in the CFTC's exclusive jurisdiction. 7 U.S.C. § 2(a)(1)(A), ECF 37 at 15-16. Being "traded or executed on" a regulated exchange does not magically legalize activity otherwise prohibited by state or federal law. Rather, if another law prohibits the transaction, it is similarly prohibited from being offered on CFTC-regulated exchanges. Prohibited means prohibited.

A more natural reading of the Special Rule, in light of the CEA's existing self-certification procedures, is that Congress empowered the CFTC to identify and remove banned transactions or

6

to undertake a public interest review if a transaction appears "similar" to something already prohibited. This reading of the Special Rule reinforces and backstops prohibitions in other laws. At the time of Dodd-Frank, Congress knew that sports wagering was generally prohibited throughout the country via PASPA, the Wire Act, and IGRA. Through the Special Rule, Congress was not authorizing the CFTC, either through action or inaction, to legalize gaming or any other illegal conduct. Rather, Congress simply empowered the CFTC to police the markets it regulated in light of the self-certification process without needing to wait for other law enforcement entities.

**III.    Gaming Contracts Are Not Swaps – As Kalshi Previously Noted.**

In the Prior Litigation, Kalshi made a compelling argument that gaming contracts lack the extrinsic economic consequences necessary to be qualified as swaps within the CFTC's exclusive jurisdiction. ECF 37 at 11-13. In support of its prior argument, Kalshi relied on the same examples it proposes to this Court – the Super Bowl and the Masters Tournament. ECF 29 at 6; Plaintiff's Memorandum of Law, *KalshiEX LLC v. CFTC*, 2024 WL 397419 (D.D.C.), Doc. 17-1 at 33; ECF 37-2 at 31 (17-21). In the D.C. district court, Kalshi stated that these two events constitute games with no extrinsic economic value. Plaintiff's Memorandum, *KalshiEX LLC*, 2024 WL 397419, Doc. 17-1 at 33. The D.C. district court issued a final appealable judgment based on the facts presented in Kalshi's motion for summary judgement. *KalshiEX LLC v. CFTC*, 2024 WL 4164694 at *13 ("Nor does [the question of whether a specific party will control a chamber of Congress] bear any relation to any game—played for stakes or otherwise"). To this Court, Kalshi reverses itself and claims that these two events *do* have an extrinsic economic impact. ECF 37-2 at 31 (17-21). To justify this reversal, Kalshi highlights language in the Prior Litigation where it argued that "generally" games have no extrinsic value but some may. ECF 36 at 18-22.

Even if Kalshi equivocated on the absolute nature of games in the Prior Litigation, it did not equivocate on the specific examples cited to both this Court and the D.C. district court. Both the Masters and the Super Bowl are widely viewed gaming events.[7] Given their popularity, if these games do not have the requisite extrinsic economic consequences to be swaps, it is unlikely that any other games do. Despite its prior equivocation, Kalshi is now estopped from arguing that its gaming contracts – covering the Super Bowl, March Madness, Masters Tournament, and other less widely watched sporting events – are such games.

Even in the absence of judicial estoppel, Kalshi's arguments in the Prior Litigation persuasively establish that sports wagers are not swaps. "The only relevant legislative history … confirms that contracts on 'sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament' were *precisely* what Congress had in mind as 'gaming' contracts." Plaintiff's Memorandum, *KalshiEX LLC*, 2024 WL 397419, Doc. 17-1 at 33 (emphasis original). Further, "Congress did not want sports betting to be conducted on derivatives markets" because games "are staged purely for entertainment and to facilitate betting. They have no independent significance; their outcomes carry no economic risks." Plaintiff's Memorandum, *KalshiEX LLC*, 2024 WL 397419, Doc. 17-1 at 37, 41. Prohibiting gaming contracts on regulated exchanges made sense because "[t]he basic purpose of [DCMs] is to allow 'hedging' of economic risk. Contracts that 'serve[] no commercial purpose at all' may therefore not deserve to be traded on a regulated exchange. And, at least in general, contracts relating to *games*--again, activities conducted for

---

[7] In addition to being widely watched, it is estimated that Americans bet over $23 billion on the Super Bowl in 2024. American Gaming Association, *Record 68 Million Americans to Wager 23.1B on Super Bowl LVIII*, https://www.americangaming.org/record-68-million-americans-to-wager-23-1b-on-super-bowl-lviii/, February 6, 2024 (last visited June 20, 2025).

diversion or amusement--are unlikely to serve any 'commercial or hedging interest.'" Appellee's Brief at 45, *KalshiEX LLC,* 2024 WL 4802698 (emphasis and alterations original).

Kalshi's arguments in the Prior Litigation mirror the Defendants' same arguments in the pending litigation. Both parties argue that Kalshi's gaming contracts are based on the *outcome* of the event, not on the *occurrence* of the event. ECF 26 at 13-14; ECF 36-3 at 64 (15-17) (stating, "Whoever wins the Super Bowl, they'll be very happy. That doesn't have widespread economic consequences"). In addition, both parties agree that, unlike swaps, sports wagers are connected to no potential financial, economic, or commercial results in the marketplace. ECF 37 at 11-14 (collecting Kalshi quotes), 17-19 (noting that interest rate swaps promote economic efficiency by trading floating for fixed rates, and currency swaps promote international commerce). When left unregulated, swaps have threatened economic stability, resulting in Dodd-Frank, but, once again, both parties agree that sports wagers have no such connection to commerce. ECF 37 at 11-13, 19-21. Numerous canons of statutory interpretation (*noscitur a sociis*, implied repeal, no elephants in mouseholes, no superfluidity specific governs the general) indicate that sports wagers are not swaps. ECF 26 at 15-19. Finally, even Kalshi itself prevents participants – the only persons acknowledged by Kalshi to have a hedging interest – from wagering on their own contests. ECF 37 at 10-11. Any one of these reasons provides compelling rationale in support of Kalshi's first argument that sports wagers are not swaps.

Whether bound by judicial estoppel or not, this Court can rely on the persuasive arguments made by Kalshi in the Prior Litigation and mirrored by the Defendants in the pending litigation to reach the conclusion advanced by both parties: Kalshi's gaming contracts fail to satisfy the necessary economic consequences to qualify as swaps, and, as such "fall outside of the CFTC's exclusive jurisdiction." ECF 36 at 22.

**IV.    Kalshi's Gaming Contracts Are Prohibited on a DCM – They Are Not Subject to a Public Interest Review.**

Kalshi's statutory analysis ends prematurely at the Special Rule. It conveniently forgot to check the regulations "implementing the Special Rule." ECF 2 at 7; *see also* ECF 29 at 11-12; ECF 36 at 10. While the Special Rule authorizes the CFTC to undertake a public interest review to determine if gaming contracts, among others, should be prohibited, *see* 7 U.S.C. § 7a-2(c)(5)(C)(i), Kalshi ignores that the CFTC completed this public interest review and published a final rule that categorically prohibits gaming contracts from being listed on a DCM – 17 C.F.R. § 40.11. ECF 36 at 10. Instead, Kalshi argues erroneously that the Special Rule requires a two-step inquiry, *see* ECF 36 at 5, ignoring that the CFTC has already completed any required inquiry and published Regulation 40.11.

Regulation 40.11 has three parts. First, § 40.11(a)(1) provides that "a registered entity *shall not list* for trading or accept for clearing . . . an agreement, contract, transaction or swap based upon an excluded commodity, that involves, relates to, or references . . . gaming." 17 C.F.R. § 40.11(a)(1) (emphasis added). Subsection (a)(1) is a *per se* prohibition on the exact, word-for-word event contract categories delegated by Congress for agency review. If an event contract, such as Kalshi's gaming contracts, fall within this category, no further public interest review is required and the contract is prohibited from being "traded or executed on" a DCM. See ECF 37 at 18-19. Second, § 40.11(a)(2) provides for public interest review for contracts "*similar* to an activity enumerated in § 40.11(a)(1)." *Id.*; 17 C.F.R § 40.11(a)(2) (emphasis added).

The third and final subsection, § 40.11(c), considers the CEA's self-certification process and provides for a discretionary 90-day review process to delist a contract that violates § 40.11(a). Notably, § 40.11(c) contains no language about a "public interest review." 17 C.F.R. § 40.11(c). *See* ECF 37 at 18-19. Subsection 40.11(c) is meant to allow the CFTC discretion to review event

contracts that "*may* involve" one of the prohibited categories under § 40.11(a)(1). The subsection is permissive and does not require a 90-day review for event contracts that *do* involve such prohibited categories, like Kalshi's gaming contracts. The same is true of the Special Rule, which merely requires the CFTC to make a public interest determination "no later than 90 days" from when it commences a review—something the CFTC did long-ago when promulgating its categorical determination in § 40.11(a)(1). *See* 7 U.S.C. §§ 7a-2(c)(5)(C)(i)–(ii), (iv).

In § 40.11's short history, the CFTC has functioned as described above. For example, in the CFTC's Review of Nadex Sports Contract Submissions, it notified Nadex "pursuant to Commission regulation § 40.11(c), the Commission has commenced a 90-day review" and that "[t]he Commission has determined that the Contracts may involve an activity enumerated in Commission regulation 40.11(a)(1) and section 5c(c)(5)(C)(i) of the Commodity Exchange Act" and requested Nadex suspend any listing and trading during the review. *See Notification of Commodity Futures Trading Commission ("Commission") Commencement of 90-day Review of Certain Contract Certifications Submitted on December 19, 2024*, https://www.cftc.gov/sites/default/files/filings/documents/2025/orgdcmnadexnotlett250114.pdf (last accessed June 24, 2025). The CFTC issued a similar letter for RSBIX NFL Futures Contracts. *See Notification of Commodity Futures Trading Commission ("CFTC" or "Commission") Commencement of 90-day Review of Proposed RSBIX NFL Futures Contracts)*, https://www.cftc.gov/sites/default/files/filings/documents/2020/orgdcmerissignedletter201223.pdf (last accessed June 24, 2025).

At no point, in any brief filed in this Court, has Kalshi addressed the plain language of § 40.11(a)(1). *See* ECF 2 at 7; ECF 29 at 11-12; ECF 36 at 10. In the Prior Litigation, Kalshi noted these undisputed points, that: (1) "a contract on the outcome of a sporting event" is the "classic

example" of gaming events that Congress does not want on derivatives exchanges; (2) such events include the Super Bowl or Masters golf tournament; (3) such sporting events "are unlikely to serve any 'commercial or hedging interest;'" and (4) Congress thus enacted the Special Rule to address those concerns. ECF 36 at 12. But then Kalshi argues that the Special Rule requires the CFTC to undertake a two-step, case-by-case public interest analysis about whether its self-certified gaming contracts can be offered on derivatives exchanges. ECF 36 at 20-21. Finally, Kalshi contends without evidence that the CFTC "declined" to review its contracts. *Id.* at 2.

Kalshi's argument is incorrect and misleading – it's not the end of the story. Pursuant to the Congressional delegation of authority in the Special Rule, the CFTC undertook a public interest review of the Special Rule's enumerated categories (including gaming) and published Regulation 40.11. ECF 26 at 6-7. Subsection 40.11(a)(1) *categorically* bans gaming contracts such as those offered by Kalshi. Subsection 40(c) creates a permissive procedure for the CFTC to police its regulated markets. The CFTC's failure to commence a 90-day review, however, does not legalize Kalshi's prohibited contract. *See DTCC Data Repository (U.S.) LLC v. CFTC*, 25 F. Supp. 3d 9, 18 (D.D.C. 2014).

Kalshi has ignored § 40.11(a)(1) in the instant case because it is fatal to Kalshi's argument. Regulation 40.11 provides that gaming contracts are *per se* prohibited, and no further public interest review is required. 17 C.F.R. § 40.11(a)(1), (c). Because Kalshi's gaming contracts undisputedly involve "gaming" under 40.11(a)(1), they are prohibited and cannot be "traded or executed on" a DCM and are outside the CFTC's exclusive jurisdiction. *See* ECF 37 at 17-19.

**V.     Maryland's Sports Gaming Laws Complement the CEA – No Conflict Exists.**

The CEA's "exclusive jurisdiction" provides only for conflict preemption, and Maryland's sports gaming laws complement the CEA. The "dramatic implications" Kalshi suggests in its

supplemental brief are precisely conflict preemption concerns. *See* ECF 36 at 26. Kalshi makes plain that Congress, in birthing the CFTC's "exclusive jurisdiction," was concerned about conflicts between other federal law, state law, and the CEA hampering market efficiency. *Id.* Kalshi even cites the *American Agriculture* matter to support its rationale, but this conflict preemption case held that the CEA did not occupy the field, and that it was not impossible to comply with both state and federal law. ECF 37 at 22 (citing *Am. Agric. Movement, Inc.*, 977 F.2d 1147, 1154-55). The only other circuit court to address the issue agreed. *See FTC v. Ken Roberts Co.,* 276 F.3d 583, 591 (D.C. Cir. 2001) ("[T]he CFTC was created to regulate all commodities and commodities trading; it does not follow from this, however, that Congress intended to preempt the activities of all other federal agencies in their regulatory realms.").[8]

Moreover, legislative history suggests that Congress was concerned with incompatible state laws. ECF 37 at 23 (citing 120 Cong. Rec. 30, 464 (Sept. 9, 1974) (statement of Senator Curtis noting that the Act would only preempt state law if it "were contrary to or inconsistent with Federal law."); *Commodity Futures Trading Commission Act: Hearings Before the Senate Committee on Agriculture & Forestry*, 93d Cong., 2d Sess. 685 (1974) (opposition of Senator Clark to incompatible state laws)). In fact, one case cited by Kalshi highlights Congress's conflict preemption concerns. *See Hofmayer v. Dean Witter & Co.*, 459 F. Supp. 733, 737 (N.D. Cal. 1978) ("[I]f any substantive State law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern") (quoting H.R.Rep.No.93-1383, 93d Cong., 2d Sess. (1974) at 35-36). Kalshi, and the remainder of the federal district and state courts it cites, miss this important Congressional intent.

---

[8] Plaintiffs also cite *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980), but this opinion contains only a single sentence and no analysis of the CFTC's exclusive jurisdiction.

As the Seventh Circuit has noted, the CEA recognizes continued application of state law; *American Agriculture* explicitly noted the savings clauses in the CFTC's exclusive jurisdiction. ECF 37 at 22 (discussing *Am. Agric. Movement, Inc.*, 977 F.2d at 1155 and its progeny). The Special Rule notes the continued application of "activity that is unlawful under any ... State law." In addition, 7 U.S.C. § 16(e) further preserves certain state law, notably § 16(e)(2) which explicitly preempts certain State or local gaming laws (but not for swaps traded on regulated exchanges). *See* 7 U.S.C. § 16(e).

Kalshi erroneously argues that 7 U.S.C. § 13a-2(1) made it clear "that Congress did not want states to bring enforcement actions against DCMs under federal law—let alone under the state's own law." ECF 36 at 29-30. Instead, states can enforce the CEA's antifraud provisions against DCMs pursuant to § 13a-2. *Compare Id.* at §13a-2(1) (prohibiting states from bringing CEA regulatory claims against "a contract market, derivatives transaction execution facility, clearinghouse, floor broker, or floor trader) *with id.* at §§13a-2(8)(A) (authorizing state antifraud actions against contract markets under CEA, only prohibiting such claims against "a floor broker, floor trader, or registered futures association"), 13a-2(5) (authorizing state investigations of CEA violations), 13a-2(7) (preserving any general state civil or criminal antifraud statute). Since the statutory text provides ample room for states to bring enforcement actions, conflict preemption is the logical interpretation.

Maryland's laws neither conflict with nor stand as an obstacle to the full purposes of the CEA. *Northern Virginia Hemp and Agric., LLC v. Virginia*, 125 F.4th 472, 493 (4th Cir. 2025). Kalshi has cited no evidence of a conflict or true obstacle between Maryland's gaming laws and the CEA. "[C]ourts should not seek out conflicts where none clearly exist." *Id.* at 493. Whereas the CEA addresses the efficient functioning of a derivatives market, Maryland's gaming laws are

14

designed to protect the public from potential gambling vices. For example, the CEA's "Core Principles" govern, *e.g.*, dispute resolution (17 C.F.R § 38.750), conflicts of interest (*Id.* at 38.850), diversity (*Id.* at 38.1150), and disciplinary procedures (*Id.* at 38.700). Maryland's gaming statute requires, *e.g.*, licensees to demonstrate financial stability (ECF 26 at 4), provides requirements for responsible gaming to ensure licensees do not prey on persons with gambling addiction (*Id.*), prohibits wagers from those who may influence the outcome (Md. Code Ann., St. Gov. § 9-1E-11(a)), bans false or deceptive advertising (*Id.* at § 9-1E-07(b)(6)), and prohibits licensees from having criminal associations or backgrounds (*Id.* at § 9-1E-07(b)(6) (ii), (iii); ECF 28-5 at ¶¶ 4-6).

Undue influence provides a good example of this complement. Betting on one's own contests impairs the integrity of sports (and the wagering marketplace) and is prohibited by Maryland's gaming laws. But the CEA requires no such restrictions. Though as noted in Section III, *supra*, Kalshi restricts wagers from participants, this feature is purely voluntary. Kalshi could change its mind under the CEA, but it cannot under Maryland law. These restrictions are one example of how Maryland's gaming laws complement the CEA by promoting integrity in the game itself and in wagering markets by eliminating undue influence.

Maryland's statutory requirements further enhance marketplace efficiency and the public interest. The CFTC is not designed to regulate these gaming concerns, and Maryland thus provides an industry-specific complement to the CEA.

## CONCLUSION

Based on the foregoing, this Court should deny Kalshi's Motion for a Preliminary Injunction.

**CERTIFICATE OF SERVICE**

I certify that, on this 25th day of June 2025, the foregoing was served by CM/ECF on all registered CMF users.

/s/ Max F. Brauer
_____
Max F. Brauer