## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

KALSHIEX LLC,

      *Plaintiff,*

v.

      Case No. 25-cv-1283-ABA

JOHN A. MARTIN, *et al.*,

      *Defendants*

## MEMORANDUM OPINION

Plaintiff KalshiEX LLC ("Kalshi") is a financial services company that operates a derivatives exchange and prediction market. Kalshi has moved to enjoin the Maryland Lottery and Gaming Control Agency, and the Maryland Lottery and Gaming Control Commission, from pursuing civil and criminal enforcement of Maryland's gaming laws against Kalshi for offering sports-event contracts in Maryland without registering as a sports wagering licensee. Kalshi argues that Maryland's gaming laws are preempted by the federal Commodity Exchange Act, and thus cannot be enforced with respect to Kalshi's sports-event contracts when offered in Maryland on its designated contract market platform. For the reasons explained below, Kalshi has failed to show a likelihood of success on the merits of its claim that the Commodity Exchange Act preempts Maryland's gaming laws. The motion for a preliminary injunction will be denied.

## I.    BACKGROUND

A derivative is "a financial instrument or contract whose price is 'directly depending upon (i.e.[,] derived from)' the value of one or more underlying assets–for example, commodities (like corn and wheat), securities, or debt instruments." *KalshiEX*

*LLC v. Commodity Futures Trading Commission*, No. 23-cv-3257-JMC, 2024 WL
4164694, at *1 (D.D.C. Sep. 12, 2024), *stay denied*, 119 F.4th 58 (D.C. Cir. 2024) (citing
*Futures Glossary: A Guide to the Languages of the Futures Industry*, CFTC,
https://perma.cc/63HY-DD7E). An event contract is a kind of derivative the "payoff" of
which is "based on a specified event, occurrence or value." *Id.* at *2 (citing *Contracts &
Products: Event Contracts*, CFTC, https://perma.cc/CG2B-EYWY). "These contracts
are generally binary[;] the buyer may take a 'yes' position that the specified event will
take place whereby the seller implicitly takes the 'no' position." *KalshiEX LLC v. Mary
Jo Flaherty, et al.*, No. 25-cv-2152-ESK-MJS, 2025 WL 1218313, at *1 (D.N.J. Apr. 28,
2025) (citing *id.* at *1). The contract can be purchased or sold any time before its
expiration date for a specific value, and upon expiration, the seller will pay the buyer if
the event occurs. *Id.*

    The Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 *et seq.*, is "a comprehensive
regulatory structure to oversee the volatile and esoteric futures trading complex."
*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 355-56 (1982). The
CEA provides the Commodity Futures Trading Commission (the "CFTC"), subject to
certain exceptions, with "exclusive jurisdiction" with respect to "accounts, agreements . .
. , and transactions involving swaps or contracts of sale of a commodity for future
delivery," where such transactions are "traded or executed" in particular markets or
platforms, including a "contract market designated pursuant to section 7 of this title." 7
U.S.C. § 2(a)(1)(A). The section providing for such "exclusive jurisdiction" contains the
following savings clause:

> Except as hereinabove provided, nothing contained in this
> section shall (I) supersede or limit the jurisdiction at any time
> conferred on the Securities and Exchange Commission or

> other regulatory authorities under the laws of the United
> States or of any State, or (II) restrict the Securities and
> Exchange Commission and such other authorities from
> carrying out their duties and responsibilities in accordance
> with such laws. Nothing in this section shall supersede or limit
> the jurisdiction conferred on courts of the United States or any
> State.

7 U.S.C. § 2(a)(1)(A).

The statute was amended to govern "swaps" in 2010, pursuant to the Dodd-Frank Act. *See DTCC Data Repository (U.S.) LLC v. CFTC*, 25 F. Supp. 3d 9, 12 (D.D.C. 2014) (explaining that, "in the wake of the financial crisis," Congress amended the CEA and "established an oversight and reporting regime for swaps"); *Inv. Co. Inst. v. CFTC*, 891 F. Supp. 2d 162, 174 (D.D.C. 2012), *as amended* (Jan. 2, 2013), *aff'd*, 720 F.3d 370 (D.C. Cir. 2013) ("Congress, in Dodd-Frank, charged the CFTC with the task of illuminating previously dark markets in the complex derivative instruments at the heart of the [2008 financial] crisis known as swaps.") (cleaned up).

The CEA defines a "swap" as any agreement, contract or transaction that "provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). An event contract is considered an "excluded commodity," which the CEA defines as an "occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or level of a commodity) . . . that is (I) beyond the control of the parties to the relevant contract, agreement, or transaction; and (II) associated with a financial, commercial, or economic consequence." 7 U.S.C. § 1a(19)(iv).

An entity that wishes to be a designated contract market ("DCM") regulated under the CEA must apply to the CFTC for such designation. 7 U.S.C. § 2(e), 7(a). A DCM must comply with the "core principle[s]" set forth in 7 U.S.C. § 7, as well as the regulatory framework as set out in Part 38 of Title 17 of the U.S. Code, and "any requirement that the Commission may impose by rule or regulation pursuant to section 12a(5) of this title." 7 U.S.C. § 7(d)(1)(A)(ii). Once approved, a DCM may list agreements, contracts, transactions, or swaps on the exchange, but only if such instruments satisfy the requirements of 7 U.S.C. § 7a-2(c), entitled "New contracts, new rules, and rule amendments," and only if the DCM provides a written certification of such compliance, 7 U.S.C. § 7a-2(c)(1).

Kalshi "is a regulated exchange and prediction market where users can buy and sell event contracts." ECF No. 1 ¶ 45. The CFTC has certified Kalshi as a DCM. *Id.* Kalshi offers an exchange "where individual, retail, and institutional participants can hedge their risks on event-based outcomes." *Id.* ¶ 46. These "event contracts" relate "to an array of substantive areas such as climate, technology, health, crypto, popular culture, and economics." *Id.* ¶ 47. Among this array of areas, "Kalshi offers sports-event contracts." *Id.* ¶ 48.

Congress required that the Commission play an important role in deciding the types of financial instruments that could be traded on DCMs. For "a new contract or other instrument," approval by the Commission is required, although by statute the Commission "shall approve" a new event contract or other instrument unless the Commission concludes it violates the CEA or regulations. *Id.* § 7a-2(c)(5)(B). A similar rule applies to approval of a "new rule, or rule amendment," which is not at issue in this case. *Id.* § 7a-2(c)(5)(A).

But there is also a process for DCMs to avoid pre-approval if the DCM "self-certifies," in writing, that a new contract or other instrument complies with all applicable requirements. *Id.* § 7a-2(c)(1). That is the process Kalshi used for the sporting event contracts at issue here. When a DCM invokes the self-certification process for a new event contract, it must submit a "written certification that the new contract . . . complies with this chapter (including regulations under this chapter)." *Id.* The contracts are immediately effective unless and until the CFTC initiates review of any contract. *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.11(c).[1]

Although Congress required the Commission to approve new contracts if they comply with the CEA and applicable regulations, and allowed for self-certification, it expressed a concern that some "event contracts" could begin to be traded that would be "contrary to the public interest." *Id.* § 7a-2(c)(5)(C). So as part of the Dodd-Frank Act, Congress enacted a "Special rule for review and approval of event contracts and swaps contracts." *Id.* § 7a-2(c)(5)(C); Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010). That Special Rule requires a "public interest" review when it comes to event contracts that involve "(I) activity that is unlawful under any Federal or State law; (II) terrorism; (III) assassination; (IV) war; (V) gaming; or (IV) other similar activity determined by the Commission by rule or regulation, to be contrary to the public interest." *Id.* Congress considered contracts "based upon the occurrence, extent of an occurrence, or contingency" of those types of events—including "gaming" and "activity that is unlawful"—to require that additional

---

[1] The statute provides that a *rule* that has been self-certified does not become effective until 10 days after submission of the certification. 7 U.S.C. § 7a-2(c)(2). There is no statutory waiting period for new event contracts.

scrutiny. Congress then made clear that "[n]o agreement, contract, or transaction determined by the Commission to be contrary to the public interest under [§ 7a-2(c)(5)(C)(i)] may be listed or made available for clearing or trading on or through a registered entity." *Id.* § 7a-2(c)(5)(C)(ii). That public interest review does not supersede the self-certification process; a DCM may satisfy the Special Rule by self-certifying compliance. But in doing so the statute requires a DCM to certify that a new contract or rule is not "unlawful," does not involve terrorism, assassination, war or gaming, and is not otherwise "contrary to the public interest." That is what happened here: Although Kalshi could have requested pre-approval from the Commission regarding whether Kalshi could lawfully conduct sports betting on its platform, *id.* § 7a-2(c)(4)(A), instead on January 24, 2025, "Kalshi self-certified and began listing sports-event contracts on its exchange," allowing users to "place positions on which teams will advance in certain rounds of the NCAA College Basketball Championship or who will win the U.S. Open Golf Championship." ECF No. 1 ¶ 49.

On April 7, 2025, the Maryland Lottery and Gaming Control Commission (MLGCC) sent Kalshi a cease-and-desist letter directing Kalshi "to immediately cease and desist offering in Maryland its event contract . . . and any other contract or product that provides an investing opportunity based on predicting the outcome of any sporting league play or any sporting event." ECF No. 1-1 at 2. The MLGCC explained, "[u]nder Maryland law, a gaming activity is illegal unless it is expressly authorized by the Annotated Code of Maryland, Criminal Law Article ('Crim. Law'), Titles 12 and 13." *Id.* And "[s]ports wagering is an authorized gaming activity in Maryland that is legal only if it is offered and conducted as required by the State's Sports Wagering Law (State Government Article ("SG") § 9-1E-01, *et seq.*)." *Id.*

6

The MLGCC stated that event contracts based on the outcome of sporting events constitute "sports wagering," which under Maryland law is defined as "the business of accepting wagers on any sporting event by any system or method of wagering, including single-game bets, teaser bets, parlays, over-under, moneyline, pools, *exchange wagering*, in-game wagering, in-play bets, proposition bets, and straight bets." SG § 9-1E-01(j) (emphasis added). An exchange wager is "a wager in which a bettor wagers with or against another bettor through a sports wagering licensee." Code of Maryland Regulations ("COMAR") 36.10.01.02B(24). A "mobile sports wagering licensee" is defined as "a sports wagering licensee who is authorized to conduct and operate online sports wagering." SG § 9-1E-01(e). Because Kalshi was engaged in sports wagering, the MLGCC explained that to operate that aspect of its business in Maryland it would have to, among other things, obtain a "sports wagering license[]" and comply with all state laws that apply to such licensees, including with regard to data security and advertising, including a prohibition on advertising to "individuals who are prohibited from participating in sports wagering and other at-risk individuals." SG § 9-1E-03.

Kalshi does not dispute that it does not comply with those state laws. But it has filed this lawsuit, seeking a declaration that it need not comply with those laws because they have been preempted by the Commodity Exchange Act. Kalshi also filed a motion for a temporary restraining order and/or preliminary injunction, arguing that Kalshi is likely to succeed on the merits of its preemption claim. ECF No. 2. The parties jointly stipulated that Defendants "will refrain from seeking to enforce against Plaintiff any state laws referenced in the April 7 cease-and-desist letter pending the Court's disposition of Plaintiff's motion for a preliminary injunction." ECF No. 21 at 1. Defendants filed a response to the preliminary injunction motion on May 12, 2025, ECF

No. 28, and Kalshi filed a reply on May 19, 2025, ECF No. 29. The Court held a hearing on May 28, 2025 and ordered the parties to file supplemental briefing, which the parties then filed. ECF Nos. 36, 37, 62, 63. A number of Indian tribes and gaming associations also filed an amicus brief in this case. ECF No. 65.[2]

## II.    LEGAL STANDARD

To obtain a preliminary injunction, a plaintiff must establish four factors: (1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm absent relief; (3) that the balance of equities favors them; and (4) that an injunction is in the public interest. *Frazier v. Prince George's Cnty.*, 86 F.4th 537, 543 (4th Cir. 2023) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). A party seeking preliminary injunctive relief must satisfy all four factors. *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 347 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010). And a preliminary injunction, being an "extraordinary remedy," may

---

[2] The amicus brief was filed by the Indian Gaming Association, National Congress of American Indians, California Nations Indian Gaming Association, Arizona Indian Gaming Association, Oklahoma Indian Gaming Association, United South and Eastern Tribes Sovereignty Protection Fund, Tribal Alliance of Sovereign Indian Nations, Blue Lakes Rancheria, Chicken Ranch Rancheria of Me-Wuk Indians of California, Elk Valley Rancheria, Enterprise Rancheria of Maidu Indians of California, Guidiville Rancheria of California, Ho-Chunk Nation of Wisconsin, Jamul Indian Village of California, Kalispel Tribe of Indians, Karuk Tribe, Klamath Tribes, Lytton Rancheria of California, Middletown Rancheria of Pomo Indians of California, Morongo Band of Mission Indians, Pechanga Band of Indians, Penobscot Nation, Picayune Rancheria of Chukchansi Indians of California, Pueblo of Acoma, Puyallup Tribe, Redding Rancheria, Rincon Band of Luiseo Mission Indians, Santa Ynez Band of Chumash Mission Indians, Seminole Tribe of Florida, Shoalwater Bay Indian Tribe, Suquamish Indian Tribe of the Port Madison Reservation, Table Mountain Rancheria, White Earth Nation, and Yuhaaviatam of San Manuel Nation.

"only be awarded upon a clear showing that the plaintiff is entitled to such relief."

*Winter*, 555 U.S. at 22 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

### III.    LIKELIHOOD OF SUCCESS ON THE MERITS

Kalshi argues that it is likely to succeed on the merits of its claim because

Maryland's gaming laws are preempted by the CEA as applied to Kalshi's sports-event

contracts because Kalshi is regulated as a DCM. ECF No. 2 at 11-16. Defendants contend

that (1) the sporting event contracts at issue are not "swaps" within the meaning of the

CEA, and (2) even if they are covered by the CEA, the CEA does not preempt Maryland's

gambling laws that apply to sports wagers. ECF No. 28 at 16-32. The Court will assume

without deciding that Kalshi's sports-event contracts are in fact swaps. Nonetheless, for

the following reasons, Kalshi has not established a likelihood of success on the merits of

its claim that Maryland's laws regulating sports betting have been preempted by the

Commodity Exchange Act.

The Supremacy Clause provides that the Constitution and other federal laws

"shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any

state to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Congress therefore has

the power to preempt state law. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363,

372 (2000). There are three types of federal preemption: (1) express preemption, (2)

field preemption, and (3) conflict preemption. *Id.* "Congress may withdraw specified

powers from the States by enacting a statute containing an express preemption

provision." *Arizona*, 567 U.S. at 399 (citing *Chambers of Commerce of United States of

America v. Whiting*, 563 U.S. 582, 592 (2011)).

Kalshi does not contend that the CEA expressly preempts state law. Kalshi

instead relies principally on a field preemption theory. It argues that Congress, in

expanding the CEA to cover swaps traded on designated contract markets, has occupied that "field" such that when online sports wagers are offered by a company like Kalshi, as opposed to by online sportsbooks like FanDuel or DraftKings, they need not comply with state gaming laws. Kalshi alternatively argues that even if field preemption does not apply, the Court should construe Maryland's gaming laws to so thoroughly conflict with the CEA that they are conflict-preempted. "[T]he purpose of Congress is the ultimate touchstone in every preemption case." *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485 (1996). For the following reasons, Kalshi has not shown that when Congress enacted and amended the CEA it intended to preempt state gaming laws when sports wagers are made on a platform like Kalshi's.

### A.    Field Preemption

A party arguing that Congress has occupied an entire field of law must show that "Congress, acting within its proper authority, has determined" that all "conduct in [that field] . . . must be regulated by its exclusive governance." *Arizona*, 567 U.S. at 399. Field preemption applies only "[i]n rare cases," where "Congress 'legislated so comprehensively' in a particular field that it 'left no room for supplementary state legislation,'" *Kansas v. Garcia*, 589 U.S. 191, 208 (2020) (quoting *R.J. Reynolds Tobacco Co. v. Durham County*, 479 U.S. 130, 140 (1986)), or where "there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Arizona*, 567 U.S. at 399 (citing *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

There is a strong presumption against preemption. "In all pre-emption cases, and particularly in those in which Congress has 'legislated . . . in a field which the States have traditionally occupied,' . . . [courts] 'start with the assumption that the historic police

powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Medtronic*, 518 U.S. at 485.

Kalshi argues the presumption against preemption "does not apply to the field of regulating derivatives markets" because that is "'an area where there has been a history of significant federal presence.'" ECF No. 29 at 14 (quoting *PPL EnergyPlus, LLC v. Nazarian*, 753 F.3d 467, 477 (4th Cir. 2014)). That argument is wrong for two reasons. First, the Supreme Court has held that courts must "start with the assumption" that federal law does not preempt in "*all* pre-emption cases." *Medtronic,* 518 U.S. at 485 (emphasis added). Second, the question of whether the presumption "particularly" applies here (in the *Medtronic* Court's formulation) turns not on whether the federal statute can be framed as pertaining to an area of existing federal regulation, but rather whether the *state* law governs conduct that has historically been subject to state regulation (or subject to "the historic police powers of the States" as the *Medtronic* Court put it). *See Medtronic*, 555 U.S. at 564 n.3 ("Wyeth argues that the presumption against preemption should not apply to this case because the Federal Government has regulated drug labeling for more than a century. That argument misunderstands the principle: We rely on the presumption because respect for the States as 'independent sovereigns in our federal system' leads us to assume that 'Congress does not cavalierly pre-empt state-law causes of action.' *Medtronic*, 518 U.S. at 485. The presumption thus accounts for the historic presence of state law but does not rely on the absence of federal regulation.").

"It is well recognized that regulating gambling is at the core of the state's residual powers as a sovereign in our constitutional scheme." *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 302 (4th Cir. 2009). The courts and

Congress have long recognized states' authority to regulate gambling conducted within their borders. *See, e.g.*, *Ah Sin v. Wittman*, 198 U.S. 500, 505–06 (1905) ("The suppression of gambling is concededly within the police powers of a state."). Gambling has been recognized as a potentially harmful "vice activity," such that states have a recognized interest in reducing "the social costs associated with" it. *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 185 (1999); *see also Murphy*, 584 U.S. at 458–59 (describing history of state gambling laws). Kalshi does not seriously dispute this. *Compare* ECF No. 26 at 30 (citing various cases) *with* ECF No. 29 (responding to none of them).

Thus, the presumption against preemption applies, and thus the question presented is whether Kalshi has shown that one of Congress's "clear and manifest purpose[s]" when it enacted the Dodd-Frank Act was to preempt states' or tribes' authority to regulate gambling if a DCM were offer sports wagers on a DCM platform. Kalshi argues that Maryland's gaming laws are field-preempted as applied to Kalshi's sports-event contracts because of the statutory text, statutory purpose, the drafting history of the CEA, and the fact that there exists a "comprehensive" federal regulatory scheme for DCMs. ECF No. 2 at 11-15. There is no question that Congress had some field-preemptive intent when it enacted the CEA, and when it amended the statute pursuant to the Dodd-Frank Act in 2010. *See* ECF No. 26 at 17 (Defendants contrasting event contracts for sporting events with, for example, "purchases and sales of contracts for delivery at some future date of certain quantities of specified commodities at fixed prices," which "are the CEA's core concern") (quoting S. Rep. No. 93-1131, 1974 U.S.C.C.A.N. 5843, 5856 (1974)); CFTC Act of 1974 Committee Report, U.S. Senate Committee on Agriculture and Forestry, 93rd Cong., 2d Sess., at 11 (Nov. 15, 1974)

12

(conference report, cited by Kalshi, stating that "[u]nder the exclusive grant of jurisdiction," the CEA "would preempt the field insofar as futures regulation is concerned"). But that does not necessarily establish that the "field" that Congress intended to "occupy" included gambling. Kalshi's burden with respect to its field preemption claim is to establish that Congress clearly and manifestly intended to strip states of their authority to regulate gambling if the company offering such wagering opportunities has been approved to sponsor a designated contracts market for commodities trading. Kalshi has not established that Congress had such clear and manifest purpose.

The Court begins with the text of the CEA. As noted above, the statute grants the CFTC "exclusive jurisdiction . . . with respect to accounts, agreements . . . , and transactions" involving two types of instruments—"contracts of sale of a commodity for future delivery" and "swaps"—where such transactions are conducted on (a) "a contract market designated pursuant to section 7 of this title," (b) "a swap execution facility pursuant to section 7b-3 of this title," or (c) "any other board of trade, exchange, or market, and transactions subject to regulation by the Commission pursuant to section 23 of this title." 7 U.S.C. § 2(a)(1)(A). That "jurisdiction" provision goes on to contain the savings clause quoted above, which provides that "[e]xcept as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State, or (II) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws." *Id.*

Kalshi argues that Congress manifested a field-preemptive intent by granting the CFTC "exclusive jurisdiction" over, among other things, "swaps" traded on a "contract market designated pursuant to section 7," and by phrasing the savings clause as stating that Congress was not preempting the "jurisdiction" of "regulatory authorities under the laws of . . . any State" other than as "hereinabove provided." There is some force to this argument. The phrase "exclusive jurisdiction," which was added to the CEA in 1974, Pub. L. 93-463, 88 Stat. 1389 (H.R. 13113), Oct. 23, 1974, § 201, reflects some evidence of congressional intent to displace the authority of some state laws or regulatory authority. Congress's clearest intent in conferring "exclusive jurisdiction" on the CFTC with regard to commodities futures (and, since 2010, swaps[3]) was to make clear that as among *federal agencies*, the CFTC would have exclusive authority, rather than the SEC. As the Supreme Court has explained, the exclusive-jurisdiction provision was intended to "consolidate federal regulation of commodity futures trading in the Commission" and to "separate the functions of the [CFTC] from those of the [SEC] and other regulatory agencies." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 386–87 (1982). But Kalshi is surely correct that Congress in 1974 also conveyed some intent for the CEA to displace *some* state laws; a state presumably lacks authority to have a parallel regulatory regime for grain futures, the original commodity regulated under federal law, to take one example. *See Merrill Lynch*, 456 U.S. at 360-62 (describing the Grain Futures Act of 1922, which steered those transactions toward exchanges designated as a "contract market" and regulated by the Secretary of Agriculture).

---

[3] As noted above, the exclusive jurisdiction provision was amended to include swaps in 2010. Dodd-Frank Wall Street Reform And Consumer Protection Act, Pub. L 111-203, 124 Stat. 1376 (July 21, 2010).

The existence of *some* field-preemptive intent is confirmed by the portion of the savings clause Kalshi highlights, which states that "[e]xcept as hereinabove provided," nothing in the "exclusive jurisdiction" section "supersede[s] or limit[s] the jurisdiction . . . conferred on . . . regulatory authorities under . . . the laws of . . . any State." 7 U.S.C. § 2(a)(1)(A). As Kalshi points out, providing that state laws are not superseded or limited *other than* as "hereinabove provided" suggests that Congress understood that the "exclusive jurisdiction" provision had at least *some* preemptive effect with respect to state laws. It is theoretically possible that the reference to state law in the savings clause was included purely out of an abundance of caution. But courts presume that Congress does not include language for no reason. *Fischer v. United States*, 603 U.S. 480, 495-96 (2024). And the grain futures example confirms that Defendants cannot avoid the conclusion that the Commodity Exchange Act reflects a congressional intent to preempt at least some state laws.

Kalshi would have this Court end the analysis here. And that is where the two other district courts that have considered Kalshi's preemption claims, and held that field preemption likely applies (those cases also arose on motions by Kalshi for a preliminary injunction), ended their analysis. *KalshiEX, LLC v. Hendrick*, No. 2:25-cv-00575-APG-BNW, 2025 WL 1073495, at *6 (D. Nev. April 9, 2025); *KalshiEX LLC v. Flaherty*, No. 25-CV-02152-ESK-MJS, 2025 WL 1218313, at *5-*6 (D.N.J. Apr. 28, 2025).

But the fact that the CEA has some field-preemptive effect does not mean that the "field" Congress intended for the CEA to occupy includes state gambling laws, and specifically sports wagering laws. In assessing field preemption, courts must avoid "interpreting the scope of the preempted field too broadly." *Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680 (3d Cir. 2016); *see also Decohen v. Capital One, N.A.*,

703 F.3d 216, 224 (4th Cir. 2012) (holding that, despite broad federal laws governing banking, Congress "has not occupied the field with regard to debt cancellation agreements" and instead "le[ft] room for state regulation"). The question of whether the field that Congress intended the Commodity Exchange Act to "occupy" simply is not answered by the text of § 2. And where statutory text is ambiguous, courts turn to other tools of interpretation such as history, drafting, and purpose of the statute. *See, e.g.*, *Bostock v. Clayton County, Georgia*, 590 U.S. 644, 654 (2020) ("This Court normally interprets a statute in accord with the ordinary public meaning of its terms at the time of its enactment."); *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 493 (1987) ("Given that the Act itself does not speak directly to the issue, the Court must be guided by the goals and policies of the Act in determining whether it in fact pre-empts an action based on the law of an affected State."). Here, the structure, context and legislative history of the CEA do not support Kalshi's argument, let alone establish that Congress clearly and manifestly intended to preempt state sports-betting laws.[4]

---

[4] As noted above, one of the reasons Defendants argue the CEA does not preempt Maryland law with respect to event contracts for sporting events is that those instruments are not "swaps" within the meaning of the CEA. Specifically, Defendants argue that event contracts for sporting events are not "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated *with a potential financial, economic, or commercial consequence.*" 7 U.S.C. § 1a(47)(A)(ii) (emphasis added). As Defendants put it, "Kalshi's gaming devices do not involve the sporting event *itself*, but rather the *outcome* of the event, *i.e.*, which team will win the game," but who wins a game does not create a financial, economic or commercial consequence (other than for "the competitors themselves"), but rather the holding of the competition itself. ECF No. 26 at 19. And Kalshi itself has represented in separate litigation that "at least in general, contracts relating to *games* – again, activities conducted for diversion or amusement – are unlikely to serve any 'commercial or hedging interest.'" *Id.* (quoting Appellee's Br. at 45, *KalshiEX LLC v. CFTC*, No. 24-5205, 2024 WL 4802698, at *45 (D.C. Cir. Nov. 15, 2024)). Defendants also argue that

First, the statutory Special Rule in 7 U.S.C. § 7a-2(c) itself confirms that Congress intended for at least some state laws to operate alongside the CEA, not to be preempted by it. As discussed above, Congress expressly authorized the Commission to disallow event contracts that "involve . . . activity that is unlawful under . . . State law." 7 U.S.C. § 7a-2(c)(5)(C)(i). That plain text clearly reflects an affirmative intent to *preserve* state laws governing whether particular conduct is lawful or unlawful. The fact that Congress expressly authorized the Commission to prohibit particular categories of transactions as contrary to the public interest *based on the fact that the conduct at issue would violate state law* severely undercuts Kalshi's suggestion that Congress intended to displace all state laws that would otherwise apply to transactions that fall within the scope of the CEA. Where "a federal statute expressly incorporates state law," a "preemption analysis is inappropriate." *Power v. Arlington Hosp. Ass'n*, 42 F.3d 851, 864 (4th Cir. 1994). Congress leaves "room for supplementary state legislation" where it expressly relies on and incorporates state laws. *Kansas*, 589 U.S. at 208.

That point is aptly illustrated by the state statutes at issue here. Under Maryland law, it is unlawful to, among other things, conduct sports wagering business without an appropriate sports wagering license. Md. Code Ann., St. Gov., § 9-1E-03(b), § 9-1E-04(b)(6)(ii); Md. Code Ann., Crim. Law § 12-104. Those state statutes govern whether conducting sports betting in Maryland is lawful or unlawful. To be sure, the Commission

these contracts cannot constitute swaps because if they were, then any casino or bingo hall, etc., allowing wagers to be placed based on the outcome of an event would be offering swaps outside of a CFTC-designated exchange on "any other board of trade, exchange, or market." *See* 7 U.S.C. §§ 2(e), 6a(1). As noted above, the Court does not decide one way or the other whether Kalshi's sporting events contracts constitute swaps, because even if they do, Kalshi must comply with state laws that would otherwise apply to those transactions.

has not elected, at least to date, to prohibit events contracts (though it has considered

doing so, Event Contracts, 89 Fed. Reg. 48968 (proposed June 10, 2024) (to be codified

at 17 C.F.R. pt. 40)). But if Kalshi's preemption theory were correct, that would mean

those state laws are nullities when it comes to sports wagering contracts offered on a

DCM platform like Kalshi's. Insofar as the event contracts at issue constitute swaps

under the CEA, which the Court assumes without deciding as noted above, they violate

Maryland sports-wagering laws and thus constitute an "activity that is unlawful" under

state law. 7 U.S.C. § 7a-2(c)(5)(C)(i)(I). The distinct tension between Kalshi's theory and

the express language of the Special Rule confirms that Congress did not clearly and

manifestly intend to preempt state laws with respect to sports wagering.

Second, the CEA's express preemption clauses, 7 U.S.C. § 16(e)(2) and (h),

further confirm the absence of congressional intent to preempt state sports-betting laws.

In § 16(e)(2), Congress directly considered the scope of the field it considered itself to be

occupying for preemption purposes when it comes to "gaming." This is the express

preemption provision that currently applies:

> This chapter shall supersede and preempt the application of
> any State or local law that prohibits or regulates gaming . . . in
> the case of--
>> (A) an electronic trading facility excluded under
>> section 2(e) of this title; and
>> (B) an agreement, contract, or transaction that is
>> excluded from this chapter under section 2(c) or 2(f) of
>> this title or sections 27 to 27f of this title, or exempted
>> under section 6(c) of this title (regardless of whether
>> any such agreement, contract, or transaction is
>> otherwise subject to this chapter).

7 U.S.C. § 16(e)(2). Congress elected to expressly preempt *some* "State or local law[s]

that prohibit[] or regulate[] gaming"—specifically those cross-referenced in § 16(e)(2),

as well as state insurance laws to the extent they govern swaps. *Id*. § 16(h). Kalshi does not dispute that the Maryland laws it requests to be ruled preempted do not fall within § 16(e)(2) or (h). Kalshi does not contend it is an "electronic trading facility excluded under section 2(e) of this title," and the sports events contracts at issue here are not covered by the cross-referenced provisions in § 16(e)(2), which instead refer to section 2(c) (which covers agreements, contracts, and transactions in foreign currency, government securities, and certain other commodities), section 2(f) (which covers qualifying hybrid instruments that are predominantly securities), sections 27 to 27f (which covers banks and banking products), and section 6(c) (which exempts certain DCMs from regulation for public interest purposes).

Congress's decision to expressly preempt state gaming laws for certain transactions and state-insurance laws for swaps—compared to its silence as to all others—is strong evidence that Congress did not intend to regulate so comprehensively as to exclude all state law. *See Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517 (1992) ("Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted."); *see also Freightliner Corp. v. Myrick*, 514 U.S. 280, 288 (1995) (explaining that where a statute expressly defines its "the pre-emptive reach," that supports an "inference"—not a "rule"—that Congress did not impliedly preempt state laws that fall outside the express preemption provision).

Kalshi argues that the Court should not draw that inference from § 16(e)(2) because just above it, in § 16(e)(1)(C), Congress expressly disclaimed any intent to "supersede or preempt" the application of state law to entities that are "required to be registered or designated" with the CFTC but "fail or refuse" to do so. 7 U.S.C. § 16(e). Thus, Kalshi argues, § 16(e)(1) "preserves concurrent state regulation for commodities

and futures contracts traded *outside of DCMs*," thereby "not call[ing] into question the state's regulation of casinos or other gaming establishments, none of which are DCMs." ECF No. 2 at 12 (emphasis in original). But Kalshi reads far more into that provision than it deserves. That provision applies where a person is "required" to be registered or designated, *e.g.*, as a DCM, but "fail[s] or refuse[s]" to do so. 7 U.S.C. § 16(e)(1)(C). That is about recalcitrant exchanges that refuse to register with the CEA. It provides little if any guidance for whether Congress intended to supersede state gambling laws for transactions that are placed on contract markets that *are* registered, particularly because it is unclear whether Congress intended for § 16(e)(1)(C) to apply to swaps anyway. *See* 7 U.S.C. § 2(d) (noting that, aside from specific provisions not including § 16(e)(1)(C), the CEA does not apply to swaps).

   Third, although the savings clause in the exclusive-jurisdiction provision cuts both ways as discussed above, given the presumption against preemption, its ambiguity means that on balance it cuts against a finding of field preemption. A savings clause generally "negates the inference that Congress left no room for state causes of action." *Int'l Paper Co.*, 479 U.S. at 492.

   Fourth, as the Supreme Court has long recognized, states have strong interests in regulating gambling. *See, e.g.*, *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453 (2018) (holding that the federal Professional and Amateur Sports Protection Act's restriction on states' ability to regulate sports gambling violates the anticommandeering doctrine); *WV Ass'n of Club Owners*, 533 F.3d at 302; *Ah Sin*, 198 U.S. at 505-06. The presence of those state interests not only means the presumption against preemption applies, as discussed above; it also is relevant to the application of the field preemption standard itself. It is highly unlikely that Congress would have overridden state gambling

laws without at least some indication in the text and legislative history that it intended to do so.

Fifth, where courts have carefully focused on the *scope* of Congress's preemptive intent when enacting the exclusive-jurisdiction provision, they have held that that intent had limits. In *Effex Capital, LLC v. Nat'l Futures Ass'n*, for example, the Seventh Circuit held that Congress "did not manifest an intent to occupy completely the entire field of commodity futures regulation." 933 F.3d 882, 894 (7th Cir. 2019). In that case, that meant that the CEA preempted state laws only "[w]hen application of state law would directly affect trading on or the operation of a futures market." *Id.* (quoting *Am. Agric. Movement, Inc.*, 977 F.2d at 1156). And earlier, in *American Agriculture Movement*, the Seventh Circuit held that the "savings clause" was "designed to preserve in the futures trading context at least some state law causes of actions." 977 F.2d at 1155. There, that meant that, in the context of regulating DCMs, the CEA "did not manifest an intent to occupy completely the entire field of commodity futures regulation" and therefore it was not "impossible to comply with both state and federal law." *Effex Capital, LLC*, 933 F.3d at 882 (citing *Am. Agric. Movement, Inc.*, 977 F.2d at 1156).

Although *American Agriculture* arose before Congress added swaps to that provision in 2010, the Seventh Circuit emphasized that Congress did not intend for the Commodity Exchange Act to preempt every field of state law that would otherwise apply to transactions falling within the scope of the Act. *Id.*; *accord Kerr v. First Commodity Corp.*, 735 F.2d 281, 288 (8th Cir. 1984) ("Nothing in the Act deals expressly with the preemption question"). One district court, in reviewing the legislative history, observed that the savings clause was added to allay fears that the exclusive-jurisdiction provision "might oust the courts' jurisdiction over typical state law claims." *Patry v. Rosenthal &*

*Co.*, 534 F. Supp. 545, 548–49 (D. Kan. 1982). And the D.C. Circuit in *FTC v. Ken Roberts Co.*, although not addressing preemption of state law, considered whether the exclusive-jurisdiction provision applied to the regulation of "instructional materials that purport to teach would-be investors how to make money investing in the commodities and securities markets" such that the CFTC had exclusive federal regulatory authority (as opposed to concurrent with the FTC). 276 F.3d 583, 589 (D.C. Cir. 2001). The *Ken Roberts* court observed that "[o]n its face, § 2(a)(1)(A) confers exclusive jurisdiction to the CFTC over a limited, discrete set of items related to the making of futures contracts"; it was "certainly not obvious that the advertising at issue in this case fits in any of these categories." *Id.*

Sixth, when Congress enacted the exclusive-jurisdiction provision in 1974 as part of the Commodity Future Trading Commission Act, and when it expanded the provision to include swaps as part of the Dodd-Frank Act, sports betting constituted a federal crime unless expressly permitted under state law. In 1974 (indeed still today, as discussed below), the Wire Act criminalized engaging in "betting or wagering" businesses "us[ing] a wire communication facility" to transmit "bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest" where such wagering is illegal under state law. 18 U.S.C. § 1084(a)-(b). And in 2010, the Professional and Amateur Sports Protection Act (PASPA), which had been enacted in 1992, prohibited sports gambling when sponsored or promoted by a governmental entity, or by a person acting "pursuant to the law or compact of a governmental entity." 28 U.S.C.A. § 3702. It was not until 2018, when the Supreme Court issued its ruling in *Murphy* overruling PASPA, that states were permitted to legalize sports wagering within their boundaries. *Murphy*, 584 U.S. at 486. Therefore, when Congress enacted and

amended the CEA, it was highly unlikely to have intended to override state laws that regulate sports betting such as Maryland's gaming laws, because at those times it was already largely illegal federally to engage in sports gambling (under either the Wire Act in 1974 or PASPA in 2010).

Seventh, Kalshi's argument necessarily has consequences with respect to other federal laws that further confirm the implausibility of its field preemption theory. Interpreting the CEA to preempt state gambling laws when wagers are conducted on a DCM would necessarily mean that the CEA impliedly (albeit partially) overrides the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.* ("IGRA"), and § 1084 of the Wire Act, 18 U.S.C. § 1084(a)-(b). The IGRA provides a comprehensive regulatory framework for tribal governments to engage in gaming activity on their own lands. 25 U.S.C. § 2701(4); *see also* ECF No. 65 at 2-3 (tribes' amicus brief). The Wire Act similarly makes clear that "[w]hoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate . . . commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest . . . shall be fined under this title or imprisoned not more than two years, or both." 18 U.S.C. § 1084(a). The Supreme Court has made clear there is a "strong presumption that repeals by implication are disfavored and that Congress will specifically address preexisting law when it wishes to suspend its normal operations in a later statute." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (cleaned up). Kalshi's proposed statutory interpretation would necessarily entail at least a partial implied repeal of the IGRA and the Wire Act.

Eighth, the limited legislative history that exists from 2010 that bears on the scope of Congress's preemptive intent cuts against preemption. Senator Feinstein

23

expressed concern about "derivative contract[s]" being "used predominantly by speculators or participants not having a commercial or hedging interest," and so did not understand Dodd-Frank to authorize "gambling" contracts that "served no commercial purpose at all." 156 Cong. Rec. S5902, S5906-7 (daily ed. July 15, 2010) (Sen. Feinstein). Senator Lincoln opined that "an 'event contract' around sporting events" would "not serve any real commercial purpose," but instead "would be used solely for gambling." 156 Cong. Rec. S5902-01, S5907 (July 15, 2010) (statement of Senator Lincoln). To be sure, those statements bear most directly on whether the event contracts at issue constitute swaps within the meaning of the CEA—which this Court does not decide. And isolated statements by particular legislators have limited evidentiary value when it comes to the meaning of a statute. *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 385 (2012). But those statements also reflect concern about "gambling" occurring on DCMs. That contemporaneously expressed concern makes it even less likely that Congress intended for Dodd-Frank to render obsolete state laws limiting or regulating gambling for transactions that Congress brought within the purview of the CEA pursuant to Dodd-Frank.[5]

Field preemption is a high standard, and the presumption against federal preemption is especially strong "when Congress has legislated in a field traditionally occupied by the States." *Altria Grp.*, 555 U.S. at 77. "In such cases, "[c]onsideration

---

[5] On the legislative history front, Kalshi points to a 1974 Senate report and statements by two then-senators reflecting the "deletion of a CEA provision which appeared to preserve the states' authority over futures trading." *Am. Agric. Movement*, 977 F.2d at 1156; *see also* ECF No. 2 at 13. But there is no question that the CEA has *some* preemptive effect; evidence of *that* legislative intent does not help determine whether Congress intended the scope of that preemptive to encompass state gambling laws.

under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law." *Just Puppies, Inc. v. Brown*, 123 F.4th 652, 661 (4th Cir. 2024) (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)). Field preemption applies only in the "rare case[]" when "Congress has legislated so comprehensively that it has left no room for supplementary state legislation." *Id.* (quoting *R.J. Reynolds Tobacco Co. v. Durham Cnty.*, 479 U.S. 130, 140 (1986). Here, the weight of the evidence strongly confirms that Congress did not intend for Dodd-Frank to constitute legislation not only legalizing sports betting nationwide, but displacing states' authority to regulate it, including when such betting takes place on a website of a company that happens to have been designated as a commodity futures DCM. And even if the evidence were in equipoise (which it is not), the presumption against preemption would require rejecting Kalshi's field preemption theory. In short, Kalshi has not shown a likelihood of success on the merits that the CEA has the effect of field-preempting the regulation of sports-event contracts that are traded on DCMs.

### B.    Conflict Preemption

Kalshi next argues that even if field preemption does not apply, Maryland's gaming laws are preempted with respect to sports-event contracts on Kalshi's DCM platform as a matter of conflict preemption. Unlike field preemption, conflict preemption exists when the state laws at issue conflict with federal laws, such as where "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963), or where the state law at issue "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the

federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). Assessing conflict preemption requires "a two-step process of first ascertaining the construction of the two statutes and then determining the constitutional question [of] whether they are in conflict." *H & R Block Eastern Enterprises, Inc. v. Raskin*, 591 F.3d 718, 723 (4th Cir. 2010) (quoting *Chi & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 317 (1981)).

Kalshi argues that Maryland's gaming laws are "conflict-preempted as applied to Kalshi because they 'stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress' as evidenced in the CEA," ECF No. 2 at 15 (quoting *Hines*, 312 U.S. at 67), and "undermine the intended purpose and natural effect of the federal scheme for regulating CFTC-designated exchanges," *id.* (citing *Crosby*, 530 U.S. at 373), in four ways.

*First*, Kalshi argues that because Congress's purpose in enacting the 1974 amendments was to bring the futures market under a uniform set of regulations, the MLGCC's actions and enforcement of Maryland's gaming laws "clearly conflict with Congress's goal to avoid subjecting regulated exchanges to multiple conflicting legal regimes." ECF No. 2 at 16. For the reasons the Court has already explained above as to why Kalshi has failed to show that field preemption applies to this case, *see* § III.A, *supra*, Kalshi has failed to show that Congress intended for the CEA to *completely preclude* any state's gaming laws from being applied to DCMs.

*Second*, Kalshi argues that subjecting DCMs to Maryland's gaming laws would lead to "the carefully calibrated federal enforcement scheme [being] displaced by a blunt application of mandatory state criminal penalties." ECF No. 2 at 17. Kalshi primarily cites *Crosby* in support of its argument, arguing that, in *Crosby*, the Supreme Court held

26

that conflict preemption applied because the state's regulatory scheme undermined Congress's "delegation of effective discretion" to the executive. *See Crosby*, 530 U.S. at 373-74. Kalshi argues that, similarly, Congress "gave the CFTC a variety of tools for enforcing federal law against DCMs and entrusted the CFTC with discretion to pursue the penalties it deems most appropriate." ECF No. 2 at 17. But in *Crosby*, the Court was dealing with a federal statute regulating sanctions towards Burma, a matter of national security as to which there is a uniquely federal interest. That bears little resemblance to gambling, which states have a strong interest in regulating, as explained above. Specifically, the Court in *Crosby* noted that the state statute at issue "compromise[s] the very capacity of the President to speak for the Nation with one voice in dealing with other governments." 530 U.S. at 381. Here, as explained above, *see* § III.A, *supra*, the regulation of gambling is precisely the kind of area of law that has been traditionally considered to be within the purview of state regulatory authority.

*Third*, Kalshi argues that "the CFTC has already authorized Kalshi's event contracts by declining to restrict them after Kalshi self-certified them." ECF No. 2 at 18. Therefore, Kalshi argues, because "the MLGCC now claims the authority to regulate Kalshi based on its assessment of state public policy," this is "in direct conflict with the CFTC's evaluation of the public interest." *Id.* But as MLGCC correctly points out, Congress was concerned with preempting only "incompatible state laws." *See* 120 Cong. Rec. 30, 464 (Sep. 9, 1974) (statement of Senator Curtis noting that the Act would only preempt state law if it "were contrary to or inconsistent with Federal law"). Kalshi has not demonstrated how Maryland's laws would either conflict or stand as an obstacle to achieving the purposes of the CEA. For example, Kalshi could simply obtain a mobile sports wager license in Maryland, while still being able to comply with federal regulatory

requirements imposed by the CEA and CFTC. Kalshi has not shown how obtaining a license in Maryland and otherwise complying with Maryland law would prevent it from complying with federal law. Maryland law also requires Kalshi to ensure there are age verification procedures for its online sports wagering platform, *see* SG § 9-1E-11; Kalshi has not shown it would be unable to comply with that requirement and also still comply with the requirements of the CEA.

*Fourth*, Kalshi argues that "the MLGCC's demands conflict with the CFTC Core Principles on which Kalshi's designation as a CFTC-approved market depends" because Core Principle 2 requires Kalshi to "provide its members, persons with trading privileges, and independent software vendors with *impartial access* to its markets and services." ECF No. 2 at 18 (citing 17 C.F.R. §§ 38.150, 38.151(b)) (emphasis in original). Kalshi argues that MLGCC's position that Kalshi must comply with Maryland law has the effect of threatening to cut off Maryland residents from accessing Kalshi's platform.

This last argument fails because the CFTC's Core Principles and Maryland's gaming laws work in tandem. The CEA and the CFTC's Core Principles seek to address the efficient functioning of the derivatives and futures markets; Maryland's gaming laws are focused on protecting the public from potential gambling issues. ECF No. 63 at 15-16. For example, the Core Principles focus on matters such as conflicts of interest, whereas Maryland's gaming statutes, for example, prohibit wagers that cannot be made impartially or prohibiting licensees from preying on persons with gambling addictions. To the extent Kalshi is arguing that Maryland's gaming laws prevent it from complying with the impartial access principle by not allowing it to offer sports-event contracts to Marylanders unless it were to obtain a license, the Court rejects that argument. Kalshi's point is not a basis for holding that conflict preemption exists and that Maryland's laws

are preempted simply because *not* obtaining a license limits Kalshi's geographical access. It is Kalshi's desire not to comply with Maryland law and presumably incur some additional compliance costs—not the existence of Maryland consumer protection laws themselves—that creates the situation Kalshi professes to worry about. So long as Kalshi obtains a license and complies with Maryland sports gambling laws, those laws would not pose an obstacle to Kalshi making the sports gambling portion of its platform available to users in Maryland.

For these reasons, Kalshi has not shown that compliance with Maryland law and the CEA is an "impossibility," *Florida Lime*, 373 U.S. at 143, or that Maryland's gaming laws stand as an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines*, 312 U.S. at 67. Accordingly, it has not shown a likelihood of success on its conflict-preemption theory.

## IV.    CONCLUSION

A party seeking a preliminary injunction must satisfy all four *Winter* elements. *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 211 (4th Cir. 2019). Because Plaintiff has not shown a likelihood of success on the merits, the Court does not reach the questions of whether Plaintiff has shown that it would suffer irreparable harm in the absence of an injunction or whether the balance of equities or public interest would weigh in favor of or against a preliminary injunction. *Viktus v. Blinken*, 79 F.4th 352, 361-62 (4th Cir. 2023) ("a district court is entitled to deny preliminary injunctive relief on the failure of any single *Winter* factor, without fully evaluating the remaining factors.").

For the foregoing reasons, because Kalshi has failed to show it has a likelihood of success on the merits, Kalshi's motion for a preliminary injunction (ECF No. 2) is DENIED. A separate order follows.


Date:  August 1, 2025                                        _____/s/_____
                                                                           Adam B. Abelson
                                                                           United States District Judge